IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTRAL VALLEY CHRYSLER VALLEY JEEP, INC., et al.,<br><br>Plaintiff,<br><br>vs.<br><br>CATHERINE E. WITHERSPOON,<br><br>Defendants.<br>_____ / | CASE NO. **CV-F-04-6663 REC LJO**<br><br>**ORDER ON DEFENDANT'S AND DEFENDANT INTERVENORS' MOTION TO COMPEL DOCUMENTS** (Doc 241) |

Defendant Catherine Witherspoon and Defendant Intervenors Sierra Club, Natural Resources Defense Council and Environmental Defense (collectively "defendants") move to compel plaintiffs General Motors Corporation ("GM"), DaimlerChrysler ("DCC"), and Alliance of Automobile Manufacturers ("AAM") (collectively, "plaintiffs") to produce documents. The disagreement concerns plaintiffs' response to Defendants' Second Set of Requests for Production of Documents requesting documents about global warming. On June 16, 2006, defendants filed their notice of motion and on July 3, 2006, the parties filed a joint statement re discovery disagreement pursuant to Local Rule 37-251. The matter came on regularly for hearing on July 7, 2006 in Department 8 of the above-entitled court. Plaintiffs appeared by telephone by counsel Timothy Jones, Andrew Clubok, Stuart Drake and Michael Scoville. Defendants appeared by telephone by counsel Ellen Peter, Linda Berg, Matthew Pawa, David Bookbinder, and Benjamin Krass. Having considered the moving and opposition arguments in the joint statement, and the exhibits attached thereto, as well as the arguments of counsel and the Court's file, the Court issues the following order.

**FACTUAL OVERVIEW**

The First Amended Complaint ("FAC") alleges that it is an action for declaratory and injunctive relief under the Supremacy Clause in Article VI of the United States Constitution and 42 U.S.C. § 1983. The FAC challenges the requirements of A.B. 1493, codified at California Health and Safety Code § 43018.5, and the regulation proposed by the California Air Resources Board ("CARB") set forth in Resolution No. 04-28, dated September 24, 2004. The FAC alleges that CARB has interpreted the statute to require the adoption and enforcement of rules to limit the release of carbon dioxide from new motor vehicles sold in California beginning in the 2009 model year, which starts in calendar year 2008.

The FAC alleges the following claims for declaratory and injunctive relief:

1. Count I - Preemption under the Energy Policy and Conservation Act of 1975 (EPCA), 49 U.S.C. §§ 32902-32919, specifically Section 32919(a).
2. Count II - Preemption under § 209(a) of the Federal Clean Air Act, 42 U.S.C. § 7543(a).
3. Count III - Preemption under the foreign policy of the United States and the foreign affairs powers of the Federal Government.
4. Count IV - Violation of the Dormant Commerce Clause of the United States Constitution.
5. Count V - Violation of the Sherman Act, 15 U.S.C. § 1.

Defendants served the Second Set of Document Requests upon GM, DCC and AAM on April 13, 2006. Plaintiffs served their responses on May 16, 2006. The discovery at issue relates primarily to the science of global warming, the vehicle manufacturers' knowledge of the problem of global warming, and the vehicle manufacturers' domestic and foreign affairs activities with respect to the issue of global warming. Defendants objected to the requests in the Second Set of Document Requests on the grounds that the requests are overbroad, unduly burdensome, and in no way are "reasonably calculated to lead to the discovery of admissible evidence" regarding any claim or defense in this litigation, among other objections.[1] Fed. R. Civ. P. 26(b).

---

[1] **The Requests for Production of Documents** at issue are: Request no 8, 9, 10, 11, 12, 13, 14.

GM Request no 15/DCC-AAM Request no 14; GM Request no 16/DDD-AAM Request no 15; GM Request no

2

**OVERVIEW OF DEFENDANTS' MOVING ARGUMENTS**

The issues involving global warming all relate directly to contested issues of fact with respect to three legal claims in this case, i.e., the Clean Air Act ("CAA") preemption claim (Count II), the foreign policy and foreign affairs preemption claim (Count III), and the Dormant Commerce Clause claim (Count IV).

