1
2
3
4
5
6
7    **IN THE UNITED STATES DISTRICT COURT FOR THE**
8    **EASTERN DISTRICT OF CALIFORNIA**
9

| | |
|---|---|
| **CENTRAL VALLEY CHRYSLER-JEEP, et al.,** ) | **CV F 04-6663   AWI LJO (NEW DJ)** |
| ) | |
| **Plaintiffs,** ) | **MEMORANDUM OPINION AND ORDER RE DEFENDANT AND DEFENDANT-INTERVENORS'** |
| **v.** ) | **MOTION FOR RECONSIDERATION OF THE** |
| **CATHERINE E. WITHERSPOON, in** ) | **ORDER DENYING MOTION TO COMPEL PRODUCTION OF** |
| **her official capacity as Executive Director of the California Air Resources** ) | **DOCUMENTS** |
| **Board, et al.,** ) | |
| ) | |
| **Defendants.** ) | (Documents #304) |
| ) | |

17
18
19        This case concerns the legality of environmental regulations imposed by a state
20   administrative agency.  Plaintiffs seek declaratory and injunctive relief on the basis that the
21   regulations violate and are preempted by federal law.  This court has federal question jurisdiction
22   pursuant to 28 U.S.C. § 1331.

23                          **BACKGROUND**

24        In September 2004, pursuant to its authority under California Health and Safety Code
25   § 43098.5(a), the California Air Resources Board ("CARB") adopted regulatory amendments
26   addressing motor vehicle emissions of four greenhouse gases: carbon dioxide, methane, nitrous
27   oxide, and hydrofluorocarbons.  See Cal. Code Regs. tit. 13, § 1961.1(e)(4).  On December 7,
28

2004, Plaintiffs[1] filed suit against CARB's executive director to prevent enforcement of the regulations.[2]  In their first amended complaint ("FAC"), filed February 16, 2005, Plaintiffs seek declaratory and injunctive relief on the following claims:

> 1. Count I –  Preemption under the Energy Policy and Conservation Act of 1975 ("EPCA"), 49 U.S.C. §§ 32902-32919, specifically Section 32919(a).
>
> 2. Count II – Preemption under § 209(a) of the Federal Clean Air Act, 42 U.S.C. § 7543(a).
>
> 3. Count III –  Preemption under the foreign policy of the United States and the foreign affairs powers of the Federal Government.
>
> 4. Count IV –  Violation of the Dormant Commerce Clause of the United States Constitution.
>
> 5. Count V –  Violation of the Sherman Act, 15 U.S.C. § 1.

On April 13, 2006, Defendant and Defendant-Intervenors (collectively "Defendants") served their Second Set of Requests for Production of Documents on Plaintiffs.  The requests sought documents from General Motors ("GM"), DaimlerChrysler ("DCC"), and Alliance of Automobile Manufacturers ("AAM") (collectively "Plaintiffs" or "Manufacturers").  The documents Defendants sought concerned the science of global warming, the Manufacturers' knowledge of global warming and its effects, and the Manufacturers' domestic and foreign affairs with respect to global warming.  Plaintiffs served their responses on May 16, 2006, objecting to requests for various reasons.  In letters dated June 1, 2006, Defendants requested that the Manufacturers produce the withheld documents.  After meeting and conferring to attempt to resolve the disputes, Defendants filed a motion to compel on June 16, 2006.  On July 3, 2006, the

---

[1]     Plaintiffs include various vehicle dealers, two manufacturers who supply them, an automobile trade association, and the Tulare County Farm Bureau.  The Association of International Automobile Manufacturers has intervened as a Plaintiff.

[2]     Sierra Club, Bluewater Network, Global Exchange, Rainforest Action Network, and Natural Resources Defense Council have intervened as Defendants.

parties filed a Joint Statement regarding the disputed requests.  After conducting a hearing, the Magistrate Judge issued an order denying the motion to compel in its entirety on July 7, 2006 (the "Order").  The Magistrate Judge noted that Plaintiffs had "rel[ied] on their objection that the document[] requests are not relevant to any claim" and did not argue any other objection to the requests for production.  Order 7:19-26.  He concluded that none of the requests sought evidence relevant to claims or defense in this case.  On July 24, 2006, Defendants filed a motion for reconsideration of the Order, which Plaintiffs opposed.

## LEGAL STANDARDS

### A.  Motion for Reconsideration

According to Local Rule 72-303, a district judge upholds a magistrate's ruling on a referred matter unless it is "clearly erroneous or contrary to law."[3]  See Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1)(A).  The "clearly erroneous" standard applies only to a magistrate judge's findings of fact.  Concrete Pipe & Prods. v. Constr. Laborers Pension Trust, 508 U.S. 602, 623 (1993).  "[R]eview under the 'clearly erroneous' standard is significantly deferential, requiring a 'definite and firm conviction that a mistake has been committed.'"  Id.  The "contrary to law" standard, on the other hand, allows independent, plenary review of purely legal determinations by the magistrate judge.  FDIC v. Fidelity & Deposit Co. of Md., 196 F.R.D. 375, 378 (S.D. Cal. 2000); Haines v. Liggett Group, Inc., 975 F.2d 81, 91 (3d Cir. 1992).

---

[3]       Defendants urge the court to employ an "abuse of discretion" standard for reconsideration of the Magistrate Judge's rulings on relevance in the discovery context.  They cite in support three district court opinions that apply that standard.  See Geophysical Sys. Corp. v. Raytheon Co., 117 F.R.D. 646, 647 (C.D. Cal. 1987) ; Marksman Partners, L.P. v. Chaetal Pharm. Corp., 1996 U.S. Dist. LEXIS 13870, at *7 (C.D. Cal. Aug. 15, 1996); Forbes v. Hawaiian Tug & Barge Corp., 125 F.R.D. 505, 507-08 (D. Haw. 1989).  Local Rule 72-303 governs the district judge's reconsideration of a magistrate judge's rulings on general pretrial matters.  Local Rule 72-303(f) is clear and provides no exceptions: "The standard that the assigned Judge shall use in all such requests is the 'clearly erroneous or contrary to law' standard set forth in 28 U.S.C. § 636(b)(1)(A)."  Accordingly, the court declines to employ the "abuse of discretion" standard Defendants propose.

