1

2

3

4

5

6

7        IN THE UNITED STATES DISTRICT COURT FOR THE

8              EASTERN DISTRICT OF CALIFORNIA

9

| | |
|---|---|
| CENTRAL VALLEY CHRYSLER-JEEP, et al., | CV F 04-6663 AWI LJO (NEW DJ) |
| Plaintiffs, | MEMORANDUM OPINION AND ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANT AND DEFENDANT-INTERVENORS' MOTION FOR JUDGMENT ON THE PLEADINGS AND (2) LIMITING DISCOVERY OF GLOBAL WARMING SCIENCE DOCUMENTS |
| v. | |
| CATHERINE E. WITHERSPOON, in her official capacity as Executive Director of the California Air Resources Board, et al., | |
| Defendants. | |

(Document #226)

        This case concerns the legality of environmental regulations imposed by a state administrative agency.  Plaintiffs seek declaratory and injunctive relief on the basis that the regulations violate and are preempted by federal law.  This court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

## BACKGROUND

### A.  California Health and Safety Code § 43018.5

        In 2002, the California Legislature enacted Assembly Bill Number 1493, codified at California Health and Safety Code § 43018.5.  Section 43018.5(a) required the California Air Resources Board ("CARB") to "develop and adopt regulations that achieve the maximum feasible and cost-effective reduction of greenhouse gas emissions from motor vehicles."  Section

43018.5 only authorizes regulations that apply to vehicles manufactured in the 2009 model year or after.  Cal. Health & Safety Code § 43018.5(b)(1).  "Maximum feasible and cost-effective reduction of greenhouse gas emissions" refers to reductions that are "[c]apable of being successfully accomplished within the time provided by this section, taking into account environmental, economic, social, and technological factors" and are "[e]conomical to an owner or operator of a vehicle, taking into account the full life-cycle costs of a vehicle."  Cal. Health & Safety Code § 43018.5(i)(2).

At a public hearing in September 2004, CARB approved regulatory amendments ("California regulations" or "regulations") adding greenhouse gas emission standards to California's existing motor vehicle standards.  See FAC Ex. A.  CARB, through its normal process, ultimately adopted the regulatory language in its Resolution 04-28.  Id.

CARB made factual findings to support its adoption of the regulations.  CARB found that "[o]ver the past century the temperatures in the northern hemisphere have changed at a rate faster than at any other time over the last millennium, and that change is because human activities are altering the chemical composition of the atmosphere through the buildup of greenhouse gases and other pollutants."  FAC Ex. A at 9.  CARB further noted that "the global climate is changing at a rate unmatched in the past one thousand years" and climate change is affecting California.  Id.  CARB found that the proposed standards would significantly reduce greenhouse gas emissions.  FAC Ex. A at 14.

The regulations addressed four greenhouse gases:  carbon dioxide, methane, nitrous oxide, and hydrofluorocarbons.  Cal. Code Regs. tit. 13, § 1961.1(e)(4).  The regulations weight the emission of each gas based on its "global warming potential."  Cal. Code Regs. tit. 13, § 1961.1(e)(6).  Compliance with the regulations is based on "fleet average" greenhouse gas emissions.  Cal. Code Regs. tit. 13, § 1961.1(a)(1)(A).  The average is defined separately for two categories of vehicles:  (1) passenger cars and light duty trucks under 3,750 pounds, and (2) light duty trucks over 3,750 pounds and medium duty passenger vehicles.  Id.  The standards set

emissions limits beginning in model year 2009 that become more stringent each year through 2016.  Id.  Manufacturers who fail to comply face civil penalties.  See Cal. Health & Safety Code § 43211.

Manufacturers that meet the standards for model year 2009 or surpass the standards in any later year will accrue credits.  Cal. Code Regs. tit. 13, § 1961.1(b)(1).  These credits may be used to offset that manufacturer's emissions in a later year, may be transferred between vehicle categories, or may be sold to another manufacturer.  Id.  A manufacturer who does not meet the standards may avoid the civil penalty for noncompliance by offsetting their failures within a five-year period.  Cal. Code Regs. tit. 13, § 1961.1(b)(3).  Manufacturers can also comply by earning credits for using alternative fuels that produce lower greenhouse gas emissions.  Cal. Code Regs. tit. 13, § 1961.1(a)(1)(B).

**B.  The Clean Air Act**

In 1963, Congress expanded its role in addressing air pollution by enacting the Clean Air Act.  Pub. L. No. 88-206, 77 Stat. 392 (1963).  Section 209(a) of the Clean Air Act, codified at 42 U.S.C. § 7543(a),[1] generally preempts state regulation of motor vehicle emissions.  Section 209(b) provides an exemption to 209(a) for rules adopted by the State of California that receive a waiver from the Environmental Protection Agency ("EPA").  42 U.S.C. § 7543(b)(1);[2] see

---

[1]      In relevant part, 42 U.S.C. § 7543(a) provides as follows:  "No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part."

[2]      In full, 42 U.S.C. § 7543(b)(1) provides as follows:

The Administrator shall, after notice and opportunity for public hearing, waive application of this section to any State which has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966, if the State determines that the State standards will be, in the aggregate, at least as protective of public health and welfare as applicable Federal standards.  No such waiver shall be granted if the Administrator finds that–
  (A) the determination of the State is arbitrary and capricious,
  (B) such State does not need such State standards to meet

3

1   Engine Mfrs. Ass'n v. EPA, 88 F.3d 1075, 1080 (D.C. Cir. 1996) (noting that, under the terms of

2   section 209(b), "California is the only state that qualifies for the waiver, because it was the only

3   state that had adopted emissions control standards prior to March 30, 1966").  In order to receive

4   such a waiver, the state standards must be, "in the aggregate," at least as protective as federal

5   standards.  42 U.S.C. § 7543(b)(1).  The EPA may deny a waiver if it finds that the state's

6   determination is "arbitrary and capricious," that the state standards are not needed to meet

7   "compelling and extraordinary conditions," or that the state standards are not consistent with 42

8   U.S.C. § 7521(a).  Id.  Though only California's regulations may receive a waiver, other states

9   may elect to adopt such California standards under Clean Air Act section 177, rather than being

10  governed by the federal scheme.  42 U.S.C. § 7507.

11         On September 8, 2003, the EPA concluded that "in light of the language, history,

12  structure and context of the [Clean Air Act] and Congress'[s] decision to give DOT authority to

13  regulate fuel economy under EPCA, it is clear that EPA does not have authority to regulate motor

14  vehicle emissions of CO[2] and other [greenhouse gases] under the [Clean Air Act]."  Control of

15  Emissions from New Highway Vehicles and Engines, 68 Fed. Reg. 52,922, 52,929 (September 8,

16  2003).  The District of Columbia Circuit upheld the EPA's decision, and the case is currently

17  before the Supreme Court.  See Massachusetts v. EPA, 415 F.3d 50 (D.C. Cir. 2005), *cert.*

18  *granted*, 126 S. Ct. 2960 (2006).

19         On December 21, 2005, CARB requested that the EPA grant the California regulations a

20  section 209(b) waiver, which the EPA has yet to provide.  Defs.' RJN Ex. C.

21  **C.  The Energy Policy and Conservation Act**

22         Enacted in 1975, the Energy Policy and Conservation Act ("EPCA") established federal

23  fuel economy standards for new vehicles.  Pub. L. No. 94-163, 89 Stat. 871 (1975).  The EPCA

24

25  ───────────────

26         compelling and extraordinary conditions, or
           (C) such State standards and accompanying enforcement

27  procedures are not consistent with section 7521(a) of this title.

28                                           4

authorizes the National Highway Traffic Safety Administration[3] ("NHTSA") to set a minimum corporate average fuel economy ("CAFE") for a manufacturer's fleet of new vehicles. 49 U.S.C. §§ 32902(a), 32902(c).

The EPCA provides that the CAFE standards must be set at the "maximum feasible average fuel economy level." 49 U.S.C. §§ 32902(a), 32902(c). In setting the maximum feasible level, NHTSA "shall consider technological feasibility, economic practicability, the effect of other motor vehicle standards of the Government on fuel economy, and the need of the United States to conserve energy." 49 U.S.C. § 32902(f). This requires NHTSA to consider the effect on fuel economy of state regulations that receive an EPA waiver under Clean Air Act section 209. EPCA § 301, 89 Stat. at 905; see Light Truck Average Fuel Economy Standard, Model Year 2004, 67 Fed. Reg. 16,052, 16,057 (April 4, 2002) (to be codified at 49 C.F.R. pt. 533) (considering the effect of California's low emission vehicle regulations in setting CAFE standard). The EPCA contains an express preemption provision:

> When an average fuel economy standard prescribed under this chapter is in effect, a State or a political subdivision of a State may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard under this chapter.

42 U.S.C. § 32919.

**D.  This Lawsuit**

On December 7, 2004, Plaintiffs[4] filed suit against Catherine E. Witherspoon, CARB's

---

[3]     The EPCA expressly provided that the Secretary of Transportation would administer the program. See, e.g., 49 U.S.C. § 32902(a). The Secretary delegated these responsibilities to the National Highway Traffic Safety Administration. 49 C.F.R. § 1.50(f).

[4]     Plaintiffs in the FAC include the following automobile dealerships located in Modesto, Turlock, Merced, Madera, Lemoore, Tulare, and Porterville: Central Valley Chrysler-Jeep, Inc.; Kitahara Pontiac GMC Buick, Inc.; Madera Ford Mercury, Inc.; Madera Chevrolet; Frontier Dodge, Inc.; Tom Fields Motors, Inc.; Pistoresi Chrysler Dodge Jeep; Bob Williams Chevrolet; Courtesy Oldsmobile Cadillac, Inc.; Merle Stone Chevrolet, Inc.; Merle Stone Porterville, Inc.; Sturgeon and Beck Incorporated; and Swanson Fahrney Ford, Inc. General Motors Corporation, DaimlerChrysler Corporation, the Tulare County Farm Bureau, and the Alliance of Automobile Manufacturers are also plaintiffs. The Association of International Automobile Manufacturers ("AIAM" or "Plaintiff-Intervenor") has intervened as a plaintiff.

5

executive director, to prevent enforcement of the California regulations.[5]  In their first amended complaint ("FAC"), filed February 16, 2005, Plaintiffs seek declaratory and injunctive relief on the following claims:

1. Count I – Preemption under the Energy Policy and Conservation Act of 1975 ("EPCA"), 49 U.S.C. §§ 32902-32919.

2. Count II – Preemption under § 209(a) of the Federal Clean Air Act, 42 U.S.C. § 7543(a).

3. Count III – Preemption under the foreign policy of the United States and the foreign affairs powers of the Federal Government.