**Relevance of Global Warming Science Discovery**

The science of global warming is directly contested in both the Clean Air Act issue of whether there are "compelling and extraordinary conditions" and the Commerce Clause issue of the "benefits" of the CARB regulation in addressing global warming. See FAC at ¶ 111 ("A.B. 1493 rule will not reduce global warming in California"); id. at ¶ 136 ("The regulation adopted in Resolution 04-28 provides no local environmental benefit, or insubstantial local benefits at best."); AIAM Complaint at ¶ 46 ("Carbon dioxide does not cause localized environmental impacts").

By their discovery at issue here, Defendants seek to: (1) demonstrate that the vehicle manufacturers' own documents demonstrate the severity of the global warming problem, and (2) to cross examine the vehicle manufacturers' experts with those documents.

**Relevance of Vehicle Manufacturers' Knowledge of Global Warming**

The issue of what the vehicle manufacturers knew about global warming and when they knew it is at issue in the "burdens" analysis under the Commerce Clause.

Defendants submit it is fair game to defend against the burden of the regulation by showing that the manufacturers had many years of notice and thus made any alleged burden much heavier by not taking a head start. See, e.g., *Transcontinental GasPipeline Corp. v. State Oil & Gas Bd.*, 457 So.2d 1298, 1322 (Miss. 1984) (party failed to establish Commerce Clause burden in challenge to state rule governing natural gas extraction because should have known of the state law and it "was certainly aware

---

20/DCC-AAM Request no 19; GM Request no 22/DCC-AAM Request no 21; GM Request no 22/DCC-AAM Request no 21 (*numbering is duplicated*).

GM Request no 25/DCC Request no 24; GM Request no 26/DCC Request no 25/AAM Request no. 24; GM Request no 27/DCC Request no 26/AAM Request no. 25; GM Request no 28/DCC Request no 27/AAM Request no. 26; GM Request no 29/DCC Request no 28/AAM Request no. 27; GM Request no 30/DCC Request no 29/AAM Request no. 30. All Requests involve documents pertaining the global warming. The Court elects not to recite the text of each Request because plaintiffs' objections are uniformly resolved.

of the drainage problem inherent in natural gas production when there are two or more wells producing from a common source of supply"), *rev'd on other grounds*, 474 U.S. 409 (1986).

The manufacturers are not even willing to produce documents from within the last five years or even the last five months.

The manufacturers also suggest that the burden upon them in producing and marketing vehicles is different from the burden on interstate commerce. But in this case the alleged burden on interstate commerce arises from the alleged burden on the vehicle manufacturers as national manufacturers who must produce and market their motor vehicles for all fifty states. See, e.g., FAC at ¶ 82.  The present economic burdens should not be written off but that they should be evaluated in light of the actual knowledge of the plaintiff in foreseeing the very need to tackle the problem at issue.

**Dispute as to Timeframe of Requests**

Plaintiffs also seek to limit improperly the timeframe of the Requests. Defendants requested documents from January 1, 1990 to present.  It is certainly relevant whether Plaintiffs knew enough about global warming and its impacts in the 1990s to begin making technological changes to their motor vehicles to reduce their emissions of greenhouse gases.  The First Assessment Report of the Intergovernmental Panel on Climate Change was issued in 1990. The Kyoto Protocol was negotiated and signed during the 1990s and this is when the vehicle manufacturers worked hard to convince the public, via groups like the GCC and the climate skeptics, that measures like the Protocol were unnecessary and harmful. Thus, the manufacturers' 1990s documents are likely to contain the internal debate and discussion within the corporations in which some officials and employees would have recognized the validity of the science of global warming and argued against the tactics of the GCC and the use of the climate skeptics.

**Vehicle Manufacturers' Desire to Prevent Public Disclosure**

The vehicle manufacturers have requested the Defendants agree to keep the contents of the documents relating to global warming science and the manufacturers' conduct regarding global warming non-public.  Defendants are unwilling to re-negotiate the protective order in this case.