3

**B. Motion to Compel**

On a showing of good cause, the court may order discovery of any matter "relevant to the subject matter involved in the action." Fed. R. Civ. P. 26(b)(1). At trial, relevant evidence encompasses "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. For purposes of pretrial discovery, "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Id. The Federal Rules authorize broad pretrial discovery "based on the general principle that litigants have a right to 'every man's evidence,' and that wide access to relevant facts serves the integrity and fairness of the judicial process by promoting the search for the truth." Rivera v. NIBCO, Inc., 384 F.3d 822, 824 (9th Cir. 2004).

<strong>DISCUSSION</strong>

**A. Foreign Affairs and Foreign Policy**

The Magistrate Judge held that "defendants did not argue, and it is not obvious, how past knowledge of global warming would be relevant to the preemption under the foreign policy claim." Order 8:19-20. The Magistrate Judge did not specifically address the merits of requests for foreign policy–related documents other than those regarding past knowledge of global warming. Because the Magistrate Judge has not made findings with respect to these requests, the court will decide them de novo.

***1. Documents Relating to FAC Paragraph 9(c) and Count III***

Defendants requested certain documents supporting Plaintiffs' foreign policy preemption claims:

> **GM REQUEST NO. 28/DCC REQUEST NO. 27/AAM REQUEST NO. 26:** All DOCUMENTS relating to YOUR claim in paragraph 9(c) of the First Amended Complaint that "A.B. 1493 regulation . . . conflicts with national policy and weakens the diplomatic leverage of the federal government in negotiations on greenhouse gas standards with other nations." This request for production of documents includes but is not limited to all DOCUMENTS relating to YOUR communications with United

4

States government officials with respect to any foreign affairs aspect of the global warming issue.

. . .

**GM REQUEST NO. 29/DCC REQUEST NO. 28/AAM REQUEST NO. 27:** All DOCUMENTS relating to YOUR claim in Count III of the First Amended Complaint that the regulation adopted by CARB on September 24, 2004 is preempted by the foreign policy of the United States and the foreign affairs powers of the federal government.

Joint Statement 51:1-5, 53:4-8.[4]  Plaintiffs' only objection to these requests is that all documents responsive to these requests are "'legal strategy' documents."  Opp'n 11:4-7.

Under Rule 26(b)(3), "documents and tangible things prepared by a party or his representative in anticipation of litigation," may not be ordered produced unless the party seeking them demonstrates "'substantial need [for] the materials' and 'undue hardship [in obtaining] the substantial equivalent of the materials by other means.'"   United States v. Torf (In re Grand Jury Subpoena), 357 F.3d 900, 906 (9th Cir. 2003) (quoting Fed. R. Civ. P. 26(b)(3)).  At its core, the work-product doctrine protects "the mental processes of an attorney."  United States v. Nobles, 422 U.S. 225, 239 (1975).  Discovery of an attorney's selection and compilation of documents is prohibited to the extent it would reveal "an attorney's legal strategy, his intended lines of proof, his evaluation of the strengths and weaknesses of his case, and the inferences he draws from interviews of witnesses."  Sporck v. Peil, 759 F.2d 312, 316 (3rd Cir. 1985), *cert. denied*, 474 U.S. 903 (1985); see, e.g., United States v. TRW Inc., 212 F.R.D. 554, 564 (C.D. Cal. 2003) (citing Sporck, 759 F.2d. at 316.).

In Sporck, plaintiff sought documents counsel gave to a particular defendant to review prior to his deposition.  Id. at 313.  The district court had found that the grouping and selection of the documents was not opinion work product and ordered them produced.  Id. at 314. Defendants argued that such grouping and selection revealed counsel's legal opinions as to how

---

[4]      Some identical requests are numbered differently with respect to each Manufacturer.  Where this occurs, the numbers are separately listed and divided by slashes.

1   the evidence in the documents related to issues of the case.  Id. at 315.  The court found that the

2   compilation of documents fell within the category of highly protected information:  "In selecting

3   and ordering a few documents out of thousands counsel could not help but reveal important

4   aspects of his understanding of the case."  Id. at 316.

5       Here, Defendants' requests are broadly worded to seek documents "related to" claims in

6   the FAC.  They seek documents concerning how the regulation scheme "conflicts with national

7   policy and weakens the diplomatic leverage of the federal government in negotiations on

8   greenhouse gas standards with other nations" and concerning whether "the regulation adopted by

9   CARB on September 24, 2004 is preempted by the foreign policy of the United States and the

10  foreign affairs powers of the federal government."  Joint Statement 51:1-5, 53:4-8.  Undoubtedly,

11  certain documents that fall under this request are privileged, such as attorney notes or

12  communications analyzing the legal merits of these contentions.  Defendants clarify that their

13  request does not seek any such documents.  Moreover, Defendants do not couch their request for

14  documents in a manner that forces Plaintiffs to disclose their counsel's mental impressions.   In

15  seeking any documents Plaintiffs have obtained concerning these claims, Defendants' requests do

16  not appear calculated, nor likely, to reveal which documents Plaintiffs intend to use at trial,

17  which documents support or undermine their position, or what inferences counsel has drawn

18  from them.  See Sporck, 759 F.2d. at 316.  Plaintiffs have failed to demonstrate how, by learning

19  which documents Plaintiffs' counsel consider "related to" those claims, Defendants will become

20  privy to litigation strategy or other mental impressions protected under the work-product

21  doctrine.  Of course, Plaintiffs are not required to produce responsive documents that were

22  themselves prepared by counsel "in anticipation of litigation or for trial," such as legal

23  memoranda, notes, or communications.  Defendants' motion for reconsideration is GRANTED

24  with respect to requests GM 28/DCC 27/AAM 26 and GM 29/DCC 28/AAM 27.  Plaintiffs shall

25

26

27

28                                                   6

produce any nonprivileged documents responsive to these requests.[5]  Plaintiffs shall not refuse to provide any responsive documents on the basis that their inclusion in the scope of the request reveals attorney mental impressions in violation of the work-product doctrine.