4. Count IV – Violation of the Dormant Commerce Clause of the United States Constitution.

5. Count V – Violation of the Sherman Act, 15 U.S.C. § 1.

On June 1, 2006, Defendant and Defendant-Intervenors jointly filed a motion for judgment on the pleadings contending that each of Plaintiffs' and Plaintiff-Intervenor's causes of action had failed to state a claim upon which relief can be granted.[6]  On July 24, 2006, Plaintiffs filed a memorandum in opposition to the motion.  On the same day, Plaintiff-Intervenor filed a separate memorandum, also opposing the motion.  On August 17, 2006, Defendant and Defendant-Intervenors filed a reply to the opposition.  On September 7, 2006, Plaintiffs filed an ex parte motion for leave to file a surreply brief, to which Defendants objected.  On September 11, 2006, the court granted Plaintiffs' ex parte motion.  On September 15, 2006, the court heard the motion for judgment on the pleadings.

---

[5]   Sierra Club, Bluewater Network, Global Exchange, Rainforest Action Network, and Natural Resources Defense Council have intervened as defendants.

[6]   States that have adopted California's emission standards, along with the City of New York, have collectively filed briefs as amici arguing in favor of judgment on the pleadings. The amici are the States of New York, Connecticut, Maine, New Jersey, Oregon, Rhode Island, Vermont, Washington, the Commonwealth of Massachusetts, and the City of New York.

1          **LEGAL STANDARD**

2          Where Rule 12(c) is used to raise the defense of failure to state a claim, "the motion for

3  judgment on the pleadings faces the same test as a motion under Rule 12(b) (6)."  McGlinchy v.

4  Shell Chemical Co., 845 F.2d 802, 810 (9th Cir. 1988).  Dismissal of a complaint is proper if "it

5  appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which

6  would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  When determining a

7  motion for judgment on the pleadings, the court should assume the allegations in the complaint

8  to be true and construe them in the light most favorable to the plaintiff.  McGlinchey, 845 F.2d at

9  810.  However, "conclusory allegations without more are insufficient to defeat a motion [for

10  judgment on the pleadings]."  Id.  A complaint may be dismissed as a matter of law if there is a

11  lack of a cognizable legal theory or if there are insufficient facts alleged under a cognizable legal

12  theory.  Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990).  The court must

13  determine whether or not it appears to a certainty under existing law that no relief can be granted

14  under any set of facts that might be proved in support of a plaintiff's claims.  De La Crux v.

15  Tormey, 582 F.2d 45, 48 (9th Cir. 1978), cert. denied, 441 U.S. 965 (1979).

16          **DISCUSSION**

17  **A.  EPCA Preemption**

18          Plaintiffs and Plaintiff-Intervenor[7] (collectively "Plaintiffs") allege that the EPCA

19  preempts the California regulations.  They contend that the California regulations are expressly

20  preempted because they are "related to fuel economy standards" under 42 U.S.C. § 32919(a).

21  Plaintiffs also urge the court to find that the EPCA preempts the entire field of fuel economy

22  regulations and that the California regulations are invalid because they fall within that field.

23

24 ─────────────────

25          [7]    AIAM's Complaint in Intervention alleges that the California regulations are
preempted under both the EPCA and the Clean Air Act.  Defendants do not provide any basis to
grant judgment on the pleadings with respect to AIAM's claims distinct from its arguments for
26  dismissal of Counts I and II of the FAC.  Accordingly, the court's analysis of EPCA and Clean
Air Act preemption applies to both Plaintiffs' FAC and Plaintiff-Intervenor's Complaint in
27  Intervention.

28                                              7

Because Plaintiffs have stated a claim for preemption of the regulations based on their actual

conflict with the EPCA, the court declines to decide at this stage whether the other theories of

preemption have merit.

The Supremacy Clause, U.S. Const., art. VI, cl. 2, "invalidates state laws that 'interfere

with, or are contrary to,' federal law." Hillsborough County v. Automated Med. Labs., Inc., 471

U.S. 707, 712-13 (1985) (quoting Gibbons v. Ogden, 9 Wheat. 1, 211 (1824) (Marshall, C. J.)).

Congress, when acting within its constitutional limits, may preempt state law by expressly stating

its intent to do so. Id. at 713 (citing Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977)). In

the absence of such express language, a court can infer Congress's intent to preempt all state law

in a particular area "where the scheme of federal regulation is sufficiently comprehensive to

make reasonable the inference that Congress 'left no room' for supplementary state regulation."

Id. (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). "In addition to express

or implied pre-emption, a state law also is invalid to the extent that it 'actually conflicts with a

. . . federal statute.'" Int'l Paper Co. v. Ouellette, 479 U.S. 481, 491-92 (1987). Such a conflict

can result in preemption where it is impossible for a private party to comply with both the state

and federal requirements. English v. Gen. Elec. Co., 496 U.S. 72, 79 (1990). Conflict

preemption can also be found where "the state law 'stands as an obstacle to the accomplishment

and execution of the full purposes and objectives of Congress.'" Int'l Paper, 479 U.S. at 491-92

(quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).

In Geier v. American Honda Motor Co., 529 U.S. 861, 874-86 (2000), the Supreme Court

discussed the circumstances in which a more-restrictive state law "actually conflicts" with a

federal regulatory scheme. That case concerned whether a state tort law attaching liability for an

automobile manufacturer's failure to install an airbag conflicted with the regulatory scheme

administered by the Department of Transportation ("DOT"). Id. at 874. Based on its authority

under the National Traffic and Motor Vehicle Safety Act of 1966, the DOT had issued a safety

standard that did not require airbags in every vehicle, but instead mandated a mix of several

different passive restraint systems, including airbags.  Id. at 878.  The Court considered the

DOT's reasons for imposing a variety of restraints, rather than requiring all vehicles to use

airbags.  Id. at 875.  DOT had considered, among other things, the potential safety risks of

employing airbags, their high cost, and public reluctance to use them.  Id. at 877-78.  DOT had

concluded that an "all-airbag" standard would threaten a consumer backlash over perceived or

real safety risks.  Id. at 879.  On the other hand "a mix of devices would help develop data on

comparative effectiveness, would allow the industry time to overcome the safety problems and

the high production costs associated with airbags, and would facilitate the development of

alternative, cheaper, and safer passive restraint systems" while avoiding the backlash.  Id.  The

safety standard also provided for the gradual phase-in of passive restraints to allow the

manufacturers more time to develop airbags and other devices and to develop information about

the effectiveness of various systems.  Id.  The Court held that the state law, though it shared some

of the federal standard's goals, nevertheless presented an obstacle to the accomplishment the

federal objectives and was preempted.  Id. at 885; see also Gade v. Nat'l Solid Wastes Mgmt.

Ass'n, 505 U.S. 88, 107 (1992) (holding that, regardless of the state statute's purposes, it is

preempted if it "sufficiently interferes with federal regulation").

        Plaintiffs contend that the California regulations stand as an obstacle to the

accomplishment of the objectives of the EPCA.  Under the EPCA, NHTSA sets CAFE standards

at the "maximum feasible level" after considering various statutory factors.  49 U.S.C.

§§ 32902(a), 32902(c); see 49 U.S.C. § 32902(f).  The factors Congress requires NHTSA to

consider provide insight into the objectives of the CAFE program.  NHTSA must consider

"technological feasibility, economic practicability, the effect of other motor vehicle standards of

the Government on fuel economy, and the need of the United States to conserve energy."  49

U.S.C. § 32902(f).  In setting its maximum feasible level, NHTSA must also consider the effect

of fuel economy requirements on safety.  Competitive Enter. Inst. v. NHTSA, 956 F.2d 321, 327

(D.C. Cir. 1992).

1    The court finds that it is also appropriate to "place some weight" upon NHTSA's

2 interpretation of the EPCA's objectives.  See Geier, 529 U.S. at 883.  This is because NHTSA "is

3 likely to have a thorough understanding of its own regulation and its objectives and is 'uniquely

4 qualified' to comprehend the likely impact of state requirements."[8]  Id.  According to NHTSA,

5 one of the goals of the CAFE program is "improving motor vehicle fuel economy."  Average

6 Fuel Economy Standards for Light Trucks Model Years 2008-2011, 71 Fed. Reg. 17,566, 17,667

7 (April 6, 2006)  (to be codified at 49 C.F.R. pts. 523-33, 537).  To do so, NHTSA must set fuel

8 economy at the "maximum feasible level" while "avoiding serious adverse economic effects on

9 manufacturers and maintaining a reasonable amount of consumer choice among a broad variety

10 of vehicles."  Id.  Accordingly, Congress "carefully drafted" the CAFE program to require fuel

11 economy restrictions "that do not have the effect of either 'imposing impossible burdens or

12 unduly limiting consumer choice as to capacity and performance of motor vehicles.'"  Id.

13 (quoting H. Rep. No. 94-340, at 87 (1975).)

14    Based on the language of the EPCA and NHTSA's statements, the court finds that among

15 the objectives of the CAFE program are maximizing fuel economy, avoiding economic harm to

16 the automobile industry, maintaining consumer choice, and ensuring vehicle safety.  Plaintiffs'

17 FAC alleges that the enforcement of the California regulations will have a damaging impact on

18 the objectives of CAFE.  The FAC alleges that some manufacturers will need to improve the

19 average fuel economy level for some of their passenger automobiles to 44 miles per gallon,

20

21

22    [8]    At oral argument, Defendants pointed out that the Supreme Court in Geier
acknowledged that it would have reached the same result "even without giving DOT's own view
special weight," making the language endorsing consideration of the agency's view of its goals
23 dicta. 529 U.S. at 886.  The Ninth Circuit has nevertheless cited Geier for the proposition that
preemption can turn on an agency's opinion.  See Oxygenated Fuels Ass'n v. Davis, 331 F.3d
24 665, 672 (9th Cir. 2003) (holding that Geier was distinguishable and preemption was
inappropriate because, among other reasons, EPA had not interpreted its governing statute to
25 preempt the state regulation).  In any event, the Supreme Court's rationale for considering the
agency's view of its goals and the effect of a state statue is convincing.  The court therefore gives
26 weight to these opinions of NHTSA without ceding its duty to decide the issue of preemption de
novo.  See Smiley v. Citibank (S.D.), N.A., 517 U.S. 735, 744 (1996); Ass'n of Civilian
27 Technicians v. Fed. Labor Relations Auth., 200 F.3d 590, 592 (9th Cir. 2000).