## OVERVIEW OF PLAINTIFFS' OPPOSITION ARGUMENTS

This case is about the A.B. 1493 Regulations. In particular, it is about the differences between what those regulations require and what federal law requires; it is about whether the regulations are merely disguised fuel economy standards or (are "related" to such standards); it is about the burdens those regulations impose on interstate commerce, burdens which are excessive by comparison to their local benefits; and it is about the obstacles those regulations create to the United States' pursuit of a uniform and effective foreign policy. This case is not about what the auto-manufacturer plaintiffs thought, knew or read in the past about global warming, or even what they think, know or are reading now. Nor is it a case about "GLOBAL WARMING".  CARB has already admitted during its rulemaking that the A.B. 1493 Regulations' "contribution to a reduction in global warming . . . will be small" and therefore did not even attempt to justify the rule by any such alleged effect.

Although Defendants have retained nine separate experts on the general subject of "global warming," (which is legally irrelevant), none of them appear to offer any opinion on the actual alleged impact that the challenged regulations would have.  Defendants have propounded over eighty separate requests for production of documents, not counting subparts, to which Plaintiffs have produced over 1.5 million pages.

Defendants require plaintiffs to produce any and all documents in their possession relating to the causes and impacts of global warming, publicly available scientific research regarding global warming, and a host of other topics concerning global warming and climate change. To put it bluntly, these requests are overbroad, unduly burdensome, and in no way "reasonably calculated to lead to the discovery of admissible evidence" regarding any claim or defense in this litigation. Fed. R. Civ. P. 26(b).  The relevant subject in this case, which is the concrete impact of the A.B. 1493 Regulation.

**Defendants' Requests Are Irrelevant To The Dormant Commerce Clause Claim**

In evaluating plaintiffs' Dormant Commerce Clause challenge, the court must "examine[] whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *S.D. Myers, Inc. v. City & County of San Francisco*, 253 F.3d 461, 466

(9th Cir. 2001). To assess the burdens the A.B. 1493 regulations impose on interstate commerce, the court must compare the costs of compliance with those regulations to the costs of compliance with federal regulations (including the CAFÉ regime administered by NHTSA under the authority of EPCA), and assess the concrete effects that this cost differential will create in the automobile industry and in other sectors of the economy in the future. There is no legal basis that with a general knowledge of global warming and scientific research regarding that topic, plaintiffs had some sort of duty to prepare for regulations changing emissions.

In this case, plaintiffs complain of a burden on interstate commerce if the industry is required to reconstitute their fleets and manufacture entirely different vehicles from those required under federal law in order to obtain regulatory permission to sell automobiles in California.

Defendant's and Defendant-Intervenors' interest in engaging the plaintiffs on the topic of the concrete effects of the A.B. 1493 Regulation and the actual state of global warming today is more than adequately addressed by the opportunity to review Plaintiffs' expert reports on those subjects, to depose and subsequently cross-examine Plaintiffs' experts.

**Defendants' Requests Are Irrelevant To The Clean Air Act Claim**

The relevant topic is what is actually occurring in the atmosphere now, not what plaintiffs thought might be occurring in the past or even what they think is occurring at the moment. There too, the avenues of reviewing plaintiffs' expert reports, deposing and cross-examining plaintiffs' experts, submitting their own expert reports are sufficient.

**Defendants Do Not Need Access To Global Warming Documents In Order To Cross-Examine Plaintiffs' Experts**

There is a vast amount of publicly available literature regarding global warming. This is clearly an instance, in the words of Rule 26(b), where "the discovery sought is . . . obtainable from some other source that is more convenient, less burdensome, or less expensive" and also where "the burden or expense of the proposed discovery outweighs its likely benefit." There is only rank speculation for defendants to believe that any documents in plaintiffs' possession would have any value in impeaching plaintiffs' experts.

One of plaintiffs' experts, cited to by defendants, Mr. Austin takes as the starting point of his

6

analysis the estimate of the United Nations Intergovernmental Panel on Climate Change on the level of global warming over the past 100 years, and then assumes that all of that warming is due to $CO_2$ emissions. May 2, 2006 Expert Report of Thomas Austin (Exh. H) at 60. Even with such a baseline, Mr. Austin's results show that the A.B. 1493 Regulation will have a negligible impact on global warming.