### *2.  Documents Relating to Plaintiffs' Communications with Foreign Governments*

Defendants also seek reconsideration of the denial of the motion to compel production of documents responsive to the following request:  **"GM REQUEST NO. 30/DCC REQUEST NO. 29/AAM REQUEST NO. [28]:**  All DOCUMENTS relating to YOUR communications (or the communications of any other automobile manufacturer or association of automobile manufacturers) with any foreign government with respect to any aspect of GLOBAL WARMING." Joint Statement 54:1-3.[6]  Defendants contend that this request is likely to uncover evidence that the Manufacturers have sought to prevent international agreements that include binding emissions limits.  Plaintiffs do not dispute that the request is reasonably calculated to obtain such evidence.  Plaintiffs argue instead that any such evidence is irrelevant to its foreign policy claims.

Defendants argue that Plaintiffs' success in preventing international agreements "directly conflicts with" Plaintiffs' theory that the United States' official foreign policy is to negotiate to secure binding international emissions agreements. Defs.' Reply 8:21-9:4.  Defendants do not cite authority indicating that the practicality or likelihood of success of national policy is relevant to preemption of a state law.  Rather, the focus of such an inquiry into the nature of national policy is on its tangible expressions, such as executive agreements and statutes.  See Am. Ins. Ass'n v. Garamendi, 539 U.S. 396, 421 (2003) (focusing preemption inquiry on "the national

---

[5]      Plaintiffs submit that their forthcoming interrogatory answers identifying all facts in support of Count III makes production of such documents unnecessary.  The court rejects this claim on the basis that the documents themselves, apart from the facts they contain, may have evidentiary value to Defendants and may lead to discovery of other admissible evidence.

[6]      Defendants indicate that the AAM request number was incorrectly stated in the Joint Statement.  Mot. 6 n.2.  All such mistakes identified by the parties appear with corrections in brackets.

1  position, expressed unmistakably in the executive agreements signed by the President"); <u>Crosby</u>

2  <u>v. Nat'l Foreign Trade Council</u>, 530 U.S. 363, 375-76 (2000) (considering whether the

3  challenged state law "might . . . blunt the consequences" of actions available to the President

4  pursuant to a federal statute).

5        Defendants have not presented this court with any basis to conclude that attempts by

6  Plaintiffs to influence national policy are relevant to determining the nature or character of that

7  policy.  It is not necessary, or helpful, to draw inferences from the past or potential future

8  effectiveness of various foreign policy approaches to deduce what foreign policy actually is

9  today.  Whether Plaintiffs have attempted to interfere with international emissions agreements

10  does not bear on whether the current United States' policy is to pursue such agreements.  This

11  request is not reasonably calculated to lead to the discovery of admissible evidence.  Defendants'

12  motion for reconsideration is DENIED with respect to request GM 30/DCC 29/AAM 28.

13  **B. Global Warming**

14        Defendants urge the court to compel Plaintiffs to produce certain documents related to the

15  science of global warming and to Plaintiffs' knowledge of the effects of global warming.

16  ***1. Relevance of Foreseeability to Dormant Commerce Clause Burden Analysis***

17        Defendants contend that their requests for global warming related documents will lead to

18  the discovery of admissible evidence that awareness of the scope of the effects of global warming

19  should have caused Plaintiffs to foresee California's regulations.  Defendants further contend that

20  the foreseeability of the regulations is relevant to determining the burden on interstate commerce

21  in the Dormant Commerce Clause analysis.  The Magistrate Judge reviewed the authorities

22  Defendants presented and concluded that, with the exception of certain contractual relationships

23  not applicable here, the foreseeability of a regulation is irrelevant to Dormant Commerce Clause

24  analysis.[7]

25

26      [7]    Defendants complain that the Magistrate Judge's analysis was unduly focused on
27  the legal standard for relevance at trial, rather than the Rule 26(b)(1) discovery standard allowing
   for discovery "reasonably calculated" to yield relevant evidence.  Defendants point to the

28

1      By its terms, the Commerce Clause authorizes Congress to "regulate Commerce . . .

2   among the several States."  U.S. Const., art. 1, § 8, cl. 3.  The Supreme Court has interpreted the

3   clause to prohibit states from unduly interfering with interstate commerce absent congressional

4   permission.  See, e.g., Raymond Motor Transp., Inc. v. Rice, 434 U.S. 429, 441 (1978); Pike v.

5   Bruce Church, Inc., 397 U.S. 137, 142 (1970).  The Commerce Clause does not prohibit every

6   exercise of state power that affects interstate commerce.  Gravquick A/S v. Trimble Navigation

7   Int'l, 323 F.3d 1219, 1224 (9th Cir. 2003).  Rather, "[i]f the law 'regulates even-handedly to

8   effectuate a legitimate local public interest, and its effects on interstate commerce are only

9   incidental,' then the statute must be upheld 'unless the burden imposed on such commerce is

10  clearly excessive in relation to the putative local benefits.'"  Id. (quoting Pike, 397 U.S. at 142).

11     Plaintiffs' Dormant Commerce Clause claim does not allege that California's regulations

12  discriminate against out-of-state interests or directly regulate interstate commerce.  See

13  Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth., 476 U.S. 573, 579 (1986); NCAA v.

14  Miller, 10 F.3d 633, 638 (9th Cir. 1993).  Instead, Plaintiffs allege that the regulations are

15  impermissible because they burden "the production and sale of new motor vehicles" while

16  providing "no local environmental benefit, or insubstantial benefits at best."  FAC ¶¶ 135, 136.

17     In support of its contention that foreseeability of a regulation bears on the burden

18  analysis, Defendants cite Transcontinental Pipe Line v. Oil & Gas Board, 457 So. 2d 1298 (Miss.