28                                                        10

1  whereas the current federal standard requires an average of only 27.5 miles per gallon.  FAC

2  ¶ 78.  The California regulations require a fuel economy standard "approaching" 27 miles per

3  gallon for certain vehicles that must only meet the "light duty truck" standard of 22.2 miles per

4  gallon under the federal scheme.  FAC ¶ 79.  Plaintiffs allege in the FAC that the regulations, by

5  requiring motor vehicles to attain substantially higher fuel economy, will result in higher retail

6  prices to the consumer and higher costs and burdens on the industry.  FAC ¶ 77.  As a result, the

7  regulations allegedly "will have an acute, clear, direct and substantial impact [on] the

8  performance, price, and availability of vehicles that will be sold in California" and "on some

9  manufacturers' activities to comply with the national fuel economy standards as efficiently and

10  safely as possible, and in a manner that maximizes consumer choices and minimizes adverse

11  effects on employment."  Id.

12         The FAC alleges that vehicle manufacturers are currently designing their vehicles for

13  model year 2009.  FAC ¶ 81.  According to the FAC, the technologies and vehicle changes the

14  automobile industry is currently developing cannot fully comply with the California regulations.

15  FAC ¶ 86.  The FAC alleges that enforcement of the California regulations will force them to (1)

16  face sanctions for noncompliance in model year 2009, (2) incur increased cost by redesigning

17  vehicles already slated for production in model year 2009, making the sale of vehicles

18  unprofitable in many instances, or (3) restrict the sale of the vehicles that threaten compliance,

19  foregoing the opportunity to recover investment and production costs and profits they anticipated

20  for those vehicles.  FAC ¶ 81.  Plaintiffs allege that, if a manufacturer chooses to redirect its

21  engineers and developers to redesign vehicles for California, it will sacrifice its efforts to

22  introduce new products in markets other than California, resulting in lost sales for manufacturers

23  and lost goodwill and profits for dealers.  FAC ¶ 82.  The FAC also alleges that some

24  manufacturers will have to spend hundreds of millions of dollars to develop model year 2009

25  vehicles that comply.  FAC ¶ 101(c).  These expenditures will allegedly result in price increases

26  with the effect of reducing sales and goodwill for the manufacturers and the dealers.  Id.  The

27

28                               11

1  FAC alleges that the California regulations will also cause manufacturers to restrict or eliminate

2  the sale of some types of vehicles in California.  FAC ¶ 84.  As a result, Plaintiffs contend,

3  consumers will turn to the used-vehicle market or will select vehicles less suited to their needs or

4  business demands.  Id.

5       The FAC also alleges that enforcement of the California regulations will result in less

6  safe automobiles and increased vehicle-related fatalities.  FAC ¶¶ 87-92.  According to the FAC,

7  the regulations, once fully implemented, will "likely require the industry to produce a fleet of

8  smaller, lighter-weight vehicles for California."  FAC ¶ 90.  The FAC cites a report to Congress

9  concluding that a decrease in vehicle size, "without a concurrent upgrading of their occupant

10  protection capability, would likely lead to an increase in the rate of highway deaths and serious

11  injuries."  FAC ¶ 88.  Plaintiffs allege that, according to an analysis using NHTSA's predictive

12  model, the California regulation will result in an increase of 258 fatalities in California in 2020,

13  and an increase of 530 fatalities in 2030.  FAC ¶ 91.

14       Along with NHTSA's evaluation of CAFE's objectives, the court also considers its

15  opinion that the California regulations would disrupt the achievement of those objectives.  See

16  Geier, 529 U.S. at 883.  NHTSA concludes that a state carbon dioxide emission standard

17  requiring better fuel economy than the CAFE level "would upset the efforts of NHTSA to

18  balance and achieve Congress's competing goals."  Standards for Light Trucks, 71 Fed. Reg. at

19  17,667.  A state standard set above that determined by NHTSA under the statutory guidelines

20  "would negate the agency's analysis and decisionmaking" that it arrives at "only after

21  considering extensive technical information such as detailed product information submitted by

22  the vehicle manufacturers and NAS' report on the future of the CAFE program and conducting

23  analyses of potential impacts on employment and safety."  Id. at 17,667-68.  Accordingly,

24       NHTSA concludes that it is disruptive to the orderly
        implementation of the CAFE program, and to NHTSA's
25       reasonable balancing of competing concerns, to have two different
        governmental entities assessing the need to conserve energy,
26       technological feasibility, economic practicability, employment,
        vehicle safety and other concerns, and making inconsistent

27

28                                          12

judgments made [sic] about how quickly and how much of that single pool of technology could and should be required to be installed consistent with those concerns.

Id. at 17,668.  Thus, NHTSA has decided, echoing Plaintiffs' factual allegations, that such conflicting standards risk "serious adverse economic consequences for motor vehicle manufacturers and unduly limited choices for consumers."  Id.

On a motion for judgement on the pleadings, the court accepts as true Plaintiffs' factual allegations about the effects of the California regulations.  McGlinchey, 845 F.2d at 810. Defendants do not contend that Plaintiffs have failed to adequately allege facts supporting their claims that California regulations will risk higher prices, decreased choices and safety for the consumer, and decreased profitability and lost goodwill for manufacturers and dealers.[9] Defendants instead contend that Congress intended to permit the California regulations regardless of such impacts.

Defendants argue that California's regulations are permissible because the EPCA requires NHTSA to take such regulations into account in setting the CAFE level.  The EPCA provides that NHTSA, "[w]hen deciding maximum feasible average fuel economy . . . shall consider . . . the effect of other motor vehicle standards of the Government on fuel economy . . . ."  49 U.S.C. § 32902(f).  Defendants point out that the phrase "other motor vehicle standards" encompasses "California standards approved by EPA under section 209(b)."  Reply 9:18-19; see EPCA § 301, 89 Stat. at 905.  Defendants clarify the proposition, stating that the "NHTSA is not required to consider California's standards unless EPA, another federal agency, has approved them."  Reply 14:27-28.  Defendants further allege that the Clean Air Act requires the EPA, when deciding

---

[9]      In their reply brief, Defendants contend that the California regulations are consistent with the EPCA's "primary purpose":  improving fuel economy.  Defs.' Reply 17 n.3. They do not dispute, however, that maximizing safety, consumer choice, and the economic well-being of the automobile industry are also among the EPCA's goals.

13

1   whether to grant a waiver, to make determinations similar to those on which CAFE is based.[10]

2   Plaintiffs do not dispute that, under section 32902(f), NHTSA must consider regulations that

3   receive a waiver under 209(b).

4          Defendants argue that when Congress adopted the EPCA in 1975, it knew that motor

5   vehicle emission standards affect fuel economy.  See H.R. Rep. No. 94-340, at 86-87, 90-91

6   (1975), *reprinted in* 1975 U.S.C.C.A.N. 1762, 1848-49, 1852-53.  Certain California emission

7   standards then in place decreased average fuel economy.  Id. at 87.  The EPCA permitted

8   manufacturers to apply for a relaxation of the average fuel economy standard if the federal

9   standards, including those California standards granted a waiver under section 209(b), resulted in

10  lower fuel economy.  EPCA § 301, 89 Stat. at 904-05; H.R. Rep. No. 94-340, at 90-91; see

11  Center for Auto Safety v. NHTSA, 793 F.2d 1322, 1325 & n.12 (D.C. Cir. 1986).  Defendants

12  contend that Congress integrated section 209 standards into the EPCA by requiring NHTSA to

13  account for "other motor vehicle standards of the Government on fuel economy . . . ."  49 U.S.C.

14  § 32902(f).

15         Defendants argue that state law does not stand as an obstacle to a federal statute when the

16  federal government "contemplates coexistence between" the two regulatory schemes, citing

17  Skysign International v. City & County of Honolulu, 276 F.3d 1109, 1117 (9th Cir. 2002).  In

18  Skysign, the Ninth Circuit considered whether a municipal ordinance barring aerial advertising

19  was preempted by the FAA regulatory scheme.  Id. at 1113.  After deciding that FAA regulation

20  did not preempt the field of aerial advertising, the court addressed whether conflict preemption

21  barred the ordinance.  Id. at 1117.  At the outset, the court noted that, in a conflict preemption

22

23         ─────────────────

24         [10]      Plaintiffs construed this line of argument as a contention that the EPA would only
       grant a waiver if it decided that the EPCA did not preempt the regulations and filed a surreply
       brief refuting that argument.  See Pls.' Ex Parte Mot. for Leave to File Surreply 1:7-12.
25     Defendants disclaim making any contention that the EPA would consider whether the EPCA
       preempted the California regulations or consider whether the regulations affect the "goals and
26     purposes" of the EPCA.  Defs.' Objection to Pls.' Surreply Brief 3:12-18.  Defendants concede
       that the EPA's review of the regulations is limited by the criteria in section 209(b).  Id. at 3:18-
27     20.

28                                                   14

1  analysis, "state law cannot *by its mere existence* stand as such an obstacle when the federal

2  government contemplates coexistence between federal and local regulatory schemes." Id.

3  (emphasis added). The court was careful to qualify that the federal government, by merely

4  authorizing the states to act, did not immunize state regulations from conflict preemption

5  scrutiny: "Of course, even when the federal government has evinced its intent to leave the states

6  and localities some room in which to regulate, some local regulation may transgress those

7  boundaries by interfering with the underlying federal purposes." Id. at 1118 n.5. The court noted

8  that the FAA had granted permission for the aerial advertisement with the explicit instruction that

9  the advertiser abide by local laws and ordinances related to aerial signs. Id. at 1117-18. The

10 FAA had also made explicit statements in public documents that its grant of permission did not

11 supercede any "local, state, or city ordinance(s) prohibiting aerial advertising." Id. at 1118.

12 Given the FAA's explicit deference to local ordinances prohibiting aerial advertising, the court

13 concluded that the ordinance at issue did not "impede the federal policy or purpose" of the FAA

14 permission scheme. Id.

15     Defendants' reliance on Skysign is misplaced. It does not stand for the proposition that

16 state law does not stand as an obstacle whenever the federal government contemplates the

17 coexistence between federal and state regulatory schemes. See id. at 1117-18 & n.5. The

18 holding is much more circumscribed, requiring courts to look beyond the mere fact that federal

19 and state regulations coexist and to analyze the extent the state law "interfer[es] with the

20 underlying federal purposes." Id. at 1118 n.5. Here, unlike in Skysign, NHTSA has not

21 expressly or impliedly claimed that the California regulations are permissible or can be

22 harmonized with the EPCA scheme. Instead NHTSA has explicitly found that the challenged

23 regulations would disrupt the CAFE program. See Standards for Light Trucks, 71 Fed. Reg. at

24 17,668.