**Defendants' Request For Global Warming Documents Is Motivated By An Improper Purpose**

Plaintiffs argue they are concerned that the true motivation for the quest for such documents is not to fish for supposed "admissions" of impact, but rather to seek support for press releases that accuse plaintiffs of having known about global warming but having not done enough about it, all in an attempt to embarrass plaintiffs into dropping their lawsuit.

The only legally relevant factual issue in this case relating to "Global Warming" is the concrete issue of what impact, if any, *the regulations* being challenged here will have. Plaintiffs believe that issue was conceded by Defendants before the case began (i.e. by acknowledging in the rulemaking docket that the regulations are not based upon any alleged impact), and further conceded (at least impliedly) by Defendants' experts failure to allege any impact despite the multitude of expert reports they submitted on the general topic of "Global Warming."

## ANALYSIS & DISCUSSION

**Relevance Standards**

In support of their opposition, Plaintiffs rely on their objection that the documents requests are not relevant to any claim. Plaintiffs do not argue the other objections made in response to the Request for Production of Documents, such as attorney client privilege.

Fed.R.Evid.401 defines "relevant evidence" as evidence having any tendency to make existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevance requires only that the evidence have "any" tendency to prove or disprove "any" consequential fact. This test incorporates two separate components:

1. *Logical Relevance*: The evidence must have some tendency, however, slight, to make any fact more or less probable, i.e., is the evidence probative – does it tend to prove or disprove a fact?

7

2. *Legal Relevance*:   The evidence must relate to a fact "of consequence" to the case, i.e., will the "fact" that the evidence is offered to establish help in determining some issue in the case?  2 Jones & Rosen, *Federal Civil Trial and Evidence*, §8:100-114, Evidence (2005).

If the inference to be drawn from the evidence is the result of speculation or conjecture, the underlying evidence is not relevant. *See Engstrand v. Pioneer Hi-Bred Int'l* (S.D. Iowa 1996) 946 F.Supp. 1390, 1396, *aff'd* 112 F.3d 513 (8th Cir. 1997).  "[T]he standard of relevancy is not so liberal as to allow a party to . . . explore matter which does not presently appear germane on the theory that it might conceivably become so." *Food Lion v. United Food & Comm'l Workers Union,* 103 F.3d 1007, 1012-1013 (D.C. Cir. 1997)(internal quotes omitted).

**Relevant only to the Dormant Commerce Clause Claim**

Defendants argue that the requests for production of documents are relevant to three claims in the FAC: the Clear Air Act claim (Count II), the foreign policy claim (Count III), and the Dormant Commerce Clause claim.

The Clean Air Act claim invokes preemption of the state regulation by the federal Clean Air Act.  Defendants did not argue, nor is it in any way obvious, how past knowledge of global warming would be relevant the preemption issue.  *International Paper Co. v. Ouellette*, 479 U.S. 481, 494, 107 S.Ct. 805 (1987) (Even where federal and state statutes have a common goal, a state law will be preempted "if it interferes with the methods by which the federal statute was designed to reach this goal.")  Similarly, defendants did not argue, and it is not obvious, how past knowledge of global warming would be relevant to the preemption under the foreign policy claim.

The Court finds, based on the pleadings and argument, that the only claim to which the discovery may possibly be relevant is the Dormant Commerce Clause claim.

**Overview of the Dormant Commerce Clause**

Pursuant to the Commerce Clause, no State may attempt to isolate itself from a problem common to the several States by raising barriers to the free flow of interstate trade. *Chemical Waste Management, Inc. v. Hunt*, 504 U.S. 334, 339-340, 112 S.Ct. 2009, 2012 - 2013 (1992).  Generally, Commerce Clause claims are brought against a state law or regulation. "In order to establish a claim under the so-called dormant Commerce Clause, [plaintiffs] must show that the state law or

regulation in question penalizes interstate commerce, and does so without sufficient economic justification." *National Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 857 (9th Cir.), *amended on denial of reh'g en banc*, 312 F.3d 416 (2002). *United Egg Producers v. Department of Agric.*, 77 F.3d 567, 569-70 (1st Cir.1996) ("The Supreme Court has interpreted this affirmative grant of authority to Congress as also establishing what has come to be called the Dormant Commerce Clause--a self-executing limitation on state authority to enact laws imposing substantial burdens on interstate commerce even in the absence of Congressional action.").