19  1984), *rev'd on other grounds*, 474 U.S. 409 (1986).  In that case, the Mississippi Supreme Court

20  evaluated whether a state rule governing natural gas was barred under the Commerce Clause

21  based on an impermissible burden on interstate commerce.  Id. at 1318.  A natural gas pipeline

22  operator sought to invalidate a state rule that would require it, by virtue of its contract to

23

24  _____

25  Magistrate Judge's remark that the link between knowledge of global warming and anticipation
    of greenhouse gas regulation "is entirely speculative."  Order 12:21-22.  The Magistrate Judge
26  noted the speculativeness of the request only after categorically concluding that whether
    Defendants foresaw or should have foreseen the regulations was irrelevant.  As the court finds
27  that this conclusion was not contrary to law, it need not determine whether the Magistrate Judge
    erred by, in the alternative, refusing the discovery request as speculative.

28                                              9

purchase gas from one supplier, to also purchase additional quantities of high-cost gas from other suppliers.  Id. at 1308-10.  As part of its burden analysis, the court considered the burden the operator faced in being forced to perform under the contract as affected by the state rule.  Id. at 1322.  The court found that the operator's burden was traceable to its contract, not to the state rule.  Id.  Drawing on state contract law, the court held that the operator's burden stemming from a freely entered contract was not grounds for invalidation under the Commerce Clause.  Id.  The court held that the operator was chargeable with knowledge of the state rule's affect, so the contract impliedly incorporated the challenged state rule.  Id.

Defendants also cite Justice Rehnquist's dissent to the Supreme Court's opinion reversing the Mississippi Supreme Court on other grounds.  Transcontinental, 474 U.S. at 434-35 (Rehnquist, J., dissenting).   The dissenting justices' discussion of foreseeability also appears to hinge on contract principles.  Id.  The dissent cites Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 434-35 (1983), for the language which Defendants cite in support of their contention:  "A party runs the risk of reasonably foreseeable applications of new principles of state law to its activities."  Energy Reserves is a Contract Clause case wherein the Court held that a regulation does not impermissibly impair a contract where the complaining party should have foreseen that state actions would alter the contract.  Id. at 416.

Neither the Mississippi Supreme Court's Transcontinental opinion nor Justice Rehnquist's dissent stands for a general rule that the foreseeability of government regulation is relevant to Commerce Clause burden analysis.  At best, they provide that the foreseeable effect of a state law on a freely entered contract does not constitute an actionable burden.  Neither opinion implicitly or explicitly lends support to a more ambitious legal rule.

Defendants also ask the court to draw analogies directly from Contract Clause jurisprudence.  The Contract Clause provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const., art. I, § 16, cl. 1.  Where a state law operates "as a substantial impairment of a contractual relationship," the Contract Clause requires

10

1    that it "have a significant and legitimate public purpose." Energy Reserves, 459 U.S. at 411.

2    Where the regulation was foreseeable, for instance where the subject matter of the contract is

3    highly regulated, courts are reluctant to find such an impairment.  Energy Reserves, 459 U.S. at

4    415; Chrysler Corp. v. Kolosso Auto Sales, 148 F.3d 892, 894-95 (7th Cir. 1998).  In Chrysler

5    Corp., Chief Judge Posner clarified that the rationale for this rule is that, to the extent the

6    regulations were foreseeable, they were taken into account in the negotiations over the terms of

7    the contract.  Chrysler Corp., 148 F.3d at 894-95.  It follows that in a freely negotiated agreement

8    the party bearing the burden of regulatory uncertainty has already been compensated in the form

9    of more favorable contract terms.  Id. at 895.  Thus, considerations of foreseeability are uniquely

10   relevant where a party had the opportunity to contract for protection against regulatory

11   uncertainty.  Consequently, the court declines to extend the Contract Clause consideration of

12   foreseeability of regulations at the time of contracting to a Dormant Commerce Clause burden

13   analysis.

14        Defendants also point to a Takings Clause case where the court considered whether

15   plaintiff utilities "should have anticipated that such liability could be imposed by the federal

16   government."  Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1353 (Fed. Cir.

17   2001).  In Commonwealth Edison, this language appears in the context of discussion of

18   plaintiffs' "investment-backed expectations," which comprise part of the three-factor analysis of

19   regulatory takings.  Id. at 1348 (citing  Penn Cent. Transp. Co. v. New York City, 438 U.S. 104,

20   124 (1978)).  "The purpose of forbidding uncompensated takings of private property for public

21   use is 'to bar Government from forcing some people alone to bear public burdens which, in all

22   fairness and justice, should be borne by the public as a whole.'"  Connolly v. Pension Benefit

23   Guar. Corp., 475 U.S. 211, 227 (1986).  To this end, the Supreme Court has reasoned that "those

24   who do business in the regulated field cannot object if the legislative scheme is buttressed by

25   subsequent amendments to achieve the legislative end."  Concrete Pipe & Prods. v. Constr.

26   Laborers Pension Trust, 508 U.S. 602, 645 (1993) (quoting FHA v. The Darlington, Inc., 358

27

28                                                11

U.S. 84, 91 (1958)).

A rule barring compensation for a taking where the affected party should have expected to bear the cost of the regulation is consistent with the purposes of Takings Clause jurisprudence. A party who undertakes a venture, knowing that his interests might be harmed by future government action, "cannot object" that he is due compensation when the predicted harm is realized. Rather, the party who voluntarily took on the risk of regulation evaluated that the opportunity was nonetheless sufficiently favorable. Cf. Chrysler Corp., 148 F.3d at 895. In a sense, it is absurd to see the manifestation of a known risk as the equivalent of the state taking an individual's property. The value of the property had already diminished by virtue of the known risk. On the other hand, one who has no reason to anticipate being harmed by regulation, is more properly characterized as having been forced "to bear public burdens." Connolly, 475 U.S. at 227.