25     Defendants also cite in support Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware, 414

26 U.S. 117, 126 (1973). The Court in that case emphasized the value of protecting "the sensitive

27

28                                              15

1    interrelationship" between federal and state regulation of securities.  Id. at 126-27.  Nevertheless,

2    the Court held that conflicting state law was preempted "to the extent necessary to protect the

3    achievement of the aims" of the federal regulatory scheme.[11]  Id. at 127.

4        Neither Skysign or Merrill Lynch stands for the proposition that congressional

5    authorization of a state regulation immunizes it from a conflict preemption challenge.  Rather,

6    each requires an analysis of whether the state regulation, even if authorized, is an obstacle to the

7    objectives of the federal scheme.  Skysign, 276 F.3d at 1118 n.5; Merrill Lynch, 414 U.S. at 127.

8        Defendants contend that the EPCA and regulations that receive an EPA waiver under

9    section 209(b) comprise "an overlapping federal scheme."  Defs.' Reply 14:27-15:3.  They point

10   out that the EPA under the Clean Air Act, like NHTSA pursuant to the EPCA, considers the

11   technological feasibility and economic practicability of emission standards.  Defendants note that

12   the EPA, when scheduling implementation of regulations that have received a waiver, allows

13   such a regulation to take effect only "after such period as the Administrator finds necessary to

14   permit the development and application of the requisite technology, giving appropriate

15   consideration to the cost of compliance within such period."  42 U.S.C. § 7521(a)(2).

16       Nothing in the statutory language or the legislative history of the Clean Air Act, the

17   EPCA, or any other statute before the court indicates Congress's intent that an EPA waiver

18   would allow a California regulation to disrupt the CAFE program.  Section 209(b) provides only

19   that the waiver exempts the regulations from express preemption under section 209(a).  See 42

20   U.S.C. § 7543(b)(1).  ("The Administrator shall, after notice and opportunity for public hearing,

21   waive application of ***this section*** . . . ." (emphasis added)).  On its face, the language does not

22   endorse regulations that present obstacles to the objectives of the EPCA, nor do the criteria

23   considered by EPA in granting a waiver ensure that such interference will not occur.

24

25       _____

26   [11]    Merrill Lynch appears to suggest that when possible, the state statute should be
     preempted only to the extent that it stands as an obstacle to the federal schemes goals.  414 U.S.

27   at 127.  Defendants do not argue that some severable portion of the California regulations does
     not impede achieving the EPCA's goals.

28                                          16

Section 209(b) does not provide that the regulations, once EPA grants a waiver, become federal law and are thereby rendered immune from preemption by other federal statutes. Defendants point out that compliance with state standards that have been granted a waiver is treated as compliance with federal standards, giving them federal status.  42 U.S.C. § 7543(b)(3). However, the sentence to which Defendants refer indicates that  "compliance with such State standards shall be treated as compliance with applicable Federal standards *for purposes of this subchapter*."  Id. (emphasis added).  Section 177 demonstrates that Congress also gave narrow effect to other states' adoption of regulations that receive a waiver.  See 42 U.S.C. § 7507 (providing that "*[n]otwithstanding section 7543(a) of this title*," the Clean Air Act's express preemption provision, other states may adopt standards identical to California's (emphasis added)).  Hence, the statutory language explicitly disclaims any special status for the California regulations under other federal statutes.  The legislative history generally emphasizing the breadth of California's discretion upon receiving an EPA waiver does not provide any reason to believe that the resulting regulations could stand as an obstacle to other federal schemes.  See, e.g, H.R. Rep. No. 95-294, at 301-02 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1077, 1380-81.

The language of the EPCA also does not evince an intent to permit state regulations that conflict with the goals of its scheme.  The requirement that the Secretary "shall consider" the effect of the California regulations does not indicate congressional intent to permit regulations that are obstacles to the EPCA's goals, such as ensuring vehicle safety, the economic health of the industry, and consumer choice.  See 42 U.S.C. § 32902(f).  The parties do not discuss in depth the effect of the term "consider" in the language of section 32902(f).  Defendants appear to read into this language a mandate that the EPCA accommodate other regulations, including those granted an EPA waiver.  See also Defs.' Mot. 21:16-17 (asserting that "Congress has required that NHTSA *respect* California emission standards when establishing fuel economy standards" (emphasis added)).  At oral argument, Defendants contended that requiring NHTSA to consider the California regulations made them "part of EPCA."  Defendants urge that the requirement that

17

1    NHTSA consider the California regulations amounts to Congressional authorization of such

2    regulation, regardless of their effects on the EPCA's goals.

3            However, a congressional requirement that a decision maker "consider" a factor does not

4    deserve the weight than Defendants place on it.  Congress's use of the term "consider" in a

5    statute requires an actor to merely "investigate and analyze" the specified factor, but not

6    necessarily act upon it.  City of Davis v. Coleman, 521 F.2d 661, 679 (9th Cir. 1975); J.H. Miles

7    & Co., Inc. v. Brown, 910 F. Supp. 1138, 1156 (E.D. Va. 1995) (regulation requiring federal

8    fishing officials to "consider" a statutory factor in setting fishing quota recommendations was not

9    a "strict dictate" and suggested officials had "some discretion" in preparing their

10   recommendation); T.S. v. Ridgefield Bd. of Educ., 808 F. Supp. 926, 931 (D. Conn. 1992)

11   (requirement under Individuals with Disabilities Education Act ("IDEA") that an independent

12   educational evaluation "must be considered" was met where an individual who reviewed the

13   evaluation read an summarized portions at a school meeting); G.D. v. Westmoreland Sch. Dist.,

14   930 F.2d 942, 947 (1st Cir.1991) (report "considered" under IDEA where it was reviewed at a

15   meeting).  The language of section 32902(f) merely requires NHTSA to investigate and analyze

16   what effect the "other" regulations will have on fuel economy.

17           These definitions of "consider" comport with NHTSA's interpretation of section

18   32902(f).  Responding to suggestions that the provision prevents preemption, NHTSA concluded

19   that the "EPCA's decisionmaking factor provision is neither a saving clause nor a waiver

20   provision. . . . The agency interprets that provision only to direct NHTSA to consider those State

21   standards that can otherwise be validly adopted and enforced under State and Federal law."

22   Standards for Light Trucks, 71 Fed. Reg. at 17,669.  After having investigated and analyzed all of

23   the required factors, the agency is free to set the maximum feasible average fuel economy based

24   on all of the information properly before it.  Even if one objective of EPCA is to set fuel

25   economy standards in a manner that takes into account the effects of California standards

26   receiving a waiver, this does not evince Congress's intent that such a standard is permitted to

27

28                                                    18

1   impair the achievement of the EPCA's other objectives.  See Geier, 529 U.S. at 885.  The court

2   sees no reason to interpret Congress's directive as to which information NHTSA must consider

3   as permission for a state law to disrupt the objectives of the EPCA.  Nor do Defendants cite any

4   legislative history that furthers its reading of the "shall consider" language of section 32902(f).

5        Because nothing before the court evinces Congress's intent to permit California

6   regulations that stand as an obstacle to the EPCA's objectives, Plaintiffs have stated a claim for

7   EPCA preemption and the court will not grant judgment on the pleadings on this cause of action.

8   **B. Clean Air Act Preemption**

9        Plaintiffs contend that the California regulations are preempted by section 209(a) of the

10   Clean Air Act, 42 U.S.C. § 7543(a).  Section 209(a) provides that a state may not "adopt or

11   attempt to enforce any standard relating to the control of emissions from new motor vehicles or

12   new motor vehicle engines subject to this part."  Id.  Meanwhile, section 209(b) provides a means

13   for the EPA to waive the prohibition under section 209(a) provided it makes certain findings.  42

14   U.S.C. § 7543(b).

15        Defendants do not contend that, under section 209(a), the challenged regulations are not

16   a "standard relating to the control of emissions from new motor vehicles."  42 U.S.C. § 7543(a).

17   Accordingly, the regulations are preempted unless the EPA issues a waiver under section 209(b).

18   42 U.S.C. § 7543(b).  Defendants ask the court to enter judgment on the pleadings in their favor

19   on this claim on the basis that "Plaintiffs and Plaintiff-intervenor have virtually abandoned their

20   principal Clean Air Act claim."  Defs.' Reply 4:4-5.  Defendants point out that Plaintiffs have not

21   challenged their contentions that the Clean Air Act authorizes the regulation of greenhouse gas

22   emissions as pollutants or that the EPA has the authority to issue California a waiver.  Accepting

23   these arguments, however, does not mean that the regulations are subject to a waiver under

24   section 209(b).[12]  The EPA can still deny a waiver on the basis of a factual finding that the

25

26        [12]    In the alternative, Defendants ask the court to enter judgment against Plaintiffs'
27   contention that the "EPA may not issue a waiver under section 209(b)(1)(C)."  Defs.' Reply
     4:11-13.  At oral argument, Defendants proposed that the court also decide at this stage that

28                                              19

1    regulations are not needed to meet "compelling and extraordinary conditions."[13]   42 U.S.C.

2    § 7543(b)(1)(B).

3          In any event, the EPA has not waived 209(a) preemption with respect to the California

4    regulations.  Nothing in the Plaintiffs' FAC, the Plaintiff-intervenor's complaint, or in any other

5    part of the record justifies granting judgment on the pleadings by speculating that the EPA will

6    make a future factual finding that favors Defendants, the moving parties.  Thus, Defendants'

7    motion for judgment on the pleadings on this cause of action must be denied.

8    **C. Conflict with United States Foreign Policy**

9          It is beyond dispute that "at some point an exercise of state power that touches on foreign

10   relations must yield to the National Government's policy."  Am. Ins. Ass'n v. Garamendi, 539

11   U.S. 396, 413 (2003).  After all, it was out of "concern for uniformity in this country's dealings

12   with foreign nations" that the Constitution allocated the foreign relations power to the federal

13   government.  Id. (quoting Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 427, n.25

14   (1964)).  The "executive power" vested in Article II of the Constitution provides the President

15   the "vast share of responsibility for the conduct of our foreign relations."  Youngstown Sheet &

16   Tube Co. v. Sawyer, 343 U.S. 579, 610-11 (1952) (Frankfurter, J., concurring).  "While Congress

17   holds express authority to regulate public and private dealings with other nations in its war and

18   foreign commerce powers, in foreign affairs the President has a degree of independent authority

19

20   _____

21   EPA's authority extends regulation of greenhouse gases.  Defendants urge that such holdings are
     proper under the rule that a motion to dismiss "may be granted as to part of a complaint and

22   denied as to the remainder."  See Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 115 (2d Cir.
     1982) (affirming the dismissal of certain claims against defendants and reversing the district

23   court's dismissal of other claims).  Here, the court has concluded Plaintiffs have stated a claim
     for preemption under the Clean Air Act, regardless of whether the EPA has the power to issue a

24   waiver authorizing the California regulations.  Accordingly, the court declines at this stage to
     decide the scope of the EPA's power.