The Supreme Court has held that the first step in analyzing any law subject to judicial scrutiny under the Dormant Commerce Clause is to determine whether it "regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce." *Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727 (1979).  In contrast, nondiscriminatory regulations that have only "incidental" effects on interstate commerce are valid unless "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844 (1970) ("Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.").  "In reviewing challenges to local regulations under the Commerce Clause, we follow a two-tiered approach: [1] When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. [2] When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits."  *S.D. Myers, Inc. v. City and County of San Francisco*, 253 F.3d 461, 466 (9th Cir. 2001).

**"Burden" v. "Benefits Under the Dormant Commerce Clause**

Proof of the "burden" under the Dormant Commerce Clause frames the relevancy of the sought after discovery at issue in the motion to compel.

Plaintiffs' challenge to the regulations is a second tier challenge. The party must show that

9

the burden the regulation imposes on interstate commerce is "clearly excessive in relation to the putative local benefits." Under *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844 (1970), there is a balancing approach: "[i]f a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved ..." *See also Alaska Airlines, Inc. v. City of Long Beach*, 951 F.2d 977, 983 (9th Cir.1991) ("For a facially neutral statute to violate the commerce clause, the burdens of the statute must so outweigh the putative benefits as to make the statute unreasonable or irrational."). The burden is shown in terms of costs. The Commerce Clause is concerned with the free flow of goods and services through the several states; it is the economic interest in being free from trade barriers that the clause protects. *S.D. Myers, Inc. v. City and County of San Francisco*, 253 F.3d at 471.

**Foreseeability**

Defendants argue that plaintiffs' knowledge of global warming is at issue in the "burden" analysis of the Dormant Commerce Clause. Defendants argue that plaintiffs should have foreseen the emissions regulation in light of their knowledge of global warming and the effects thereon from carbon dioxide. Defendants argue that "forseeability" has been held to be relevant to the Commerce Clause analysis.

There is a line of cases which decide the Dormant Commerce Clause on the "foreseeability" of the challenged action. Defendants rely on *Transcontinental Gas Pipeline Corp. v. State Oil & Gas Bad,* 457 So.2d 1298, 1322 (Miss 1984), *rev'd on other grounds*, 474 U.S. 409 (1986); *Commonwealth Edison Co. v. United States*, 271 F.3d 1327 (Fed. Cir. 2001), *cert. denied*, 535 U.S. 1096 (2002).

These cases, however, are distinguishable because they deal with contractual relationships - between the regulating agency and the party in commerce or between two parties challenging the regulation. In *Transcontinental Gas Pipeline Corp. v. State Oil and Gas Bd.*, 457 So.2d 1298, 1322 (Miss 1984), *rev'd on other grounds*, 474 U.S. 409 (1986), noncontract gas producers and owners instituted proceedings to require an interstate pipeline company to comply with State Oil and Gas Board regulation requiring it to take gas from wells producing from a common pool. The state court

held that the regulation did not constitute an impermissible burden on interstate commerce. The state court found the only burden arose from the contract:

> "The fundamental flaw in Transco's reasoning on the burden point is that it seems to be talking much more about a burden upon Transco than a burden upon interstate commerce. The burden upon Transco appears traceable to its <u>contract</u> with Getty, not to [the regulation]. That contract is one Transco freely and voluntarily entered with Getty. It is hard to see how a ratable take rule or order could be said to generate an unreasonable burden on interstate commerce when the only thing requiring Transco (or any other interstate pipeline) to take at all, ratably or otherwise, is its own contract." (457 So.2d at 1322)(emphasis added.)

The state court said "[i]t is not now and never has been the function of [the judiciary] to relieve a party to a freely negotiated contract of the burdens of a provision which becomes more onerous than had originally been anticipated." *Transcontinental Gas Pipeline Corp. v. State Oil and Gas Bd. of Mississippi*, 457 So.2d at 1352. On appeal, the Supreme Court's decision rested on preemption, not the Dormant Commerce Clause, and found that a Mississippi regulation requiring an interstate pipeline company to purchase gas ratably from all owners in a common gas pool was unconstitutional as having been preempted by the federal law.