No analogy to the Contract Clause or Takings Clause cases emerges in this case. The Dormant Commerce Clause analysis does not call for the court to consider the culpable lack of foresight of those who shoulder the burden of state regulation. It instead requires the court to undertake a "delicate adjustment" of the national interests expressed by the Commerce Clause and "sensitive consideration of the weight and nature of the state regulatory concern." Raymond, 434 U.S. at 440-41. The difficult balancing of interests that Dormant Commerce Clause analysis requires does not permit the court to assign blame to particular actors for failure to respond to a foreseeable risk. Defendants urge that common sense dictates that "the magnitude of an alleged 'burden' is inversely related to the head start one has in tackling the burden." Mot. 14:14-16. This is only true from the perspective of someone who has time remaining to "tackl[e] the burden." Whether or not the Manufacturers knew in the past that these regulations would be implemented, the time for them to have acted on this foresight has passed. In any event, what is relevant to a Commerce Clause analysis is the burden Plaintiffs now face because of the regulations, which can be evaluated straightforwardly by determining what they must do to

comply.  Accordingly, no requested document is discoverable solely because it may yield

admissible evidence that the Manufacturers should have foreseen the challenged regulations.

*2.  Relevance of Global Warming Science to Dormant Commerce Clause Benefits Analysis*

Defendants contend that documents related to global warming science are relevant to

deciding the benefits of the regulations on a Dormant Commerce Clause challenge.[8]  The

Magistrate Judge did not address the merits of this position in the context of his Dormant

Commerce Clause analysis.  The court will therefore address this issue de novo.

The balancing of state and national interest in a Dormant Commerce Clause challenge

entails "consideration of the weight and nature of the state regulatory concern."  Raymond, 434

U.S. at 441.  The more substantial the benefit of the state regulation, the greater the burden it may

impose on interstate commerce.  See Pike, 397 U.S. at 145 ("But the State's tenuous interest in

having the company's cantaloupes identified as originating in Arizona cannot constitutionally

justify the requirement that the company build and operate an unneeded $ 200,000 packing plant

in the State."); Raymond, 434 U.S. at 444-45 (considering state regulation's limited advantage

for public safety in finding a Dormant Commerce Clause violation).  Accordingly, a disputed

factual issue in this case is "the regulation's environmental benefits and specifically its impacts

on global warming."  Joint Statement 4:10.

Plaintiffs argue that all Defendants need to know about global warming has been filed in

their expert reports.  In support, Plaintiffs point to uncontested facts establishing CARB staff has

stated that the regulations' "contribution to a reduction in global warming . . . will be small" and

stated that "greenhouse gas emissions from California light duty vehicles are a small fraction of

the global total."  Scheduling Conference Order 11:5-10.  Plaintiffs also point out CARB's

---

[8]     Defendants also argue that documents related to global warming science are
relevant to issue under the Clean Air Act claim of whether the regulations are entitled to an EPA
waiver under 42 U.S.C. § 7543(b).  As the request for documents related to global warming
science is relevant to deciding the benefits of the regulation under the Dormant Commerce
Clause, the court need not decide whether such a request is, in the alternative, likely to lead to the
discovery of evidence relevant to the Clean Air Act claim.

1  admissions that the regulations' effects on climate can only be quantified using computer models.

2  Opp'n 13:16-19.  Plaintiffs contend that the regulation has merely a "symbolic" connection with

3  global warning based on "an imaginary scientific hypothesis that does not exist in the real

4  world."  Id. at 13:6-19.  It follows, Plaintiffs argue, that such a theoretical inquiry is properly a

5  matter of expert opinion only.

6        It appears that Plaintiffs are asking the court, in the context of a discovery dispute, to

7  conclude that any decrease in temperature that is "small" or that cannot be measured through

8  traditional meteorological methods is the same as any other temperature change that shares those

9  characteristics.  Undoubtedly, Defendants will argue that the regulations' effects on temperature,

10  even if small or immeasurable by conventional methods, will "effectuate a legitimate local public

11  interest" of California.  See Gravquick, 323 F.3d at 1224.  In fact, such a finding is presumably

12  what led CARB to enact the regulations in the first place.  It is not self-evident that the

13  magnitude of a climate change is irrelevant simply by virtue of its being small and not

14  measurable by conventional methods.  It could very well be the case that a small, immeasurable

15  climate change could reap benefits where an even smaller change would not.[9]

16        Defendants contend that Plaintiffs are broadly contesting published global warming

17  science.  Defendants point to Plaintiffs' Expert Report of Thomas C. Austin as an example.  See

18

19  _____

20        [9]     On September 5, 2006, Plaintiffs filed an ex parte application for permission to
file a proffer of new testimony in opposition to Defendants' request for reconsideration.  The
court hereby GRANTS the ex parte application.  The testimony proffered comes from the

21  deposition of Charles Shulock, CARB's Program Manager for Motor Vehicle Greenhouse Gas
Reduction.  Shulock concedes (1) that CARB was unable, through any means available to it, to

22  determine whether the California regulations would lead to any real world impact; (2) that it was
possible that no human being would notice the impact; (3) that CARB had not quantified the

23  impact on sea level, spring runoff, snowpack, or timetable for spring blooms; (4) that he did not
believe the regulations would cause the temperature to drop a quarter of a degree or more; and

24  (5) that CARB has not attempted to quantify the regulations' total impact on average
temperatures in California.  Pls.' Proffer of New Test. 2:9-4:10.  These concessions do not permit

25  the court to decide, at this early stage, that discovery regarding global warming science will not
lead to admissible evidence.  The court has no basis to conclude that a regulation resulting in a

26  climate change in California has no benefit merely because CARB cannot predict how much the
change will be or what impacts it will have and because human beings cannot measure or feel the

27  change.

28                                          14

Joint Statement Ex. H ("Austin Report").  Before extrapolating the temperature change the regulations will make, Austin expresses his uncertainty about whether a correlation between greenhouse gas emissions and future temperature increases even exists.  Austin Report 59.  He notes that there are many other factors affecting greenhouse gas concentrations and temperature:

- greenhouse gas emissions contribute to increased growth of plants, which remove carbon dioxide from the atmosphere,

- changes that humans make to the surface of the Earth increase or decrease the amount of light reflected back into space, which may increase or decrease warming, and

- changes in solar activity and the Earth's orbit around the Sun can affect the Earth's climate and cause significant cooling.