25          [13]      AIAM's complaint explicitly alleges that no factual basis exists for such a finding.
     AIAM Compl. ¶ 62.  As Judge Coyle decided in his order of October 21, 2005, the issue before

26   the court on the Clean Air Act claim is whether section 209(a) preemption applies, not whether
     the EPA will deem a waiver of the California regulations appropriate under section 209(b)

27   criteria, such as whether "compelling and extraordinary conditions" justify the regulations.

28                                          20

1   to act." <u>Garamendi</u>, 539 U.S. at 414.

2   In <u>Garamendi</u>, the Supreme Court addressed whether California's Holocaust Victim

3   Insurance Relief Act of 1999 ("HVIRA") was preempted because it interfered with the federal

4   government's conduct of foreign relations. <u>Id.</u> at 401.  HVIRA required insurers doing business

5   in California to disclose details of any insurance policies issued in Europe between 1920 and

6   1945, which would be made public through a central registry. <u>Id.</u> at 409-10.  Around the time

7   that the legislation was passed, President Clinton was attempting to negotiate with the German

8   government to develop a coordinated approach to these claims. <u>Id.</u> at 405.  In 2000, President

9   Clinton and German Chancellor Schroder signed the German Foundation Agreement, in which

10  Germany agreed to enact legislation establishing a foundation funded by the German government

11  and German industry to compensate those injured by German companies during the Nazi era. <u>Id.</u>

12  In exchange, the President promised to attempt to shield Germany from litigation by filing

13  Statements of Interest in the courts, encouraging judges to defer to Foundation procedure. <u>Id.</u> at

14  406.  Both nations also agreed that the Foundation would work with the International

15  Commission on Holocaust Era Insurance Claims to establish procedures for handling claims. <u>Id.</u>

16  at 407.

17  The <u>Garamendi</u> Court, in determining whether HVIRA was preempted under the foreign

18  affairs doctrine, considered its analysis of an Oregon probate statue in <u>Zschernig v. Miller</u>, 389

19  U.S. 429 (1968).  The statute in <u>Zschernig</u> "prohibited inheritance by a nonresident alien, absent

20  showings that the foreign heir would take the property 'without confiscation' by his home

21  country and that American citizens would enjoy reciprocal rights of inheritance there." <u>Id.</u> at

22  417.  In practice, the statute encouraged state judges in Oregon probate proceedings to disparage

23  foreign governments and express anticommunist views. <u>Id.</u>  Accordingly, the majority struck

24  down the statute because it "impair[ed] the effective exercise of the Nation's foreign policy." <u>Id.</u>

25  at 440.  The majority concluded that the statute had "a direct impact upon foreign relations" and

26  potentially would "adversely affect the power of the central government to deal with those

27

28                                                         21

1   problems." Id. at 441.  In a concurring opinion, Justice Harlan interpreted past Supreme Court

2   jurisprudence as establishing that "in the absence of a conflicting federal policy or violation of

3   the express mandates of the Constitution the States may legislate in areas of their traditional

4   competence even though their statutes may have an incidental effect on foreign relations." Id. at

5   458-59 (Harlan, J., concurring).

6        In Garamendi, the Court decided that the majority's and Justice Harlan's opinions in

7   Zschernig represented "contrasting theories of field and conflict preemption." Garamendi, 539

8   U.S. at 419.  The Court declined to decide which approach is correct.  Id. at 419-20.  Instead, the

9   Court found that HVIRA was preempted under either approach because it would "produce

10  something more than incidental effect in conflict with express foreign policy of the National

11  Government." Id. at 420.  In deciding the propriety of state legislation in an areas of "their

12  traditional competence," the Court noted that under Justice Harlan's view it is reasonable to

13  "consider the strength of the state interest, judged by standards of traditional practice."[14]  Id.

14       The parties dispute the current administration's approach to reductions of greenhouse gas

15  emissions.  Plaintiffs focus on language in an EPA report describing the current administration's

16  greenhouse gas emissions strategy:

17          Unilateral EPA regulation of motor vehicle GHG emissions could
            also weaken U.S. efforts to persuade key developing countries to
18          reduce the GHG intensity of their economies.  Considering the
            large populations and growing economies of some developing
19          countries, increases in their GHG emissions could quickly
            overwhelm the effects of GHG reduction measures in developed
20          countries.  Any potential benefit of EPA regulation could be lost to
            the extent other nations decided to let their emissions significantly
21          increase in view of U.S. emission reductions.  Unavoidably,
            climate change raises important foreign policy issues, and it is the
22          President's prerogative to address them.

23  _____

24       [14]    The Court also suggested, but did not adopt, a complementary application of
    Justice Harlan's and the Zschernig majority's approach.  Garamendi, 539 U.S. at 419 n.11.  Such
25  an approach would call for field preemption when the state legislation addressed a matter that
    was not a "traditional state responsibility." Id.  On the other hand, a court should strike down
26  legislation within the state's "traditional competence" only upon a finding of a conflict with
    foreign affairs of sufficient "clarity or substantiality" based on "the strength or the traditional
27  importance of the state concern asserted." Id.

28                                            22

1   Control of Emissions, 68 Fed. Reg. at 52,931 (footnote omitted).[15]  The report goes on to

2   conclude that "the President's policy emphasizes international cooperation and promotes

3   working with other nations to develop an efficient and coordinated response to global climate

4   change."  Id. at 52,933.  Plaintiffs allege that the implementation of the California regulations

5   "interferes with the ability of the United States to speak with one voice upon matters of global

6   climate change" and "diminishes the bargaining power of the United States in negotiating

7   multilateral reductions of greenhouse gases."  FAC ¶ 130.

8          Plaintiffs also cite the opinion of a district court dismissing claims seeking to abate

9   greenhouse gas emissions on a public nuisance theory as nonjusticiable political questions.  See

10  State of Connecticut v. Am. Elec. Power Co., 406 F. Supp. 2d 265 (S.D.N.Y. 2005).  In

11  determining the Executive Branch's current approach to greenhouse gas reduction, the court

12  considered the reluctance of Congress and the Executive Branch to impose formal limits on such

13  emissions.  Id. at 269-70.  It noted that Congress has focused its efforts toward researching the

14  effect of emissions, for instance, through the National Climate Program Act of 1978, 15 U.S.C.

15  § 2901 et seq., and the Global Change Research Act, 15 U.S.C. §§ 2931-2938.  Id. at 269.  The

16  court also mentioned that President H. W. Bush had signed, and the senate ratified, the United

17  Nations Framework Convention on Climate Change ("UNFCCC"), "which brought together a

18  coalition of countries to work toward a coordinated approach to address the international issue of

19  global warming."  Id.  UNFCCC member nations, and President Clinton, signed the Kyoto

20  Protocol, which called for mandatory reductions in greenhouse gas emissions.  Id.  The court

21  recognized, however, that the Senate did not approve the Protocol, rather voting 95-0 in the so-

22  called Byrd-Hagel resolution to "urge the President not to sign any agreement that would result in

23  serious harm to the economy or that did not include provisions regarding the emissions of

24

25          [15]      Defendants contend that, if the Supreme Court ultimately decides that the EPA
    may not consider the effect of a state regulation on foreign affairs when it grants a waiver, then
26  Plaintiffs foreign policy preemption claim fails.  Regardless of the Supreme Court's ultimate
    holding on this issue, the statement remains an expression by an executive agency of the
27  President's foreign policy strategy.

28                                               23

developing nations." Id. (citing S. 98, 105th Cong. (1997)).  Congress subsequently passed

legislation barring the EPA from implementing the protocol.  Id. (citing Pub. L. No. 105-276,

112 Stat. 2461, 2496 (1998); Pub. L. No. 106-74, 113 Stat. 1047, 1080 (1999); Pub. L. No.

106-377, 114 Stat. 1441, 1441A-41 (2000)).  The court then considered President George W.

Bush's opposition to the Protocol based on its exemption of developing nations, its failure to

address two major pollutants, and its negative impact on the United States.  Id.  The court

concluded by citing the EPA report's focus on "international cooperation" and "coordinated

response" as an expression of "the policy of the current administration."  Id. at 270 (citing

Control of Emissions, 68 Fed. Reg. at 52,933).

        The recent cases in which the Supreme Court has held that a state statute is preempted

based on United States foreign affairs concern an executive agreement or federal statute with

which the state legislation conflicts.  See Garamendi, 539 U.S. at 421 (focusing preemption

inquiry on "the national position, expressed unmistakably in the executive agreements signed by

the President"); Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 375-76 (2000)

(considering whether the challenged state law "might . . . blunt the consequences" of actions

available to the President pursuant to a federal statute).  Here, Plaintiffs do not contend that the

United States' opposition to unilateral greenhouse gas emission or its pursuit of negotiated

reductions is embodied in any particular executive agreement or federal statute.  Rather,

Plaintiffs point to Executive Branch statements, the absence of national greenhouse gas

regulations, and the Senate's rejection of binding emissions reductions in the Byrd-Hagel

resolution to establish the nature of present United States policy.

        Plaintiffs contend that the Byrd-Hagel resolution amounts to "implied authorization" of

the administration's position on negotiating emissions reductions under Youngstown. 343 U.S. at

635.  In Youngstown, the Court held that "[w]hen the President acts pursuant to an express or

implied authorization of Congress, his authority is at its maximum, for it includes all that he

possesses in his own right plus all that Congress can delegate."  Id.  Plaintiffs point out that

1  recent Supreme Court authority provides that the scope of the President's power under

2  Youngstown determines the scope of foreign policy preemption.  See Garamendi, 539 U.S. at

3  414; Crosby, 530 U.S. at 375.

4          The Byrd-Hagel resolution expressed the Senate's opposition to any protocol to or other

5  agreement regarding the UNFCCC that would:

6                  (A) mandate new commitments to limit or reduce greenhouse gas
                    emissions for the Annex I Parties, unless the protocol or other
7                   agreement also mandates new specific scheduled commitments to
                    limit or reduce greenhouse gas emissions for Developing Country
8                   Parties within the same compliance period, or

9                  (B) would result in serious harm to the economy of the United
                    States; . . . .
10

11  S. 98, 105th Cong. (1997).  While the resolution appears to speak as to what the sort of

12  agreements the Senate refuses to support, it also appears to implicitly support a Presidential

13  approach of negotiating reciprocal emissions reductions with other nations.