The other case relied upon by defendants, *Commonwealth Edison Co. v. United States*, was not a Dormant Commerce Clause case, but a Due Process/Takings case. It dealt with the foreseeability of imposition of clean up costs for the plaintiffs' use of uranium processing facility. The Court found the liability for remediation costs reasonably expected in light of common law nuisance and strict liability.

The last case, tangentially cited by defendants, is *Chrysler Corp v. Kolosso Auto Sales*, Inc., 148 F.3d 892, 897 (7th Cir. 1998), *cert denied*, 525 U.S. 1177 (1999). The case also did not deal with the Dormant Commerce Clause, but was one under the Contracts Clause. In *Chrysler*, the court upheld as constitutional a Wisconsin statute that prohibited an automobile manufacturer from objecting to a dealer's relocation without good cause. Wisconsin passed a law, applicable to pre-existing contracts, that prohibited a manufacturer from objecting to a dealer's relocation unless a state agency determined that there was good cause for the objection. Chrysler brought suit to have the new law declared unconstitutional as an impairment upon contracts. Upholding the District

Court's decision, the appellate court reasoned that the statute did not impair the contract between Chrysler and its dealers because the state had already regulated the relationships between automobile manufacturers and dealers by prohibiting termination "unfairly, without due regard to the equities or without just provocation." The court stated "a contractual obligation is not impaired within the meaning that the modern cases impress upon the Constitution if at the time the contract was made the parties should have foreseen the new regulation challenged under this clause."

Other cases have addressed the Dormant Commerce Clause in the contractual context. *See also Sanitation and Recycling Indus.*, 107 F.3d 925, 933 (10th Cir. 1997) ("Impairment is greatest where the challenged government legislation was wholly unexpected. When an industry is heavily regulated, regulation of contracts may be foreseeable.") If the plaintiff could anticipate, expect, or foresee the governmental action at the time of contract execution, the plaintiff will ordinarily not be able to prevail. *See Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 60 S.Ct. 792, 84 L.Ed. 1061 (1940).

The parties have not cited, and the Court has not found, any case dealing with "foreseeability" of the regulation as relevant to the "burden" analysis under the Dormant Commerce Clause.[2]

Thus, whether plaintiffs could "foresee" the adoption of the regulation is irrelevant to any legal or factual issue of the Dormant Commerce Clause analysis without a contractual relationship. Whether plaintiffs had "notice" of global warming and "what they were saying internally" about global warming is not a legal or factual issue relevant to the burden analysis of the Dormant Commerce Clause. Indeed, whether, with knowledge of global warming, plaintiffs should have anticipated the regulation and undertaken action is entirely speculative.

Finally, defendants argue that the global warming documents are necessary to enable

---

[2] In a footnote, plaintiffs state "it is telling that courts have routinely analyzed state statutes under the dormant commerce clause without so much as a mention of the industry's ability to foresee the statutes' enactment in advance or prepare for compliance prospectively. See, e.g., *Edgar v. MITE Corp.*, 457 U.S. 624 (1982) (striking down an Illinois state statute aimed at regulating business takeovers); *Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662 (1981) (striking down a state regulation prohibiting the use of 65-foot double-trailer trucks within Iowa's borders); *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429 (1978) (striking down a state regulation prohibiting the use of 65-foot double-trailer trucks within Wisconsin's borders)." (Joint statement p. 17 n.3.)

1  defendants to cross-examine the experts.  The parties have not pointed to any evidence by any expert
2  which quantifies the impacts of the regulations on global warming.  The benefits and burdens of the
3  regulations are at issue in the litigation.  The science of global warming is not an issue. An expert
4  cannot create a legal issue, simply by mentioning (or even analyzing) a topic in a report, where the
5  issue does not exist.

## CONCLUSION

For the foregoing reasons, defendants' motion to compel production of documents in the Second Request for Production of Documents is DENIED.

IT IS SO ORDERED.

**Dated:   July 7, 2006**              /s/ Lawrence J. O'Neill
b9ed48                                   UNITED STATES MAGISTRATE JUDGE