Id.  He concludes from these predictions that "rising greenhouse gas concentrations may not be sufficient to offset the cooling effect."  Id.  He also notes that there is "considerable uncertainty" as to the degree to which certain feedback effects of warming, such as increased low-level cloud cover, will cool the climate.  Id. at 59-60.

Defendants intend to oppose Plaintiffs' Dormant Commerce Clause claim by arguing that the local benefits of the regulation justify its burden on interstate commerce.  Demonstrating local benefits appears to turn on Defendants establishing (1) that temperatures will rise in the future in the absence of the regulations, (2) that rising temperatures will harm California, and (3) that the regulations will decrease such harm by slowing the temperature increase.  Testimony by Austin to the effect that rising greenhouse gas concentration may not offset other cooling effects would directly undermine the first and third premises of that argument.

Austin's opinion rebuts Defendants' first premise because it tends to establish that there is a real chance that temperatures will not rise in the future.  The probability that temperatures will stay the same or decrease in the absence of the regulations is inversely related to the local benefits of the regulation.  This is because a regulation that aims to prevent a harmful eventuality

1   that is likely to materialize can succeed in outweighing its burden on interstate commerce where

2   a regulation ameliorating a less probable undesirable occurrence would fail.  Compare Raymond,

3   434 U.S. at 444 (striking down a state highway regulation under the Dormant Commerce Clause

4   based on failure to show an "appreciable threat" in its absence), with S.C. State Highway Dep't

5   v. Barnwell Bros., Inc., 303 U.S. 177, 196 (1938) (upholding state vehicle regulation that

6   ameliorated a condition responsible for "increased hazard").

7            Austin's opinion also provides a basis to question Defendants' third premise.  He states

8   that increased plant growth may reduce carbon dioxide levels and that other human activities may

9   stimulate warming.  These propositions tend to show that the regulations may not succeed in

10  preventing rising temperatures, should they occur.  To the extent that carbon dioxide emissions

11  stimulate plant growth, they may not result in a net increase in greenhouse gas accumulations.

12  Likewise, if changes to the surface of the Earth are the controlling cause of warming, decreases

13  in automobile emissions may be ineffectual in decreasing warming.

14           Austin's report contains contentions that, if accepted by the trier of fact, diminish the

15  purported benefits of the challenged regulations.  Accordingly, the court concludes that it is

16  likely that the merits of global warming science will be in dispute in this case.

17           To rebut Defendants' objection that not being able to discover documents regarding

18  global warming science will limit their ability to prepare a defense, Plaintiffs point out the

19  availability of a large volume of publicly available literature on the science of global warming.

20  They claim that this availability counsels against permitting the discovery Defendants seek.  The

21  court is unaware of, and Plaintiffs do not cite, authority for refusing requests for documents

22  reasonably calculated to discover relevant evidence on the basis that the documents are publicly

23  available.  To the contrary, "[t]here is, strictly speaking, no relevance question that arises merely

24  because the discovering party already knows or has access to the information it seeks to discover.

25  Relevance is inherent in the content of the information, not in who possesses or has access to it."

26  6 James Wm. Moore et al., Moore's Federal Practice §26.41[13] (3d ed. 2006); Weiner v. Bache

27

28                                                    16

1  Halsey Stuart, Inc., 76 F.R.D. 624, 625 (S.D. Fla. 1977) (whether requesting party was already in

2  possession of the document it sought was immaterial to relevance under the Federal Rules).

3  Plaintiffs do not complain that Defendants have requested these documents for an improper

4  purpose, such as to harass them.  See Hendler v. United States, 952 F.2d 1364, 1380 (Fed. Cir.

5  1991) (reversing dismissal for plaintiff's failure to respond to interrogatories seeking information

6  defendants already possessed and which was obviously difficult for plaintiff to obtain).  Nor do

7  Plaintiffs contend that obtaining these documents from the public domain is "more convenient,

8  less burdensome, or less expensive" or explain why "the burden or expense of the proposed

9  discovery outweighs its likely benefit."  See Fed. R. Civ. P. 26(b)(2).  In any event, it is not a

10 prerequisite to a granting a discovery request that the requesting party will otherwise suffer

11 hardship.

12      Plaintiffs take odds with some of Defendants' particular requests regarding global

13 warming science.  Defendants seek certain documents concerning effects of the challenged

14 regulations.[10]  See Joint Statement 40:11-15.  Plaintiffs admit that this request "does in fact

15 pertain to a relevant issue."  Id. at 41:16-17.  They argue, nonetheless, that the request should not

16 extend to Plaintiffs' "rank-and-file" employees "regardless of their status as experts."  Id. at

17 41:17-25.  Plaintiffs' do not specify what they mean by "rank-and-file" employees.  In its

18 response to this request, GM agreed to make available "final management reports and

19 presentations and other materials responsive to the request."  Id. at 40:19-20.  To the extent

20

21      [10]     The request, in its entirety, reads as follows:

22

23      **GM REQUEST NO. 22/DCC [REQUEST NO. 21/AAM
        REQUEST NO. 20]:**  All DOCUMENTS relating to the effect of

24      the GHG EMISSIONS reductions required by the GHG
        REGULATIONS (including the reductions required by the GHG

25      REGULATIONS in each ADOPTING STATE, separately or
        cumulatively) on (a) atmospheric concentrations of greenhouse

26      gases; (b) temperature and/or (c) GLOBAL WARMING impacts or
        risks of GLOBAL WARMING impacts.

27 Joint Statement 40:11-15.

28                                      17

Plaintiffs are asking the court to restrict responses to this request to certain reports and presentations that have been internally compiled, their request is unreasonable.   Nor does it make sense to restrict the scope of this discovery to the documents their experts have reviewed. Either of these approaches would allow Plaintiffs to avoid producing certain stray documents that, though relevant, would not be the subject of a report or presentation or be delivered to an expert preparing for litigation.  Plaintiffs have not proposed any other reasonable restriction on the breadth of the request.  Accordingly, Defendants' motion for reconsideration is GRANTED with respect to this request.  Plaintiffs shall produce all documents responsive to request GM 22/DCC 21/AAM 20.