14         Defendants contend that the Byrd-Hagel resolution has been countermanded by a more

15  recent one, the Bingaman-Domenici resolution, calling for binding limits "on emissions of

16  greenhouse gases that slow, stop, and reverse the growth of such emissions" and that "will

17  encourage comparable action by other nations."  151 Cong. Rec. S7033 (daily ed. June 22, 2005).

18  While this later resolution expresses the Senate's sense that Congress should enact mandatory

19  emissions limits, it does not contravene the Byrd-Hagel resolution's approach to international

20  agreements.  Moreover, the Bingaman-Domenici resolution does not speak to the President's

21  authority to forge international agreements, as the Byrd-Hagel resolution did.  The Senate's mere

22  statement of its own intent to impose limits does not itself interfere with or express disapproval

23  of the President's efforts to negotiate limits with other countries.  In any event, the Bingaman-

24  Domenici resolution does not divest the President of his "independent authority to act" on

25  matters of foreign affairs.  Garamendi, 539 U.S. at 414.

26         Even if the President lacks the Senate's endorsement of his negotiation-based approach to

27

28                                           25

greenhouse gas emissions, he nonetheless can act pursuant to certain independent powers of his office.  See Youngstown, 343 U.S. at 637.  In Garamendi, the Supreme Court acknowledged that Presidential action pursuant to such "independent authority" in foreign affairs, such as making an executive agreement, could preempt interfering state laws.  539 U.S. at 414-15, 424 n.14 (noting that "the President in this case is acting without express congressional authority," but, because "the President possesses considerable independent constitutional authority to act on behalf of the United States on international issues, . . . conflict with the exercise of that authority is a comparably good reason to find preemption of state law").  If the President were to negotiate with another nation or nations to agree to reduce greenhouse gas emissions, such an action would not be "incompatible" with the Senate's will as expressed in the Bingaman-Domenici resolution to obtain mandatory emissions reductions so as to place "his power is at its lowest ebb."  See Youngstown, 343 U.S. at 637.  Rather, an agreement to so reduce emissions would apparently further the Senate's expressed goals of ameliorating the risks associated with such emissions.

The Supreme Court cases do not suggest that the absence of a statute or an executive agreement is fatal to a foreign policy preemption claim.  In fact, the Court's analysis suggests that such a claim is permissible.  In Garamendi, though the Court addressed the preemptive effect of an executive agreement, it recognized a general "executive authority to decide what that policy should be" as well as authority to act independently of Congress.  539 U.S. at 414.  In the field of foreign policy, the President has the "lead role," which makes it appropriate to give weight to policy statements by Executive Branch officials to determine that policy.  Id. at 422 & n.12 (considering statements of Executive Branch officials, in addition to executive agreements, to determine the nature of United States foreign policy).  If Executive Branch statements are competent evidence of what our foreign policy is, the court sees no reason to limit preemption to foreign policy as expressed in statutes or executive agreements.

In Crosby, the Supreme Court has preempted state law based on its potential to interfere with future discretionary actions within the President's foreign policy power.  530 U.S. at 377

(finding preemption where state statute "undermin[ing] the President's intended statutory

authority by making it impossible for him to restrain fully the coercive power of the national

economy when he may choose to take the discretionary action open to him"). In Crosby, even

though the President's discretionary powers derived from a statute, the Court did not foreclose

the potential preemption of a state statute interfering with a Presidential foreign policy option on

which he has not yet acted. Id. Thus, so long as the President is empowered to act to benefit

United States foreign policy interests, whether through express or implied congressional

authorization or through his independent authority, a state statute that excessively interferes with

an action "he may choose to take" in furtherance of that interest may be preempted. See id.

Defendants contend that the UNFCCC evidences a United States policy of unilateral

reductions of greenhouse gas emissions, contrary to the EPA's account of current policy.

Defendants contend that signing on to the UNFCCC committed the United States to unilaterally

decrease its greenhouse gas emissions:

> Each of these Parties shall adopt national policies and take
> corresponding measures on the mitigation of climate change, by
> limiting its anthropogenic emissions of greenhouse gases and
> protecting and enhancing its greenhouse gas sinks and reservoirs.
> These policies and measures will demonstrate that developed
> countries are taking the lead in modifying longer-term trends in
> anthropogenic emissions . . . .

Defs.' RJN Ex. D at 12. Defendants point out that the UNFCCC signatories agreed to take the

lead acknowledging that, as developed countries, they were responsible for the "largest share of

historical and current" greenhouse gas emissions. Id. at 2. Defendants contend that the

UNFCCC obligates the United States to refrain from activities that might damage the

environment beyond its borders, to "protect the climate system," and to take precautions to

"anticipate, prevent or minimize the causes of climate change and mitigate its adverse effects."

Defs.' RJN Ex. D at 2, 9.

Defendants assert that the CAFE program under the EPCA belies Plaintiffs contention

that United States policy is to eschew unilateral greenhouse gas regulation. In support,

27

1  Defendants quote the allegation in the FAC that "[b]y setting fuel economy standards, the

2  national government has regulated the level of greenhouse gases released by cars and trucks sold

3  in this country."  FAC ¶ 4.  Plaintiffs respond that the CAFE program's fuel economy regulations

4  only functionally regulate greenhouse gas emissions to achieve the ends specified in the EPCA,

5  which was enacted before climate change became a significant issue.  Plaintiffs distinguish the

6  indirect carbon dioxide emission restrictions inherent in fuel economy from "more direct

7  regulation" of greenhouse gases, which the administration has decided to undertake through

8  multilateral agreements.  Pls.' Opp'n at 63 n.46.  That the CAFE program affects carbon dioxide

9  emissions does not contradict Plaintiffs contention that current Executive Branch policy is to

10  negotiate carbon dioxide reductions with other nations.  The CAFE program very well might

11  constrain the sort of agreement that the President might make to the extent a proposed agreement

12  was inconsistent with Congress's intent in enacting the EPCA.  See Youngstown, 343 U.S. at

13  637.  Nevertheless, a policy of seeking out such agreements is not logically or practically

14  inconsistent with the CAFE program.

15      Defendants also cite statements by members of the State Department implying that the

16  current administration does not intend to negotiate greenhouse gas limits with developing

17  nations.  Defendants provide a transcript of remarks of Dr. Harlan L. Watson, "Senior Climate

18  Negotiator and Special Representative and Alternate Head of the U.S. Delegation, Montreal,

19  Canada," on November 29, 2005.  Defs.' RJN Ex. E.  Defendants cite language from this

20  document in support of their characterization of United States policy:  "the United States is

21  opposed to any such discussions under the Framework Convention. . . .  We see no change in

22  current conditions that would result in a negotiated agreement consistent with the U.S.

23  approach. . . .  We are not a party to the Kyoto Protocol and we do not support any such approach

24  under the Convention for future commitments."  Mot. 29:27-30:3 (citing Defs.' RJN Ex. E).

25  Watson appears to only be discussing the United States' opposition to certain types of

26  negotiations, specifically negotiations by the parties to the Kyoto Protocol targeted at agreeing to

27

28                                          28

1  a "second commitment period" beginning in 2013.  Defs.' RJN Ex. E at 2.  These remarks,

2  therefore, are merely reiterating that the administration opposes binding limits modeled on the

3  Kyoto approach, not that it opposes a negotiated strategy based on reciprocal greenhouse gas

4  reductions.

5        Other parts of Watson's remarks leave open the possibility for negotiations outside of the

6  Kyoto mold.  Watson points out that currently, "through bilateral and U.S.-led multilateral

7  partnerships with nearly all major developed and developing countries, we are leading a global

8  approach to achieving our shared commitments to address climate change."  Id. at 1.  Dr. Watson

9  goes on to state that the United States "need[s] to pursue our international efforts in a spirit of

10 collaboration, not coercion, and with a true sense of partnership.  This is especially true in our

11 relations with developing nations, which have an imperative to grow their economies and provide

12 for the welfare of their citizens."  Id. at 2.

13       Defendants' position regarding United States foreign policy does not gain support from

14 the press briefing of Dr. Paula Dobriansky, Under Secretary of State, on December 7, 2005.  See

15 Defs.' RJN Ex. F.  She expresses the same skepticism as Watson about the potential for success

16 of formalized discussions under the "Canadian proposal."  Id. at 2.  Dobriansky, speaking of the

17 use of bilateral and multilateral partnerships to achieve climate change, stated that "the best way

18 forward is through different and diversified approaches that leverage these critical partnerships."

19 Id. at 1.  Dobriansky does not enunciate a United States policy of shunning negotiations with

20 developing nations regarding greenhouse gas emissions.

21       Defendants argue that, even if the California regulations interfere with the

22 administration's policy to pursue international agreements regarding greenhouse gas emissions,

23 they cannot be preempted in light of that policy because they have been authorized by Congress.

24 In support, Defendants cite a case concerning California tax laws that were allegedly harmful to

25 United States foreign policy goals.  Barclays Bank PLC v. Franchise Tax Bd., 512 U.S. 298

26 (1994).  The California tax law called for a "worldwide combined reporting" method for certain

27

28                                              29

1  multinational enterprises. Id. at 302.  For three decades, Congress had been aware that foreign

2  governments were displeased with such requirements.  Id. at 324.  On many occasions, Congress

3  had studied state taxation of multinational enterprises and introduced numerous bills on the

4  subject.  Id. at 324-25.  On each occasion, Congress declined to bar the worldwide combined

5  reporting approach.  Id. at 325.  The Court concluded that Congress "implicitly has permitted the

6  States to use the worldwide combined reporting method."  Id. at 326.

7      Defendants contend that here Congress has explicitly granted California the power to

8  implement emissions regulations under section 209 of the Clean Air Act, providing an even

9  stronger case against preemption than the implicit permission the Supreme Court found in

10  Barclays.  Defendants are hard-pressed, however, to show that section 209 demonstrates

11  Congress's intent to permit California to implement emissions regulations even if they interfere

12  with foreign policy goals.  Defendants do not contend that, as was the case in Barclays, Congress

13  has known for decades that California would impose carbon dioxide regulations that potentially

14  interfere with international greenhouse gas negotiations and has declined opportunities to

15  foreclose that approach.  Presumably, Congress would not be required to draft section 209 so as

16  to explicitly preclude emissions regulations that interfere with United States foreign policy, as it

17  could rely on well-established preemption doctrine to bar such regulations.  See Crosby, 530 U.S.