Plaintiffs also specifically object to the request that they produce documents regarding the efficacy of greenhouse gas regulations other than the regulations challenged in this case.[11]  See Joint Statement 42:1-4.  Plaintiffs contend that because the benefits of the challenged regulations are admittedly not "identifiable," the effects of other regulations are irrelevant.  Opp'n at 16:6. Again, Plaintiffs appear to be conflating the concept of the effects of a regulation being meteorologically measurable with the concept of the regulation mitigating the impacts of global warming.  Defendants have not conceded that the challenged regulations will be ineffectual.  This request seeks information about regulations imposed on a greater scale, such as the United States and other countries, and about the cumulative effect of those regulations.  To the extent this information reveals that past restrictions on carbon dioxide emissions have ameliorated the

---

[11]       The request, in its entirety, reads as follows:

**GM REQUEST NO. [23]/[DCC] REQUEST NO. [22/AAM REQUEST NO. 21]:** All DOCUMENTS relating to the effect of any GHG EMISSIONS reductions or limits proposed or implemented by any state, country (including the United States), or group of countries, separately or cumulatively, on (a) atmospheric concentrations of greenhouse gases; (b) temperature; and/or (c) GLOBAL WARMING impacts or risks of GLOBAL WARMING impacts.

Joint Statement 42:1-4.

effects of global warming, it tends to show that the regulations at issue here will also have such an effect.  Accordingly, Plaintiffs shall produce all documents responsive to request GM 23/DCC 22/AAM 21, whether or not they are publicly available.

Plaintiffs object to Defendants' request for documents related to the filing of annual reports with the United States Department of Energy ("DOE")  regarding carbon dioxide emissions from manufacturing facilities.[12]  Joint Statement 43:18-20.  Plaintiffs agree to produce the reports themselves, but refuse to produce any other related documents.  Opp'n 16:13-21.  Defendants contend that the documents related to the reports but not submitted to the DOE are likely to contain Defendants' reasons for reducing emissions and the effects of emissions reductions.  Plaintiffs do not deny that the request is likely to yield such documents.  Plaintiffs argue only that "one struggles to understand" how documents concerning manufacturing facilities, which are "stationary sources" of carbon dioxide, are relevant to this case, concerning vehicle emissions.  Opp'n 16:13-17.  The documents that Defendants claim this request will yield, those regarding the benefits of reducing greenhouse gases, are relevant to determining whether the challenged regulations, by reducing emissions, will result in a legitimate local benefit under the Dormant Commerce Clause.  There is no reason to conclude at this stage that the warming effects of greenhouse gases emitted from stationary sources, and the associated benefits of reducing such emissions, so differ from the effects of emissions from motor vehicles as to justify denying this discovery on a relevance ground.  Accordingly, Defendants' motion for reconsideration is GRANTED with respect to request GM 25/DCC 24.  Defendants shall produce all responsive documents, including those that were not submitted to the DOE.

---

[12]      The request provides, in full, as follows:

**GM REQUEST NO. 25/DCC REQUEST NO. 24**: All DOCUMENTS relating to YOUR submission of annual reports to the United States Department of Energy reporting the amount of carbon dioxide emissions avoided or sequestered from YOUR MOTOR VEHICLE manufacturing facilities.

Joint Statement 43:18-20.

1    In response to Defendants' request for documents relating to "abrupt climate change"[13]

2    (see Joint Statement 45:1-3), Plaintiffs agree to produce only "any original research of their own

3    on this issue." Opp'n 16:26-27.  Such a limitation appears to exclude relevant documents from

4    the scope of the request.  For instance, Plaintiffs' internal communications about the merits of

5    research performed by third parties could be relevant to the Dormant Commerce Clause Claim.

6    A statement of a Plaintiff recognizing the environmental harm presented by Plaintiffs' products

7    would be especially trustworthy, given that there would be diminished motive to fabricate such a

8    statement.  Cf. People v. Chapman, 50 Cal. App. 3d 872, 879 (1975) (recognizing the

9    trustworthiness of a statement against the declarant's interest where a "reasonable man in

10   [declarant's] position would not have made the statement unless he believed it to be true").  Nor,

11   as discussed above, does the availability to Defendants of any of the global warming science bear

12   on the permissibility of discovery.  See Weiner, 76 F.R.D. at 625.  Accordingly, Defendants'

13   motion for reconsideration is GRANTED with respect to request  GM 26/DCC 25/AAM 24.

14   Plaintiffs shall produce all documents responsive to request.

15   In their opposition, Plaintiffs do not specifically address the merits of several of

16   Defendants' document requests regarding the causes of global warming (GM-DCC-AAM 8 and

17   9), the impacts of global warming (GM-DCC-AAM 10 and 11), and Plaintiffs' SEC disclosures

18   on global warming (GM 20/DCC-AAM 19).  Plaintiffs appear to rely on their arguments that

19   documents concerning global warming science, other than the contents of their experts' reports,

20   are categorically irrelevant and that Defendants should not be allowed to discover publicly

21   available documents.  For the reasons mentioned above, Defendants' motion for reconsideration

22

23      [13]    The request provides, in full, as follows:

24      **GM REQUEST NO. 26/DCC REQUEST NO. 25/AAM**
        **REQUEST NO. 24:** All DOCUMENTS relating to abrupt climate

25      change, including but not limited to DOCUMENTS relating to
        thresholds of GHG concentrations or of temperature beyond which

26      a GLOBAL WARMING impact occurs rapidly.

27   Joint Statement 45:1-3.

28                                           20

1  is GRANTED with respect to these requests.  Plaintiffs shall produce all documents responsive

2  to requests GM-DCC-AAM 8, 9, 10 and 11, and request GM 20/DCC-AAM 19.