18  at 387-88 ("A failure to provide for preemption expressly may reflect nothing more than the

19  settled character of implied preemption doctrine that courts will dependably apply . . . .").

20      In Garamendi, the Supreme Court discussed the effect of the McCarran-Ferguson Act, 15

21  U.S.C. §§ 1011-1015, on the foreign policy preemption analysis of California's HVIRA

22  legislation.  539 U.S. at 427-29.  The Court interpreted the McCarran-Ferguson Act as limiting

23  congressional preemption under the commerce power.  Id. at 428.  The Court concluded,

24  nevertheless, that "a federal statute directed to implied preemption by domestic commerce

25  legislation cannot sensibly be construed to address preemption by executive conduct in foreign

26  affairs."  Id.  The scope of the section 209(b) waiver seems no broader than the McCarran-

27

28                                            30

1   Ferguson Act's authorization of state regulation of insurance.  Section 209(b) merely provides

2   that the explicit preemption under section 209(a) of any state motor vehicle emissions shall not

3   apply if the EPA properly grants a waiver.  42 U.S.C. § 7543(b).  Defendants have pointed to no

4   basis, either in the language or legislative history of the statute, to believe that Congress, in

5   providing for a section 209(b) waiver, contemplated the effects of California emissions

6   regulations on foreign policy and intended endorse such regulations even when they interfered

7   with foreign policy goals.

8           Defendants do not contend that Plaintiffs, in alleging that the California regulations will

9   impair the President's leverage in pursuing multilateral agreements, have failed to allege

10  sufficient interference with United States foreign policy, should such a policy exist.  Instead,

11  Defendants assert that preemption is only appropriate where the state statute concerns "laws or

12  conduct of foreign governments" or "foreign businesses."  Defs.' Reply 22:5-6.  Defendants

13  point out that the Supreme Court cases finding preemption concern state laws targeting foreign

14  entities.  See Zschernig, 389 U.S. at 430-31, 440 (probate statute affecting the rights of

15  nonresident aliens and requiring a judicial evaluation that resulted in criticism foreign

16  governments); Crosby, 530 U.S. at 376 (statute exerting economic pressure on the Burmese

17  political regime); Garamendi, 539 U.S. at 423-24 (disclosure requirements designed to apply

18  economic pressure to insurance companies that did business in Europe during World War II).

19          Defendants focus on language in Garamendi that they assert precludes preemption of a

20  generally applicable domestic regulation:  "[Q]uite unlike a generally applicable 'blue sky' law,

21  HVIRA effectively singles out only policies issued by European companies, in Europe, to

22  European residents, at least 55 years ago."  Garamendi, 539 U.S. at 425-26.  Reading this

23  sentence in context, however, indicates that it does not evince the Court's intent to exclude

24  generally applicable laws from conflict preemption.  Id.  Rather, the sentence comes in the

25  context of an analysis of the degree of the state's interest in enforcement of the statute.  Id. at

26  425.  The state had contended that the statute's disclosure requirements merely facilitated

27

28                                                31

evaluating corporate reliability.  Id. at 425-26.  The Court found that the statute's limitation of the disclosure requirement to certain companies' sales to certain types of customers "raises great doubt" as to the validity of the state's expressed purpose.  Id. at 426.  In other words, because HVIRA's disclosure requirements were not generally applicable, the Court questioned their furtherance of the state's interests in corporate reliability.  Id.  The Court did not speak to whether preemption generally turned on the breadth of the state regulation.

Nothing in the Supreme Court's foreign policy preemption jurisprudence forecloses the possibility of preemption of a generally applicable law that interferes with foreign policy.  The focus is on whether the practical effect of the state law is to disturb foreign relations or impair a proper exercise of Presidential authority.  See Crosby, 530 U.S. at 375; Zschernig, 389 U.S. at 440.  Plaintiffs have demonstrated that current Executive Branch policy is to negotiate with other nations to reach agreements regarding greenhouse gas emissions reductions.  They have alleged that the California regulations, by unilaterally reducing such emissions, potentially undercut the Executive's ability to pursue such agreements.  Accordingly, Plaintiffs have stated a claim for preemption of the regulations based on foreign policy.

**D. Dormant Commerce Clause**

By its terms, the Commerce Clause authorizes Congress to "regulate Commerce . . . among the several States."  U.S. Const., art. 1, § 8, cl. 3.  The Supreme Court has interpreted the clause to prohibit states from unduly interfering with interstate commerce absent congressional permission.  See, e.g., Raymond Motor Transp., Inc. v. Rice, 434 U.S. 429, 441 (1978); Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).  The Commerce Clause does not prohibit every exercise of state power that affects interstate commerce.  Gravquick A/S v. Trimble Navigation Int'l, 323 F.3d 1219, 1224 (9th Cir. 2003).  This is because, "[i]f the law 'regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental,' then the statute must be upheld 'unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'"  Id. (quoting Pike,

397 U.S. at 142).

Plaintiffs' Dormant Commerce Clause claim does not allege that California's regulations discriminate against out-of-state interests or directly regulate interstate commerce. See Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth., 476 U.S. 573, 579 (1986); NCAA v. Miller, 10 F.3d 633, 638 (9th Cir. 1993). Instead, Plaintiffs allege that the regulations are impermissible because they burden "the production and sale of new motor vehicles" while providing "no local environmental benefit, or insubstantial benefits at best." FAC ¶¶ 135, 136.

Defendants argue that, if the EPA grants the California regulations a waiver, they cannot violate the Dormant Commerce Clause because they will have been congressionally authorized. Because the Commerce Clause is a grant of authority to Congress, it does not restrict Congress's authority to regulate interstate commerce as it sees fit. W. & S. Life Ins. Co. v. State Bd. of Equalization, 451 U.S. 648, 652 (1981). Accordingly, Congress may authorize states to restrict the flow of interstate commerce in a manner that they would not otherwise enjoy. Id. "If Congress ordains that the States may freely regulate an aspect of interstate commerce, any action taken by a State within the scope of the congressional authorization is rendered invulnerable to Commerce Clause challenge." Id. at 652-53; White v. Mass. Council of Constr. Employers, 460 U.S. 204, 213 (1983) ("Where state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce."). The Supreme Court has set a rigorous standard for finding congressional intent to authorize state laws that violate the Commerce Clause. "Congress must be 'unmistakably clear' before we will conclude that it intended to permit state regulation which would otherwise violate the dormant Commerce Clause." C&A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 408 (1994) (O'Connor, J., concurring) (quoting South-Central Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 91 (1984)). Courts may look to the language of the relevant statute and the legislative history to find this intent. Sporhase v. Nebraska ex rel. Douglas, 458 U.S. 941, 960 (1982). The state bears the burden of demonstrating this intent. Wyoming v. Oklahoma, 502 U.S. 437, 458

1  (1992).

2          It is undisputed that, on its face, Clean Air Act section 209(b) authorizes California to

3  implement emissions regulations upon receiving an EPA waiver.  The terms of section 209(b)

4  indicate that it only shields such regulations from "application of this section," referring to the

5  broad preemption under section 209(a).  See 42 U.S.C. § 7543.  Defendants point instead to

6  legislative history to demonstrate Congress's intent to immunize California regulations from a

7  Dormant Commerce Clause challenge.  They contend that when Congress conferred on

8  California the authority to set standards applicable to automobile manufacturers selling cars in

9  California, it knew that California would regulate a significant aspect of interstate commerce.

10         The District of Columbia Circuit summarized the history of California's Clean Air Act

11  waiver in Motor & Equipment Manufacturers Association v. EPA, 627 F.2d 1095, 1109-10 (D.C.

12  Cir. 1979).  The debate in the Senate over granting California a broad waiver "sharpened the

13  differences between the states, which wanted to preserve their traditional role in regulating motor

14  vehicles, and the manufacturers, which wanted to avoid the economic disruption latent in having

15  to meet fifty-one separate sets of emissions control requirements."  Id. at 1109.  As the Senate

16  Committee presenting the bill acknowledged, "[t]he auto industry . . . was adamant that the

17  nature of their manufacturing mechanism required a single national standard in order to eliminate

18  undue economic strain on the industry."  Id. (citing S. Rep. No. 90-403, 33 (1967)).  "Thus the

19  Committee that formulated the waiver provision understood the costs involved in making an

20  exception" but reported that the drawbacks of the waiver were balanced by the "benefits for the

21  Nation to be derived from permitting California to continue its experiments in the field of

22  emissions control . . . and the benefits for the people of California to be derived from letting that

23  State improve on 'its already excellent program' of emissions control."  Id. at 1109-10.

24         The House also considered the far-reaching economic implications of the waiver

25  provision.  The House Committee was so concerned "that the separate administration of two

26  different sets of emission regulations would unduly burden the industry," that it amended the

27

28                                                34

waiver provision to make the Secretary's action permissive, rather than mandatory. Id. at 1121 (citing H.R. Rep. No. 90-728, 21-22 (1967)). On the floor of the House, the bill was amended to replace the House Committee language and revert to that of the original Senate proposal. Id. (citing 113 Cong. Rec. 30975 (1967) (remarks of Rep. Moss)). The House ultimately adopted the amendment, agreeing with the Senate to place the burden on those "on those who allege, in effect, that the national program is adequate to California's needs." Id.

The legislative history makes clear that both the House and the Senate considered that the California regulations under the waiver would substantially burden interstate commerce. Nevertheless, realizing the benefits for California and for the nation from allowing the state broad authority, Congress enacted the waiver anyway. One judge in this district and a California Court of Appeal have concluded that Congress intended regulations that receive a section 209(b) waiver to be immune from Dormant Commerce Clause scrutiny. Oxygenated Fuels Ass'n v. Davis, 163 F. Supp. 2d 1182, 1188 (E.D. Cal. 2001), aff'd, 331 F.3d 665 (9th Cir. 2003) (holding that Congress's authorization of California's regulation of fuels and fuel additives upon receiving a section 209(b) waiver rendered the state law "not subject to the Commerce Clause" (quoting White, 460 U.S. at 213)); People ex rel. State Air Res. Bd. v. Wilmshurst, 68 Cal. App. 4th 1332, 1345 (1999) (Congress's intent to "allow California to forge emissions standards at variance with the rest of the United States" meant that a California regulation receiving an EPA waiver was not vulnerable to a Commerce Clause challenge (citing Motor and Equip. Mfrs. Ass'n, 627 F.2d at 1128.)).