3       With respect to the document requests that Defendants characterize as relating to "the

4  vehicle manufacturers' past and present activities challenging and questioning the science of

5  global warming" (Mot. 8:24-25), Plaintiffs have successfully argued that they are not relevant to

6  the Dormant Commerce Clause burden analysis, as discussed above.  Plaintiffs neglect, however,

7  to rebut in their opposition Defendants' contention that these documents, to the extent they

8  discuss the science of global warming, are relevant to the Dormant Commerce Clause benefit

9  analysis.  With respect to two of these requests, GM-DCC-AAM 13 and GM 16/DCC-AAM 15,

10 the Manufacturers state that they have conducted a "reasonably diligent search" and "located no

11 responsive non-privileged documents."  Joint Statement 31:10-20, 37:16-38:2.  The

12 Manufacturers have effectively certified that, "to the best of the signer's knowledge, information,

13 and belief," the response is given for a proper purpose, not simply to prevent Defendants from

14 receiving discovery material.  Fed. R. Civ. P. 26(g)(2).  The attorney's signature on a discovery

15 response "signals that the attorney has made a reasonable effort to assure that the client has

16 provided a truthful response—e.g., that all available documents are . . . furnished in response to

17 discovery requests."  6 James Wm. Moore et al., Moore's Federal Practice §26.154[2][a] (3d ed.

18 2006).  Failure to comply with this directive results in mandatory sanctions.  Fed. R. Civ. P.

19 26(g)(3).  The record currently before the court does not demonstrate that the Manufacturers'

20 representations are untrue.  Defendants' motion for reconsideration is DENIED with respect to

21 GM-DCC-AAM 13 and GM 16/DCC-AAM 15.

22      Defendants' request 14 to GM seeks documents "relating to both Global Warming and to

23 Tech Central Station including" their communications and documents relating to their

24 relationship.  Joint Statement 34:1-4.  Plaintiffs contend that Defendants seek irrelevant

25 documents concerning what the Manufacturers knew about global warming to use to embarrass

26 Plaintiffs into dropping this litigation.  This request potentially seeks relevant documents

27

28                                    21

1   concerning communications regarding the science of global warming.  However,

2   communications concerning, for example, the politics of or public opinion regarding global

3   warming and that do not discuss the science of global warming are not likely to be relevant to the

4   benefit analysis.  Nor does it appear documents that concern GM's relationship with Tech

5   Central Station and that do not discuss the science of global warming are relevant.  Defendants

6   have not explained how documents not discussing global warming science are likely to lead to

7   the discovery of admissible evidence.   Defendants' motion for reconsideration is GRANTED in

8   part and DENIED in part with respect to request GM 14.  GM shall only produce documents

9   responsive to request 14 that relate to any aspect of the science of global warming, such as the

10   causes of global warming, the effects of global warming, the effects of greenhouse gas emissions

11   or greenhouse gas concentrations on global warming, and the effect on global warming of

12   reductions in greenhouse gas emissions pursuant to government regulations or otherwise.

13        Defendants also request documents relating to a list of 18 individuals and to global

14   warming, including the Manufacturers' relationship with or communications with the individuals

15   and any automobile manufacturers' payments to the individuals.[14]  Joint Statement 35:1-9.  As

16

17       [14]     The request provides, in full, as follows:

18   **GM REQUEST NO. 15/DCC-AAM REQUEST NO.14:** All
DOCUMENTS relating to both GLOBAL WARMING and to any

19   of the following individuals: S. Fred Singer, James Glassman,
David Legates, Richard Lindzen, Patrick J. Michaels, Thomas Gale

20   Moore, Robert C. Balling, Jr., Sherwood B. Idso, Craig D. Idso,
Keith E. Idso, Sallie Baliunas, Paul Reiter, Chris Homer, Ross

21   McKitrick, Julian Morris, Frederick Seitz, Willie Soon, and Steven
Milloy, including but not limited to:

22

23   a. All DOCUMENTS relating to any communications between
YOU and these individuals, and

24   b. All DOCUMENTS relating to YOUR relationship (or the
relationship of any automobile manufacturer or association of

25   automobile manufacturers) with any of them, including but not
limited to payments directly or indirectly from YOU or any other

26   automobile manufacturer or association of automobile
manufacturer to any of them.

27

28                                 22

with the Tech Station request, this request is likely to lead to the discovery of admissible

evidence regarding the science of global warming that is relevant to the Dormant Commerce

Clause claim.  It also encompasses a variety of documents concerning communications or aspects

of the individuals' relationship to the Manufacturers that are irrelevant.  The Federal Rules

require Plaintiffs to disclose "the compensation to be paid for the study and testimony" of any

witness who will provide expert testimony.  See Fed. R. Civ. P. 26(a)(2)(B).  Defendants do not

explain how documents concerning any other payments are relevant.  Defendants' motion for

reconsideration is GRANTED in part and DENIED in part with respect to request GM 15/DCC-

AAM 14.  The Manufacturers shall only produce documents responsive to this request that relate

to any aspect of the science of global warming.

**CONCLUSION AND ORDER**

Accordingly, for the reasons stated in the above Memorandum Opinion, IT IS HEREBY

ORDERED that:

1.  Defendants' motion for RECONSIDERATION of the Magistrate Judge's order
    denying the motion to compel is DENIED with respect to requests GM-DCC-
    AAM 13, GM 16/DCC-AAM 15, and GM 30/DCC 29/AAM 28;

2.  Defendants' motion for RECONSIDERATION is GRANTED with respect to
    requests GM-DCC-AAM 8, 9, 10 and 11, GM 20/DCC-AAM 19, GM 22/DCC
    21/AAM 20, GM 23/DCC 22/AAM 21, GM 25/DCC 24, GM 26/DCC 25/AAM
    24, GM 28/DCC 27/AAM 26, and GM 29/DCC 28/AAM 27;  and

//

//

//

//

//

---

Joint Statement 35:1-9.

1         3.     Defendants' motion for RECONSIDERATION is GRANTED in part and

2               DENIED in part with respect to requests GM 14 and GM 15/DCC-AAM 14.  The

3               Manufacturers shall produce all documents responsive to requests GM 14 and GM

4               15/DCC-AAM 14 that discuss any aspect of the science of global warming.

5

6    IT IS SO ORDERED.

7    **Dated:**   **September 6, 2006**           **/s/ Anthony W. Ishii**
     0m8i78                          UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                         24