Plaintiffs do not take issue with Defendants' characterization of the legislative history of section 209(b). Plaintiffs do not dispute that, at the time Congress passed the waiver provision, it intended to permit California, with EPA approval, to implement regulations burdening interstate commerce. Plaintiffs contend instead that, in deciding whether Congress intended to permit the California regulations even if they burden interstate commerce, the court should also consider the extent to which the EPCA demonstrates a congressional intent to protect interstate commerce in

vehicle production from state fuel economy regulation.  Plaintiffs point to the express preemption

provision, 49 U.S.C. § 32919(a), as well as other provisions requiring administration of the

CAFE program in a manner that does not economically harm the automobile manufacturing

sector.  See 49 U.S.C. §§ 32913, 32916.  Plaintiffs contend that the holdings of S. Life Ins. Co.

and White do not apply where there is "no clear expression of Congressional intent to approve

any type of state regulation."  Pls.' Opp'n 66:9-11.

Because they do not dispute the District of Columbia Circuit's interpretation of the

legislative history of the Clean Air Act, Plaintiffs must find in the EPCA Congress's intent to

revoke the permission to burden interstate commerce that it had previously given California.  The

EPCA sections to which Plaintiffs cite do not evince such congressional intent.  Plaintiffs point

to 42 U.S.C. § 32913, which concerns civil penalties for failing to comply with requirements

under the EPCA.  It authorizes the Secretary of Transportation to reduce such a penalty to the

extent "necessary to prevent a substantial lessening of competition."  42 U.S.C. § 32913.

Plaintiffs also cite a requirement that the Secretary, after providing a manufacturer an exemption

from "the requirement of separate calculations" should evaluate the economic effect of such an

exemption.  42 U.S.C. § 32916.  Neither of these provisions illuminates Congress's intent

regarding the economic effects of regulations waived under Clean Air Act section 209(b).  Nor

does the EPCA's express preemption provision, 42 U.S.C. § 32919(a), explicitly or implicitly

bear on Congress's belief that the benefits of more stringent California emissions regulations

justify a burden on commerce.[16]  Taken together in light of the legislative history of section

209(b), the EPCA provisions that Plaintiffs cite do not contravene Congress's  "unmistakably

clear" permission to California to burden interstate commerce.  See C&A Carbone, 511 U.S. at

408.  Accordingly, Plaintiffs do not state a claim under the Dormant Commerce Clause, making

judgment on the pleadings for Defendants appropriate.

---

[16]    Of course, it is undisputed that should the California regulations be subject to the
EPCA's preemption provision, they will be barred.

**E.  Sherman Act**

In their opening brief, Defendants moved for judgment on the pleadings on Plaintiffs'

claim under the Sherman Act on the basis that they had failed to state a facial preemption

challenge.  In their opposition brief, Plaintiffs concede that they have not stated a claim for a

facial challenge to the California regulations.  Pls.' Opp'n 67:21-22.  Instead, they  seek to

"prove specific anticompetitive effects that trigger preemption under the Sherman Act."  Id.  In

their reply, Defendants contend that Plaintiffs have failed to state a claim for such an as-applied

challenge and, in the alternative, that such a claim is unripe.

Under section 1 of the Sherman Act, "[e]very contract, combination in the form of trust or

otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with

foreign nations," is illegal. 15 U.S.C. § 1.  To establish a section 1 violation, a plaintiff must

demonstrate three elements:

> (1) an agreement, conspiracy, or combination among two or more
> persons or distinct business entities; (2) which is intended to harm
> or unreasonably restrain competition; and (3) which actually causes
> injury to competition, beyond the impact on the claimant, within a
> field of commerce in which the claimant is engaged (i.e., "antitrust
> injury").

McGlinchy, 845 F.2d at 811.  Where two parties to an alleged conspiracy actually constitute a

"single entity," they are immune from section 1 liability, as the "company cannot conspire with

itself."  Freeman v. San Diego Ass'n of Realtors, 322 F.3d 1133, 1147 (9th Cir. 2003) (citing

Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 769 (1984)).  "Where there is

substantial common ownership, a fiduciary obligation to act for another entity's economic benefit

or an agreement to divide profits and losses, individual firms function as an economic unit and

are generally treated as a single entity."  Id.

The FAC alleges that the California regulations may lead to price fixing.  FAC ¶ 143.

This is because the regulations, in some cases, require companies with a ten percent or greater

overlap in ownership, but which are not one economic unit, to jointly demonstrate compliance

37

1   with the greenhouse gas emissions limits.  Id.  The FAC alleges that manufacturers control the

2   mix of vehicles sold by raising and lowering prices to influence demand for particular vehicle

3   groups or models.  Id.  In order to control the aggregate emissions of the vehicles sold, the FAC

4   alleges, "the two manufacturers will need to coordinate the sale of vehicles according to their fuel

5   economy."  Id.  This will require, according to the FAC, the exchange of production, supply, and

6   price information, which could ultimately result in price fixing.  Id.

7          Generally, the Sherman Act does not constrain "a state or its officers or agents from

8   activities directed by its legislature."  Parker v. Brown, 317 U.S. 341, 350-51 (1943).  This is

9   because the Sherman Act does not evince Congress's intent to "nullify a state's control over its

10  officers and agents."  Id. at 351.  Consequently, the Parker Court decided, based on principles of

11  federalism and state sovereignty, that the acts of a state's legislative power or "official action

12  directed by a state" are not subject to Sherman Act scrutiny.  Id.  A state statute may, however, be

13  preempted where "there exists an irreconcilable conflict between the federal and state regulatory

14  schemes."  Rice v. Norman Williams Co. (Rice), 458 U.S. 654, 659 (1982).

15         Rice concerned the enforceability of a state scheme involving licensing of beverage

16  importers.  Id. at 656-57.  The Court held that it was irrelevant to the inquiry into the validity of

17  the statute whether it "might have an anticompetitive effect when applied in concrete factual

18  situations."  Id.  A consideration of the effects of a state statute may be relevant to determining

19  whether a private individual is entitled to the "state action" exemption to Sherman Act liability.

20  See Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, 445 U.S. 97, 103 (1980) (citing

21  Parker, 317 U.S. at 351).  Plaintiffs do not present any authority, and the court is aware of none,

22  suggesting that anticompetitive effects short of "irreconcilable conflict" are grounds for

23  preemption of a state statute.[17]  See Rice, 458 U.S. at 659.  To the contrary, only "[w]hen the

24

25         [17]     Plaintiffs' attempts to resuscitate this claim, both in their opposition brief and at
    oral argument, centered on presenting authority indicating that a preenforcement as-applied
26  challenge to a state statute is generally permissible.  See Compassion in Dying v. Washington,
    79 F.3d 790, 798 (9th Cir. 1996).  Such authority is unhelpful to Plaintiffs as they have not
27  demonstrated any statutory basis for preemption of the California regulations under the Sherman

28                                              38

1  plaintiff challenges the facial validity of a statute or ordinance, preemption principles come into

2  play.  Where, however, the plaintiff alleges that action taken pursuant to legislation constitutes an

3  antitrust violation, preemption principles are not implicated, while the state action doctrine can

4  provide protection."  3 Julian O. von Kalinowski et al., <u>Antitrust Laws and Trade Regulation</u>

5  § 49.06[2] (2d ed. 2004).

6          Preemption based on "irreconcilable conflict" under <u>Rice</u> represents an exception to the

7  well-established rule that a state's actions are exempt from section 1 scrutiny.  <u>See</u> 458 U.S. at

8  659.  Plaintiffs do not point to any other grounds to invalidate the California regulations.  Thus,

9  while, "specific anticompetitive effects" of the California regulations might ameliorate the

10  liability of manufacturers forced to engage in anticompetitive activities to comply with them,

11  principles of federalism and state sovereignty preclude invalidating all or part of the statute based

12  on such effects.  Because Plaintiffs concede that <u>Rice</u> preemption of the regulations is

13  inappropriate and no other grounds for Sherman Act preemption are before the court, the court

14  grants judgment on the pleadings for Defendants on this claim.

15  **F. Global Warming Science Discovery**

16          In its order issued September 11, 2006, the court granted Defendants' motion for

17  reconsideration with respect to certain discovery orders of the Magistrate Judge.  The court

18  concluded, in the section entitled "Global Warming," that certain document requests[18] were

19  permissible because they were likely to lead to the production of evidence relevant to Plaintiffs'

20  Dormant Commerce Clause challenge, on which judgment on the pleadings has now been

21  granted.  <u>See</u> Fed. R. Civ. P. 26(b)(1); Fed. R. Evid. 401.  In opposing the motion for

22  reconsideration, Defendants had also contended that the document requests were permissible to

23  seek evidence refuting AIAM's claim that EPA cannot find, under 42 U.S.C. § 7543(b)(1)(B),

24  _____

25  Act.

26          [18]     These requests include those designated GM 22/DCC 21/AAM 20, GM 23/DCC
27  22/AAM 21, GM 25/DCC 24, GM 26/DCC 25/AAM 24, GM-DCC-AAM 8, 9, 10 and 11, GM
   20/DCC-AAM 19, GM 14, and GM 15/DCC-AAM 14.

28                                              39

"compelling and extraordinary conditions" justifying a waiver.  See AIAM Compl. ¶ 62.  As Judge Coyle made clear in his order of October 21, 2005, whether EPA will ultimately decide to grant the California regulations a waiver is not properly before this court.  Accordingly, the court finds that, notwithstanding any prior order, document requests that seek evidence about the science of global warming are not, on that basis, reasonably calculated to lead to evidence admissible in this action.

## CONCLUSION AND ORDER

For the reasons stated in the above Memorandum Opinion, IT IS HEREBY ORDERED that:

1.  Defendants' motion for JUDGMENT ON THE PLEADINGS is DENIED with respect to the claims for EPCA preemption, EPA preemption, and foreign policy preemption;

2.  Defendants' motion for JUDGMENT ON THE PLEADINGS is GRANTED with respect to the Dormant Commerce Clause and Sherman Act claims; and

3.  Notwithstanding any prior order of this court, Plaintiffs need not produce documents responsive to requests designated GM 22/DCC 21/AAM 20, GM 23/DCC 22/AAM 21, GM 25/DCC 24, GM 26/DCC 25/AAM 24, GM-DCC-AAM 8, 9, 10 and 11, GM 20/DCC-AAM 19, GM 14, and GM 15/DCC-AAM 14.

IT IS SO ORDERED.

**Dated:   September 22, 2006**            _____/s/ Anthony W. Ishii_____
0m8i78                                             UNITED STATES DISTRICT JUDGE

40