1  JON WALLACE UPTON, SBN 46089
   KIMBLE, MACMICHAEL & UPTON
2  Fig Garden Financial Center
   5260 North Palm Avenue, Suite 221
3  Fresno, California 93792-9489
   Telephone: (559) 435-5500
4  Facsimile: (559) 435-1500

5  RAYMOND B. LUDWISZEWSKI *Pro Hac Vice*
   CHARLES H. HAAKE, SBN 190178
6  GIBSON, DUNN & CRUTCHER LLP
   1050 Connecticut Ave. NW
7  Washington, D.C. 20036
   Telephone: (202) 955-8500
8  Facsimile: (202) 467-0539

9  Attorneys for Plaintiff Intervenor,
   Association of International Automobile Manufacturers

10

11                    UNITED STATES DISTRICT COURT

12              EASTERN DISTRICT OF CALIFORNIA – FRESNO

13

14  CENTRAL VALLEY CHRYSLER-JEEP, INC.,
    et al,                                          CASE NO. CIV-F-04-6663-REC-LJO
15              Plaintiffs,

16        v.                                        **NOTICE OF MOTION AND MOTION OF
                                                    PLAINTIFF-INTERVENOR THE
17  Catherine E. WITHERSPOON, in her official       ASSOCIATION OF INTERNATIONAL
    capacity as Executive Officer of the California  AUTOMOBILE MANUFACTURERS FOR
    Air Resources Board,                            SUMMARY JUDGMENT; MEMORANDUM
18              Defendant,                           OF POINTS AND AUTHORITIES IN
                                                    SUPPORT THEREOF**
19  THE ASSOCIATION OF INTERNATIONAL
    AUTOMOBILE MANUFACTURERS               DATE:        December 11, 2006
20                                         TIME:        1:30 p.m.
              Plaintiff-Intervenor,        JUDGE:       Anthony W. Ishii
21
    SIERRA CLUB, NATURAL RESOURCES
22  DEFENSE COUNCIL, ENVIRONMENTAL
    DEFENSE, BLUEWATER NETWORK,
23  GLOBAL EXCHANGE and RAINFOREST
    ACTION NETWORK,
24
25              Defendant-Intervenors.

26

27

28

_____
**MOTION FOR SUMMARY JUDGMENT**

**TO ALL PARTIES AND THEIR ATTORNEY OF RECORD,**

**PLEASE TAKE NOTICE** that on December 11, 2006, at 9:00 am, or as soon thereafter as the matter may be heard before the Honorable Anthony W. Ishii, in Courtroom Two of the United States District Court for the Eastern District of California, located at 1130 O Street, Fresno, California, Plaintiff-Intervenor the Association of International Automobile Manufacturers ("AIAM") will and hereby does move this Court, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, for summary judgment as to the First Claim for Declaratory and Injunctive Relief set forth in the Complaint in Intervention (Preemption Under The Federal Energy Policy And Conservation Act) on the ground that there is no genuine issue of material fact, and that AIAM is entitled to judgment as a matter of law that the regulatory amendments approved by the California Air Resources Board in Resolution No. 04-28, dated September 24, 2004, are both expressly and impliedly preempted by federal law.

This Motion is based on this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, the accompanying Statement of Undisputed Facts, the Declarations of Charles H. Haake and Harold M. Haskew, the Request for Judicial Notice, all other pleadings, records and papers filed in this action, such other matters as the Court may judicially notice, and such further evidence or argument as may be presented at or before the hearing of this motion.

DATED: November 8, 2006

KIMBLE, MACMICHAEL & UPTON

By:_____/s/_____
            Jon Wallace Upton

Attorneys for Plaintiff Intervenor,
Association of International Automobile Manufacturers

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

I.  INTRODUCTION................................................................................................................. 1

II. SUMMARY JUDGMENT STANDARD .......................................................................... 3

III. LEGAL BACKGROUND CONCERNING EXPRESS  AND IMPLIED
    PREEMPTION................................................................................................................... 4

IV. EXPRESS PREEMPTION UNDER EPCA ...................................................................... 5

    A.    The Federal Government Exclusively Regulates Fuel Economy Through The
    Federal Energy Policy and Conservation Act. ................................................................ 5

    B.    There Is A Direct, Inextricable, And Mathematical Relationship Between
    Carbon Dioxide Emissions and Fuel Economy. .......................................................... 8

    C.    The AB 1493 Regulations Impose De Facto Fuel Economy Standards. ..................... 11

        1.    The AB 1493 Regulations Require Reductions In CO2 Emissions And
        Improvements In Fuel Economy ...................................................................... 11

        2.    The AB 1493 Regulations Are Based On The Use Of Technologies
        That Improve Fuel Economy. ......................................................................... 15

    D.    The AB 1493 Regulations Are Preempted By EPCA Because They Are
    "Related to Fuel Economy Standards." ........................................................................ 17

IV. IMPLIED PREEMPTION UNDER EPCA ...................................................................... 21

    A.    The AB 1493 Regulations Are Preempted Because EPCA Occupies The Field
    Of Fuel Economy Regulation........................................................................................ 21

    B.    The AB 1493 Regulations Are Preempted Because They Conflict With The
    Federal CAFE Program................................................................................................. 23

        1.    The AB 1493 Regulations Conflict With EPCA On Their Face Because
        They Require More Stringent Fuel Economy And Are Structured
        Inconsistently. ................................................................................................. 24

        2.    The AB 1493 Regulations Conflict With EPCA With Regard To The
        State's Consideration of EPCA's Statutory Criteria. ...................................... 27

    V. CONCLUSION ............................................................................................................... 32

# TABLE OF AUTHORITIES

## Cases

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation*
  *& Dev. Comm'n*, 410 F.3d 492 (9th Cir. 2005) .......................................... 22

*Aloha Airlines v. Dir. of Taxation*, 464 U.S. 7 (1983) ................................ 6

*Bank of Am. v. City & County of San Francisco*, 309 F.3d 551
  (9th Cir. 2002) ....................................................................................... 5, 25

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001) .................. 24

*Californians For Safe & Competitive Dump Truck Transp. v. Mendonca*,
  152 F.3d 1184 (9th Cir. 1998) ................................................................. 22

*Celetox Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................. 4

*Cent. Valley Chrysler-Plymouth v. Cal. Air Res. Bd.*, No. CV-F-02-5017, 2002 U.S.
  Dist. LEXIS 20403 (E.D. Cal. June 11, 2002) ...................................... 13, 24

*Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*,
  956 F.2d 321 (D.C. Cir. 1992) ................................................................ 34

*Control of Emissions From New Highway Vehicles and Engines*,
  68 Fed. Reg. 52922 (Sept. 8, 2003) ...................................................... 3, 11

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ..................... 5

*Dist. of Columbia v. Greater Wash. Bd. of Trade*,
  506 U.S. 125 (1992) ................................................................................ 22

*Edgar v. MITE Corp.*,
  457 U.S. 624, 102 S. Ct. 2629, 73 L. Ed.2d 269 (1982) ......................... 28

*Egelhoff v. Egelhoff*, 532 U.S. 141 (2001) ............................................ 22, 23

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
  541 U.S. 246 (2004) ................................................................................ 21

*Fireman's Fund Ins. Co. v. City of Lodi*,
  296 F. Supp. 2d 1197 (E.D. Cal. 2003) .................................................... 4

*Florida Lime & Avocado Growers, Inc. v. Paul*,
  373 U.S. 132 (1963) ................................................................................. 5

*FMC Corp. v. Holliday*, 498 U.S. 52 (1990) ............................................. 21

*Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88 (1992) ........ 5, 6

*Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000) ............................. 19, 27

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ................................................ 5, 27

Gibson, Dunn & Crutcher LLP

*Indus. Truck Ass'n v. Henry*, 125 F.3d 1305 (9th Cir. 1997) ............................................... 20

*Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133 (1990) ....................................................... 21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ............................................................................................................ 4

*Metrophones Telecomm., Inc. v. Global Crossing Telecomm., Inc.*,
    423 F.3d. 1056 (9th Cir. 2005) .......................................................................................... 25

*Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724 (1985) ...................................... 21

*Michigan Canners & Freezers Ass'n., Inc. v. Agricultural Marketing
    & Bargaining Bd.*, 467 U.S. 461 (1984) ........................................................................... 27

*Morales v. Trans Word Airlines, Inc.*, 504 U.S. 374 (1992) ........................................ 120, 21, 22, 25

*Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835 (9th Cir. 2002) ........................................ 4

*New York State Conference of Blue Cross & Blue Shield Plans
    v. Travelers Ins. Co.*, 514 U.S. 645 (1995) .......................................................... 21, 22, 23

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190
    (1983) .................................................................................................................................. 25

*Palmer v. Liggett Group, Inc.*, 825 F.2d 620 (1st Cir. 1987) ............................................... 28

*Perez v. Campbell*, 402 U.S. 637 (1971) ................................................................................. 6

*Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987) .............................................................. 21

*Public Utility Dist. No. 1 of Grays Harbor County Wash. v. IDACORP Inc.*, 379 F.3d
    641 (9th Cir. 2004) ............................................................................................................ 25

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) ..................................................... 5, 25

*Sayles Hydro Ass'n v. Maughan*, 985 F.2d 451 (9th Cir. 1993) ........................................... 25

*Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 ........................................................................... 21

*Taylor AG Indus. v. Pure-Gro*, 54 F.3d 555 (9th Cir. 1995) ................................................. 4

*Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Bd.*,
    474 U.S. 409 (1986) .......................................................................................................... 27

*United States v. Locke*, 529 U.S. 89 (2000) .......................................................................... 24

## Statutes

42 U.S.C. § 6297(a) ......................................................................................................... 22, 26

42 U.S.C. § 6297(a)(1)(B) ..................................................................................................... 26

42 U.S.C. § 7507 .................................................................................................................... 33

49 U.S.C. § 23902(a) ............................................................................................................... 8

49 U.S.C. § 32901 ................................................................................................ 8, 23

49 U.S.C. § 32901(a)(10) ........................................................................................ 23

49 U.S.C. § 32902(a) ........................................................................................... 8, 28

49 U.S.C. § 32902(b) ........................................................................................... 7, 29

49 U.S.C. § 32902(c) ........................................................................................... 7, 25

49 U.S.C. § 32902(c)(2) ............................................................................................. 7

49 U.S.C. § 32902(f) .................................................................................................. 7

49 U.S.C. § 32904(c) ........................................................................................... 9, 21

49 U.S.C. § 32919(a) ..................................................................................... 8, 18, 19

49 U.S.C. § 39219(b) ................................................................................................ 24

49 U.S.C. § 39219(c) ................................................................................................ 24

Cal. Health & Safety Code § 43018.5 ...................................................................... 29

Cal. Health & Safety Code § 43018.5(d)(3) ............................................................. 32

## Rules

Fed. R. Civ. P. 56(c) .................................................................................................. 4

Fed. R. Civ. P. 56(e) .................................................................................................. 4

## Regulations

40 C.F.R. § 600.113-93(e) ....................................................................................... 22

40 C.F.R. § 86.144-90 ......................................................................................... 9, 21

49 C.F.R. § 531.5 ................................................................................................. 7, 26

49 C.F.R. § 531.6(a) ................................................................................................... 9

49 C.F.R. § 533.6(b) .................................................................................................. 9

## Other Authorities

U.S. Const. art. VI, cl. 2 ............................................................................................. 5

Energy Policy and Conservation Act of 1975,
   Pub. L. No. 94-163, 89 Stats 871 (1975) .......................................................... 6

*Average Fuel Economy Standards for Light Trucks,*
   70 Fed. Reg. 51414 (Aug. 30, 2005) ................................................................. 4

*Light Trucks Model Years 2008-2011*, 71 Fed. Reg. 17566 (Apr. 6, 2006) ............... *passim*

*Passenger Automobile Average Fuel Economy Standards for Model Year 1986*, 50 Fed.
    Reg. 40528 (Oct. 4, 1985) ................................................................................ 7

*Passenger Automobile Average Fuel Economy Standards for Model Years 1987-88*, 51
    Fed. Reg. 35594 (Oct. 6, 1986) ...................................................................... 31

*Passenger Automobile Average Fuel Economy Standards for Model Year 1989*, 53 Fed.
    Reg. 39275 (Oct. 6, 1988) .............................................................................. 31

*Reforming the Automobile Fuel Economy Standards Program*,
    68 Fed. Reg. 74908 (Dec. 29, 2003) ........................................................ 8, 31

H.R. 7014, 94th Cong. § 507 (1975) ........................................................................ 8

H.R. 7014, 94th Cong. § 509 (1975) ........................................................................ 8

S. 1883, 94th Cong., 1st Sess., § 509 ...................................................................... 8

S. Rep. No. 93-526 66 (1974) .................................................................................. 8

S. Rep. No. 94-179 (1975) ...................................................................................... 7

Cal Air Res. Bd., Staff Report: Initial Statement of Reasons for Proposed Rulemaking,
    Public Hearing to Consider Adoption of Regulations to Control Greenhouse Gas
    Emissions from Motor Vehicles 49-69 ............................................................ 16

Nat'l Acad. of Sci., Effectiveness and Impact of Corporate Average Fuel Economy
    (CAFE) Standards 3 (2002) ...................................................................... 17, 28

Black's Law Dictionary (5th ed. 1979) .................................................................. 19

Gibson, Dunn &
Crutcher LLP

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

On September 25, 2006, this Court entered an order denying the Defendants' Motion for Judgment on the Pleadings on AIAM's causes of action under the Energy Policy and Conservation Act ("EPCA") and the Clean Air Act. In its decision, the Court correctly dispatched the Defendants' legal argument that the regulations challenged here are valid under the waiver provision of Section 209(b) of the Clean Air Act, and are therefore rendered immune from a preemption challenge under EPCA or other federal law. Because the Court found that the allegations in this action state a claim for conflict preemption, it declined to decide at that stage whether the other theories of preemption – express preemption and field preemption – have merit. *Memorandum Opinion and Order (1) Granting In Part and Denying In Part Defendant and Defendant Intervenors' Motion for Judgment on the Pleadings and (2) Limiting Discovery of Global Warming Science Documents* (the "September 25 Order") (ECF 363) at 7-8.

Discovery in this action is largely complete, and the time is ripe for this Court to determine that the AB 1493 Regulations are preempted by EPCA as a matter of law based on the undisputed facts of the case. These undisputed facts are straightforward and show that the AB 1493 Regulations (a) are expressly preempted by EPCA because they are "related to fuel economy standards," and (b) are impliedly preempted by EPCA because they intrude into the field of fuel economy regulation which has been reserved for the federal government, and on their face conflict with the federal CAFE program.

On the most fundamental level, the regulations are "related to fuel economy standards" and are therefore expressly preempted because there is no functional difference between a carbon dioxide emission standard and a fuel economy standard. Carbon dioxide emissions are a direct and unavoidable by-product of fuel consumption, and the only known practical way for a manufacturer of today's gasoline-powered automobile to reduce tailpipe emissions of $CO_2$ is to improve the fuel economy. In fact, the Defendant admits that fuel economy and carbon dioxide emissions are so closely equivalent that one can translate the AB 1493 standards mathematically to an equivalent miles-per-gallon fuel economy standard. The Defendant also admits that compliance with the

regulations will as a practical matter require dramatic improvements in fuel economy. For these reasons, the National Highway Traffic Safety Administration ("NHTSA") has concluded that "CO2 standards and GHG standards" are the "functional equivalents" of fuel economy standards. *Light Trucks Model Years 2008-2011*, 71 Fed. Reg. 17566, 17670 (Apr. 6, 2006), (the "Light Truck Standards"). These facts are not in dispute and demonstrate that there is a direct and inextricable relationship between carbon dioxide emissions standards and fuel economy standards.

Not only does EPCA expressly preempt the AB 1493 Regulations, but the undisputed facts also demonstrate that the regulations intrude into the field of fuel economy which is exclusively regulated by the federal government, and create a direct and unavoidable conflict with the federal fuel economy program. Accordingly, the regulations also are impliedly preempted. EPCA sets forth the federal statutory and regulatory scheme for regulating fuel economy, and vests NHTSA with the exclusive authority to prescribe national fuel economy standards at the level it determines constitutes the "maximum feasible average fuel economy level," for a given model year. As this Court has found, the federal fuel economy program strives to balance a number of competing goals: maximizing fuel economy, maintaining consumer choice, protecting the automotive industry from adverse economic consequences, and ensuring vehicle safety. The CAFE standard for passenger cars is currently set by statute at 27.5 miles per gallon (mpg). For light duty trucks (pickups, minivans, sport utility vehicles and "cross-over" vehicles) NHTSA has determined that the "maximum feasible average fuel economy level" is a national fleet-wide average of 23.1 and 23.5 mpg for the 2009 and 2010 model years, respectively, and then transitions to a vehicle-specific size-based approach for the 2011 model year and beyond.

The AB 1493 Regulations effectively require fuel economy greatly in excess of these federal levels – reaching over 40 mpg for the PC/LDT1 category and over 26 mpg for the LDT2/MDPV category – and rejects the attribute-based approach adopted by NHTSA for light-duty trucks. The Defendant does not dispute this. Thus, by definition the California regulations upset the balance between the competing interests struck by the federal program. NHTSA recognizes the inherent conflict posed by allowing individual States to effectively regulate fuel economy through the guise of reducing greenhouse gas emissions, concluding in recent rulemaking that state regulation of carbon

dioxide "would 'abrogate EPCA's regime,' rendering NHTSA's careful balancing of consideration[s] a nullity." *Light Truck Standards* 71 Fed. Reg. at 17668.  Thus, NHTSA has stated that a "state law that seeks to reduce motor vehicle carbon dioxide emissions is both expressly and impliedly preempted" by EPCA.  *Average Fuel Economy Standards for Light Trucks*, 70 Fed. Reg. 51414-01, at 51457 (Aug. 30, 2005).  The U.S. Environmental Protection Agency shares this view.  *Control of Emissions From New Highway Vehicles and Engines*, 68 Fed. Reg. 52922, 52925 (Sept. 8, 2003) ("Congress has not authorized the Agency to regulate CO2 emissions from motor vehicles to the extent such standards would effectively regulate car and light truck fuel economy, which is governed by a comprehensive statute administered by DOT.").

This action raises issues of profound importance to the automobile industry in America.  If implemented, the AB 1493 Regulations will dramatically affect how manufacturers must design and market their new cars and trucks intended for California.  While automobile manufacturers continue to work aggressively to produce more fuel efficient motor vehicles that emit reduced levels of greenhouse gases, California lacks the authority to dictate the means for achieving these ends.  The nation's dependency on oil and the interwoven issue of global warming are national issues that require a national approach.  That is the fundamental purpose of EPCA.  By enacting these regulations, California has intruded into a field long reserved for the Federal Government and is regulating the automobile industry in a manner which Congress never intended.  This Court should therefore find that the AB 1493 Regulations are preempted by federal law and enjoin their enforcement.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celetox Corp. v. Catrett*, 477 U.S. 317 (1986).  The non-moving party thereafter must produce "specific facts," Fed. R. Civ. P. 56(e), showing not merely "that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586-87 (1986), but rather "that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

Where the party moving for summary judgment bears the burden of persuasion at trial, the moving

party is entitled to summary judgment if it can establish that the undisputed facts entitle it to

judgment as a matter of law.  *Celotex,* 477 U.S. at 322-23.

Summary judgment is particularly appropriate in cases which raise primarily legal issues,

such as federal preemption.  *See e.g., Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835 (9th Cir.

2002) (affirming summary judgment that state leg-trap ban was preempted by the Endangered

Species Act); *Taylor AG Indus. v. Pure-Gro*, 54 F.3d 555 (9th Cir. 1995) (affirming summary

judgment holding that claims against defoliant manufacturer were preempted by Federal Insecticide,

Fungicide, and Rodenticide Act); *Fireman's Fund Ins. Co. v. City of Lodi*, 296 F. Supp. 2d 1197

(E.D. Cal. 2003) (granting partial summary judgment holding that portions of municipal ordinance

were preempted by CERCLA).

### III.    LEGAL BACKGROUND CONCERNING EXPRESS AND IMPLIED PREEMPTION

Preemption flows inexorably from the U.S. Constitution, which commands that the laws of

the United States "shall be the supreme law of the land, any thing in the constitution, or laws of any

State to the contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  Therefore, a "fundamental

principle of the Constitution is that Congress has the power to preempt state law."  *Crosby v. Nat'l

Foreign Trade Council*, 530 U.S. 363, 372 (2000).

Federal law may preempt state law in three different ways.  First, Congress may preempt state

law in express terms.  *Bank of Am. v. City & County of San Francisco*, 309 F.3d 551, 558 (9th Cir.

2002).  Second, preemption may be inferred when federal regulation in a particular field is "so

pervasive as to make reasonable the inference that Congress left no room for the States to supplement

it."  *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  This is often referred to

as "field preemption."  Third, preemption may be implied when state law actually conflicts with

federal law.  *Id.*  This is known as "conflict preemption."  A conflict for preemption purposes arises

when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime

& Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963), or when state law "stands as an

obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

Federal preemption does not turn on a state's characterization or labeling of its own law. Indeed, if that were the case, preemption could always be defeated by carefully worded legislative or regulatory findings. Thus, in *Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88 (1992), the Supreme Court noted that "[i]n assessing the impact of a state law on the federal scheme, we have refused to rely solely on the legislature's professed purpose and have looked as well to the effects of the law." *Id*. at 105. The Court there held that state regulations concerning the handling of hazardous waste were preempted by the Occupational Safety and Health Act, even though the stated purpose of the regulation was to protect the public from spills. The Court found that:

> it would defeat the purpose of [the preemption provision] if a state could enact measures stricter than OSHA's and largely accomplished through regulation of worker health and safety simply by asserting a non-occupational purpose for the legislation. ***Whatever the purpose or purposes of the state law, pre-emption analysis cannot ignore the effect of the challenged state action on the pre-empted field.***

*Gade*, 505 U.S. 106-107 (emphasis added) (citation omitted).[1] Accordingly, in determining whether the AB 1493 Regulations are preempted, this Court's focus should not be on the State's expressed purpose in enacting the regulations, but rather on their ultimate effect and impact.

## IV.     EXPRESS PREEMPTION UNDER EPCA

**A.     The Federal Government Exclusively Regulates Fuel Economy Through The Federal Energy Policy and Conservation Act**

In 1975, Congress passed the Energy Policy and Conservation Act of 1975, Pub. L. No. 94-163, 89 Stats 871 (1975), as a comprehensive response to the energy crisis of the early 1970's. 49 U.S.C. §§ 32901 *et seq*. One prong of EPCA's national approach to energy policy was the imposition of new fuel economy requirements on the automobile industry in the form of mandatory

---

[1] *See also Aloha Airlines v. Dir. of Taxation*, 464 U.S. 7, 13-14 (1983) ("The manner in which the state legislature has described and categorized [its law] cannot mask the fact that the purpose and effect of the provision are to impose a levy upon the gross receipts of airlines" which was preempted under federal law); *Perez v. Campbell*, 402 U.S. 637, 651-52 (1971). ("We can no longer adhere to the aberrational doctrine . . . that state law may frustrate the operation of federal law as long as the state legislature in passing its law had some purpose in mind other than one of frustration.").

corporate average fuel economy ("CAFE") standards. Under the CAFE program, an automobile manufacturer can sell any combination of vehicles it chooses, so long as the average fuel economy of its nationwide fleet meets the applicable CAFE standard. Congress selected the fleet-wide averaging approach to "ensure wide consumer choice by leaving maximum flexibility to the manufacturer" to produce a "diverse product mix" while meeting the applicable CAFE standards. S. Rep. No. 94-179, at 6 (1975).

The text of the EPCA statute provides for a congressionally-established average fuel economy standard for passenger automobiles of 27.5 miles per gallon. 49 U.S.C. § 32902(b). The statute further provides, however, that "the Secretary of Transportation may prescribe regulations amending the standard under subsection (b) of this section for a model year to a level that the Secretary decides is the maximum feasible average fuel economy level for that model year." 49 U.S.C. § 32902(c).[2] In determining "the maximum feasible average fuel economy level," NHTSA is required to consider technological feasibility, economic practicability, the effect of other government regulations on fuel economy and the nation's need to conserve energy. 49 U.S.C. § 32902(f).[3] NHTSA has, for example, amended the passenger car standard in the past to address situations in which market conditions rendered the statutory standard impracticable and infeasible despite manufacturers' good-faith compliance plans. *Passenger Automobile Average Fuel Economy Standards Model Year 1986*, 50 Fed. Reg. 40528 (Oct. 4, 1985). The current CAFE standard for passenger cars is 27.5 mpg, as set forth by Congress in the statute. 49 C.F.R. § 531.5. NHTSA, however, is in the process of considering reforming the CAFE program for all motor vehicles, and has stated that "[a]ny potential

---

[2] The statute further provides that if the proposed revision increases the standard above 27.5 miles per gallon or decreases the standard below 26.0 miles per gallon, the revision must be submitted to Congress for approval. 49 U.S.C. § 32902(c)(2). NHTSA has interpreted this provision as a congressionally enacted restriction on its authority to raise the CAFE standard for passenger cars above 27.5 mpg.

[3] As this Court found, the goals NHTSA strives to fulfill in making this determination include maximizing fuel economy, avoiding economic harm to the automobile industry, maintaining consumer choice, and ensuring vehicle safety. *Sept. 25 Order* at 10. "In selecting the maximum feasible level, NHTSA strives to set the standards as high as it can without causing significant adverse consequences for the manufacturers or consumers." *Light Truck Standards,* 71 Fed. Reg. at 17668.

Gibson, Dunn & Crutcher LLP

reforms to the CAFE system should be considered in light of their ability not only to enhance fuel economy but also to ensure the economic well-being and safety of the American public." *Reforming the Automobile Fuel Economy Standards Program*, 68 Fed. Reg. 74908 at 74913 (Dec. 29, 2003).[4] With respect to non-passenger automobiles, such as light-duty trucks, the statute requires the Secretary of Transportation to set "the maximum feasible average fuel economy level that the Secretary decides the manufacturers can achieve in that model year."  49 U.S.C. § 23902(a).[5]

To ensure national uniformity in fuel economy regulations, EPCA includes a broad express preemption clause at 49 U.S.C. §32919(a).  That section provides:

> When an average fuel economy standard prescribed under this chapter [49 U.S.C. §§ 32901, *et seq.*] is in effect, a State or a political subdivision of a State may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard under this chapter [49 U.S.C. §§ 32901, *et seq.*].

49 U.S.C. § 32919(a).  The legislative history of EPCA's preemption provision confirms that Congress intended it to preempt broadly ***all*** regulation in the area of fuel economy and for the Department of Transportation to have sole authority to regulate this field.  For example, the original Senate bill would have preempted state laws only if they were "inconsistent" with federal fuel economy standards, labeling, or advertising.  S. 1883, 94th Cong., 1st Sess., § 509.  Similarly, the House bill would have preempted state laws only if they were not "identical to" a Federal requirement.  H.R. 7014, 94th Cong. § 507 (as introduced), § 509 (as reported) (1975).  Instead of adopting these more limited forms of preemption, the final version of the law expressly preempts all state laws that relate to fuel economy standards.  No exception is made for state laws on the ground that they are consistent with or identical to federal requirements.  Moreover, as the legislative history of an earlier draft of EPCA makes clear, Congress intended this preemption provision to have a broad application, irrespective of the metric used to measure fuel economy:  "State or local fuel economy

---

[4]  NHTSA has implemented reform for light-duty trucks in the recently enacted light truck standards and is seeking authority to enact similar reform for the passenger car program.

[5]  The current CAFE standards for light-duty trucks go through the 2011 model year.  However, NHTSA is statutorily obligated to enact light-duty truck CAFE standards at least eighteen months before the beginning of each model year.  49 U.S.C. § 32902(a).  NHTSA has never failed to comply with this mandate.

standards would be preempted, regardless of whether they were in terms of miles per gallon or some other parameter such as horsepower or weight." S. Rep. No. 93-526, at 66 (1974).

**B.    There Is A Direct, Inextricable, And Mathematical Relationship Between Carbon Dioxide Emissions and Fuel Economy**

For general public consumption, fuel economy is commonly expressed in terms of the number of miles driven per gallon of fuel consumed (mpg).  Fuel economy under the CAFE program, however, is actually determined by measuring a vehicle's <u>exhaust emissions</u>.  Pursuant to EPA guidelines,[6] exhaust emissions of hydrocarbons ("HC"), carbon monoxide ("CO"), and $CO_2$ per mile traveled are measured.  40 C.F.R. § 86.144-90.  After effectively "counting" all of the carbon atoms emitted per mile driven, EPA then uses a formula found at 40 C.F.R. § 600.113-93(e), commonly referred to as the carbon balance equation, to calculate the amount of fuel burned per mile driven (because a gallon of gasoline contains a fixed number of carbon atoms).  *Declaration of Harold M. Haskew* ("Haskew Decl."), ¶ 14.  The final result is expressed in miles per gallon of fuel consumed. Because of advances made in reducing emissions of CO and HC, "CO and HC play an increasingly and extremely minor role in the measurement of fuel economy, such that fuel economy has become virtually synonymous with $CO_2$ emission rates." *Light Truck Standards,* 71 Fed. Reg. at 17660; *Haskew Decl.* ¶ 15.

Thus, for all practical purposes, the federal fuel economy standard is actually a fleet-average carbon dioxide emissions limit.  Indeed, as NHTSA stated in the recently enacted revisions to the CAFE standard for light-duty trucks, "[f]uel consumption and $CO2$ emissions from a vehicle are two 'indissociable' parameters" such that "fuel economy is directly related to emissions of greenhouse gases such as $CO2$." *Light Truck Standards*, 71 Fed. Reg. at 17659.

The reason EPA relies on carbon dioxide emissions to measure fuel economy is a matter of basic chemistry and automotive engineering.  Carbon dioxide emissions from a motor vehicle are

---

[6]  The EPCA statute and NHTSA's regulations require that fuel economy be measured by way of "procedures established by the Administrator of the Environmental Protection Agency." 49 U.S.C. § 32904(c); 49 C.F.R. §§ 531.6(a), 533.6(b).  Thus, despite the fact that NHTSA is the federal agency with the substantive responsibility for implementing the EPCA statute, EPA is granted the limited responsibility for designing and administering the test procedures for compliance.

directly and inversely proportional to the vehicle's fuel economy and there is a mathematical formula whereby one can convert $CO_2$ emissions into a miles-per-gallon fuel economy figure and vice-versa. *Separate Statement of Undisputed Facts* ("Sep. State.") Fact No. 9.  Carbon dioxide is a natural and unavoidable byproduct of combustion of carbon-containing fuels such as gasoline, coal and natural gas.  Sep. State. Fact No. 1.   The relationship between fuel consumption and $CO_2$ emissions for a given fuel is fixed and depends only on the carbon composition of the fuel that is burned.  *Id.* Fact No. 2.  A gallon of a typical commercial grade of gasoline contains approximately 5.5 pounds (or 2,475 grams) of carbon.  *Id.* Fact No. 3.  When that carbon is combusted, the 2,475 grams of carbon combines with approximately 6,600 grams of oxygen from the atmosphere and becomes approximately 9,075 grams of $CO_2$.  *Id.* Fact No. 4.  Thus, "[b]ased on its content (carbon and hydrogen), as a matter of basic chemistry, the burning of a gallon of gasoline produces about 20 pounds [9,075 grams] of $CO_2$."  *Light Truck Standard*, 71 Fed. Reg. at 17659; *Sep. State.* Fact No. 4.

Perfect combustion of gasoline results in just two products from the fuel in the exhaust: $CO_2$ and water.  However, combustion in internal combustion engines is often incomplete, and small amounts of carbon monoxide and unburned hydrocarbons are released in the emissions – hence the inclusion of these two substances in the calculation of fuel economy.  *Sep. State.* Fact No. 5.[7]  Even so, $CO_2$ comprises the overwhelming majority of the carbon-containing compounds in the exhaust.  For example, NHTSA estimates that model year 2006 light-duty trucks emit on average 471 grams of $CO_2$ per mile driven in the city, but only 0.042 grams of HC and 0.56 grams of CO.  *Light Truck Standard,* 71 Fed. Reg. at 17661; *Sep. State.* Fact No. 6.

Carbon dioxide, however, is fundamentally different from other automotive emissions that are commonly regulated by EPA and the State of California in that there is no "bolt on" aftertreatment device that can capture or chemically alter $CO_2$ emission.[8]  *Sep. State.* Fact No. 10.  Improving fuel

---

[7]  Combustion engines also emit oxides of nitrogen ($NO_X$), but those compounds do not originate from the fuel.  Rather, the heat from the combustion process causes the oxidation of nitrogen in the air flowing through the engine.  *Light Truck Standards,* 71 Fed Reg. at 17659.

[8]  For example, the technologies that produce reductions in HC and CO emissions – such as catalytic converters and computer-controlled air/fuel mixture controls – do so by more completely combusting them to $CO_2$ and water.  *Light Truck Standards,* 71 Fed. Reg. at 17660.

economy is the only known practical way for a manufacturer of today's gasoline-powered automobiles to reduce tailpipe emissions of CO2. *Id.  Light Truck Standards,* 71 Fed. Reg. at 17656 ("the only technologically feasible, practicable way for vehicle manufacturers to reduce CO2 emissions is to improve fuel economy."); *Control of Emissions From New Highway Vehicles and Engines,* 68 Fed. Reg. 52922, 52929 (Sept. 8, 2003) ("No technology currently exists or is under development that can capture and destroy or reduce emissions of CO2, unlike other emissions from motor vehicle tailpipes.  At present, the only practical way to reduce tailpipe emissions of CO2 is to improve fuel economy.")

These facts show that fuel economy and CO2 emissions are essentially the same thing.  If you know how much CO2 a vehicle emits per mile traveled, then determining that vehicle's fuel economy is a matter of a simple mathematical conversion, like converting degrees Fahrenheit to degrees Celsius.  As the depositions of witnesses from CARB demonstrate, there is no dispute about this fact. For example, CARB's Program Manager for Motor Vehicle Greenhouse Gas Regulation, Charles Shulock, testified as follows:  "[Q.]  You agree there is a mathematical formula by which one could translate miles per gallon into CO2 emissions per mile; correct?   A.  Yes." *Deposition of Charles Shulock* ("Shulock Depo.") at 134:7-10.  CARB's other designated witnesses agreed.  Steve Albu, Assistant Division Chief of the Mobile Source Control Division, testified:

> Q.  Considering the standard -- the regular type of gasoline sold in California, what is the relationship between improvements of fuel economy and decreases to CO2 tail pipe emissions from motor vehicles?
>
> A.  As I said --
>
> [Objection interposed]
>
> THE WITNESS:  As I said, they're linked.
>
> BY MR. CLUBOK:
>
> Q.  Yeah.  But how, sir?  Are they closely linked?
>
> A.  Yes.
>
> Q.  They're precisely linked; aren't they, sir?
>
> A.  To an equation, yes.

Q.   And in fact, there are mathematically, directly and [in]versely proportional. Correct?

[Objection interposed]

THE WITNESS:  That is correct.

*Deposition of Steve Albu* ("Albu Depo.") at 66:21-67:20.  *See also Deposition of Paul Hughes* ("Hughes Depo.") at 177:9-178:1 (testifying that carbon dioxide emissions decrease as fuel economy increases in a manner that can be mathematically defined).

**C.     The AB 1493 Regulations Impose De Facto Fuel Economy Standards**

Despite EPCA's carefully balanced program and its broad preemption provision aimed at protecting that balance, and despite the direct and mathematically defined relationship between carbon dioxide emissions and fuel economy, the State of California is attempting to limit the level of CO2 emissions from new motor vehicles sold in California.  Indeed, this is the second time the State has attempted to do so.  Its prior attempt involved amendments to the State's Zero Emission Vehicle program.  The enforcement of those regulations was preliminarily enjoined because Judge Coyle found that the regulations "will have the practical effect of regulating fuel economy."  *Cent. Valley Chrysler-Plymouth v. Cal. Air Res. Bd.*, No. CV-F-02-5017, 2002 U.S. Dist. LEXIS 20403 at *9 (E.D. Cal. June 11, 2002).  Although different in substance, the AB 1493 Regulations challenged here suffer from the same infirmity as the prior regulations and should therefore suffer the same fate.[9]

**1.     The AB 1493 Regulations Require Reductions In CO2 Emissions And Improvements In Fuel Economy**

This Court is familiar with the structure and the substance of the AB 1493 Regulations from prior briefing, so they will not be recounted here.  *See September 25 Order* at 2-3.  The important

---

[9]  Indeed, the regulations at issue here present a clearer case for preemption than the 2001 ZEV amendments at issue in *Central Valley Chrysler-Plymouth*.  Those amendments related to fuel economy only insofar as one alternative method of compliance with the ZEV regulations measured fuel consumption and CO2 emissions.  Despite the fact that this compliance option constituted a relatively small aspect of the entire regulatory scheme, the Court nevertheless found that "enforcement of the 2001 ZEV amendments is precluded by complete preemption" under EPCA.  *Cent. Valley Chrysler-Plymouth*, 2002 U.S. Dist. LEXIS 20403, at *7 n.3.  Here, in contrast, the entirety of the AB 1493 Regulations is aimed at improving fuel economy and thereby reducing emissions of CO2.

point for purposes of this motion is that although the AB 1493 Regulations purport to address emissions other than just $CO_2$ – namely hydrofluorocarbons from air conditioners, methane and nitrous oxide – in reality the contribution of the other greenhouse gases is insignificant when compared with the $CO_2$ component of the regulations.  In fact, it would be impossible to comply with the regulations without dramatically curtailing $CO_2$ emissions.  This is demonstrated in the following table, showing CARB's estimated emission rates from a "baseline" large passenger car:

| Greenhouse Gas Emission Rates from Large Passenger Cars | | |
|---|---|---|
| Source | Emissions | $CO_2$-Equivalent |
| $CO_2$ Emissions (With No Air Conditioning) | 329.2 g/mi | 329.2 g/mi |
| "Indirect" $CO_2$ Emissions (From Air Conditioning) | 15.40 g/mi | 15.40 g/mi |
| Methane Emissions | 0.005 g/mi | 0.12 g/mi |
| Nitrous Oxide Emissions | 0.006 g/mi | 1.78 g/mi |
| Direct A/C Emissions (refrigerant leakage) | 0.007 g/mi | 9.00 g/mi |
| TOTAL | 344.61 g/mi | 355.5 g/mi |
| $CO_2$ as a Percent of Total | 99.9% | 96.9% |

Haskew Decl. ¶ 8.

The $CO_2$-equivalent emissions limit for the 2012 model year for the PC/LDT1 category is 233 g/mi.  Thus, assuming the values above are representative of a manufacturer's average baseline PC/LDT1 fleet, reducing all of the forms of greenhouse gas emissions other than $CO_2$ would be grossly insufficient to meet the standard, as depicted in the graphic below:



In fact, CARB witnesses readily admit that the AB 1493 Regulations will require significant reductions in carbon dioxide emissions, and that doing so will necessarily require improvements in fuel economy:

Q.  So over 90 percent of the regulation is going to be in ARB's expectation complied with by reducing $CO_2$ tailpipe emissions; correct?

Gibson, Dunn &
Crutcher LLP

A.   Correct.

Q.   And the only way that you are aware of to reduce CO2 tailpipe emissions is by improving fuel economy; correct?

A.   ***It's by reducing the fuel usage, yes***. There is a fuel savings from complying with the greenhouse gas regulations.

*Hughes Depo.* at 162:2-11 (emphasis added).

Moreover, as discussed above, there is a mathematical link between $CO_2$ emissions and fuel economy.  This formula can be applied to the AB 1493 Regulations to determine the minimum fleet-average fuel economy required by the regulations.  Sep. State. Fact No 18.  CARB staff agrees.  In fact, their own internal analyses of the regulations show that when they reach their most stringent point in the 2016 model year, they will amount to a *de facto* fuel economy standard for the PC/LDT1 category of roughly 43 miles per gallon.

[Q]   What is the standard for 2016 greenhouse gas emissions?

A.   For cars, it's 205.

Q.   And you could translate that into a miles-per-gallon equivalent; correct?

A.   Well, no.  That isn't a miles-per-gallon number.  One could -- it's CO2 equivalent, not CO2, okay.  So I need further --

Q.   One could translate that.  Assuming there was no air conditioning technology applied, one could translate that 205 CO2 equivalent emission standard to a miles-per-gallon standard?

[Objection interposed]

BY MR. CLUBOK:

Q.   [Through a] Mathematical formula?

A.   If you assumed it represented only CO2 emissions, then yes.

Q.   And do you have an idea about roughly what that would be in terms of miles per gallon?

A.   Somewhere perhaps around 43 miles per gallon.

Q.   Yeah.  In fact, there has been some internal discussion of that particular number, 43 miles per gallon, in terms in connection with setting the standard, hasn't there, sir?  You didn't just come up with that number off the top of your head?

A.   No.  I have done the conversion myself.

Q.  So when you have done the conversion yourself, that 205 CO2 equivalent emissions standards, if it's purely achieved through CO2 emissions reduction, would translate to an approximately 43-mile-per-gallon standard?

A.  Right.

*Hughes Depo.* at 270:8-271:18.  Mr. Albu made a similar calculation and raised it directly with

Defendant Witherspoon and others at CARB:

Q.  So sir, Exhibit Albu 004 is an E-mail dated August 3rd, 2004, from Steve Albu. That's an E-mail that you wrote.

Correct, sir?

A.  Yes.

Q.  And on Exhibit Albu 004, which is Bates labeled ARB 390347, you are writing in response to an E-mail that Tom Cackette had written to you.

Correct?

A.  It looks that way, yes.  I haven't read this whole yet.

* * *

Q.  Can you please read what -- can you please read the first sentence that you wrote in your communication of August 3rd, 2004, to Mr. Cackette, Mr. Cross, Ms. Witherspoon, Mr. Shulock and Mr. Hughes?

A.  "***Our standard for cars amounts to 43 miles per gallon***, which isn't a cake walk like some enviros seem to believe, (recall the Toyota Echo, their smallest car with an automatic transmission is rated at 33 city, 39 highway)."

*Albu Depo.* at 61:14-63:19 (emphasis added).

Admittedly, the analysis referred to in these deposition passages did not account for air conditioning credits provided for in the regulations.  However, even assuming the maximum use of air conditioning credits (13.0 g/mi for model year 2009 through 2012, and 18.5 g/mi for model year 2013 through 2016) and the total elimination of methane and nitrous oxide emissions (thus making CO2 the only greenhouse gas emitted), one could use the same mathematical formula used by CARB staff to determine the minimum fuel economy required to meet the AB 1493 standard.  This conversion for each model year is set forth below:

//

| PC/LDT1 | | | | LDT2/MDPV | | |
|---|---|---|---|---|---|---|
| Model Year | CO2 Emissions Limit (in grams) | Corresponding Fuel economy (in miles per gallon) | | Model Year | CO2 Emissions Limit (in grams) | Corresponding Fuel economy (in miles per gallon) |
| 2009 | 336 | 27.0 mpg | | 2009 | 452 | 20.1 mpg |
| 2010 | 314 | 28.9 mpg | | 2010 | 433 | 21.0 mpg |
| 2011 | 280 | 32.4 mpg | | 2011 | 403 | 22.5 mpg |
| 2012 | 246 | 36.9 mpg | | 2012 | 374 | 24.2 mpg |
| 2013 | 245.5 | 36.9 mpg | | 2013 | 373.5 | 24.3 mpg |
| 2014 | 240.5 | 37.7 mpg | | 2014 | 368.5 | 24.6 mpg |
| 2015 | 231.5 | 39.2 mpg | | 2015 | 359.5 | 25.2 mpg |
| 2016 | 223.5 | 40.6 mpg | | 2016 | 350.5 | 25.9 mpg |

Sep. State. Fact Nos. 20-21.  Thus, even accounting for the maximum reduction of the other regulated substances, the regulations still place strict limits on – and require dramatic reductions in – CO2 emissions.

> **2.      The AB 1493 Regulations Are Based On The Use Of Technologies That Improve Fuel Economy.**

In setting the numerical standards for the AB 1493 Regulations, CARB made an assessment of the technologies automakers could use to reduce carbon dioxide emissions from their vehicles. Not surprisingly, because the regulations require improvements in fuel economy (by CARB's own admission), all of the technologies relied on by CARB in the rulemaking are fuel savings technologies.  These so-called "Carbon Dioxide Reduction Technologies" include "valvetrain, transmission, vehicle accessory, hybrid-electric, and overall vehicle modifications designed to reduce engine exhaust $CO_2$ emissions from conventional vehicles."  *Sep. State*. Fact No. 22; Cal Air Res. Bd., Staff Report: Initial Statement of Reasons for Proposed Rulemaking, Public Hearing to Consider Adoption of Regulations to Control Greenhouse Gas Emissions from Motor Vehicles 49-69 [hereinafter ISOR] (attached as Exhibit 1 to the Request for Judicial Notice filed concurrently herewith).  These technologies are set forth in Table 5.2-3 of the ISOR and are discussed in greater detail in Section 5.2A of the ISOR.  *Id.*

None of these Carbon Dioxide Reduction Technologies cause reductions in CO2 emissions by capturing or treating tailpipe CO2 emissions.  *Sep. State.* Fact No. 24.  As discussed above, that is not

Gibson, Dunn & Crutcher LLP

possible. Rather, these technologies consist primarily of improvements to the engine and transmission that reduce fuel consumption. *Id.* Any reduction in $CO_2$ emissions is simply a consequence of the fact that less fuel is burned to power the vehicle. *Id.* These technologies, therefore, are by and large the very same technologies NHTSA considered in determining the "maximum feasible average fuel economy level" for light-duty trucks in its recent rulemaking. *Compare ISOR at 49-69, with Light Truck Standards,* 71 Fed. Reg. at 17583-585; *see also Light Truck Standards,* 71 Fed. Reg. at 17661 ("The technologies that would be employed to reduce $CO_2$ emissions are, in all relevant ways, the same technologies as underlie NHTSA's judgment about the appropriate CAFE standards for light-duty trucks").[10]

Moreover, CARB staff admits that the only feasible and cost effective means they assessed in the rulemaking for reducing carbon dioxide emissions is use of fuel savings technologies:

[Q] Has there been any modeling, analysis or testing by the Air Resources Board or at the Air Resources Board's direction or that the Air Resources Board has relied upon to identify the feasibility of reducing $CO_2$ tailpipe emissions through methods other than by adding technologies that improve fuel economy?

[Objection interposed]

THE WITNESS: The technologies we modeled are all listed in the ISOR. Since those technologies reduce the emissions of $CO_2$, then clearly they have an impact on fuel economy.

* * *

[Q] Identify if you are aware of any modeling, testing or analysis conducted by or on behalf of the Air Resources Board that demonstrates the feasibility of reducing $CO_2$ tailpipe emissions through any method other than by adding technologies to the vehicle that improve fuel economy.

A. I am not aware of any.

---

[10] NHTSA's technology assessments was based in part on a 2002 report by the National Academy of Sciences entitled "Effectiveness and Impact of Corporate Average Fuel Economy (CAFE) Standards." Light Truck Standards, 71 Fed. Reg. at 17572. *See* Nat'l Acad. of Sci., Effectiveness and Impact of Corporate Average Fuel Economy (CAFE) Standards 3 (2002) [hereinafter NAS CAFE Study] (attached as Exhibit 2 to the Request for Judicial Notice). The report assessed over two dozen different technologies in terms of their ability to reduce fuel consumption, their applicability to various classes of motor vehicles, and cost. These technologies include advanced engine technologies (such as variable valve timing, cylinder deactivation and engine downsizing and turbocharging), transmission technologies (such as the use of five-speed and six-speed transmissions and continuously variable transmissions), and the use of hybrid-electric engines. *Id.* at 35-39.

*Hughes Depo.* at 179:18-180:7; 181:11-17; *see also Albu Depo.* at 435:20-436:22 (testifying that the only cost-effective means of complying with AB 1493 is incorporating the fuel savings technologies discussed in the ISOR and improving air conditioning systems). Therefore, CARB's assessment concludes that ninety percent of the greenhouse gas reductions will come from technologies that improve fuel economy. *Albu Depo.* at 437:19-22 ("Q. Fair to say that over 90 percent of the reductions assumed under AB 1493 will come from technologies that improve fuel economy? A. I think that's fair.").

**D.     The AB 1493 Regulations Are Preempted By EPCA Because They Are "Related to Fuel Economy Standards"**

The discussion above demonstrates that carbon dioxide emissions and fuel economy are flip sides of the same coin, and that because the AB 1493 Regulations place strict limits on carbon dioxide emissions from motor vehicles, they are directly and inextricably "related to fuel economy standards." 49 U.S.C. § 32919(a). NHTSA, the federal agency that is responsible for implementing EPCA, agrees that such regulations are preempted:

> In mandating federal fuel economy standards under EPCA, Congress has expressly preempted any state laws or regulations relating to fuel economy standards. A State requirement limiting CO2 emissions is such a law or regulation because it has the direct effect of regulating fuel consumption. CO2 emissions are directly linked to fuel consumption because CO2 is the ultimate end product of burning gasoline. Moreover, because there is but one pool of technologies for reducing tailpipe CO2 emissions and increasing fuel economy available now and for the foreseeable future, regulation of CO2 emissions and fuel consumption are inextricably linked. It is therefore NHTSA's conclusion that such regulation is expressly preempted.

*Light Truck Standards,* 71 Fed. Reg. at 17654.[11]

---

[11]  In its September 25 Order denying the Defendants' Motion for Judgment on the Pleadings, this Court correctly noted that "it is also appropriate to 'place some weight' upon NHTSA's interpretation of the EPCA's objectives." *September 25 Order* at 10 (quoting *Geier v. American Honda Motor Co.*, 529 U.S. 861, 883-84, 120 S. Ct. 1913, 146 L. Ed.2d 914 (2000)). *See also Indus. Truck Ass'n v. Henry*, 125 F.3d 1305, 1311 (9th Cir. 1997) ("[a]n agency's interpretation of the preemptive effect of its regulations is entitled to deference where Congress has delegated authority to the agency, the agency's interpretation is not contrary to a statute, and agency expertise is important to determining preemption."). Agency deference is especially appropriate where, as here, the agency "is likely to have a thorough understanding of its own regulation and its objectives and is 'uniquely qualified' to comprehend the likely impact of state requirements." *September 25 Order* at 10 (quoting *Geier*, 529 U.S. at 883).

Congress's intent to preempt broadly any and all state action in the area of fuel economy is set forth unambiguously in the language of EPCA, which preempts any state law or regulation "related to fuel economy standards or average fuel economy standards for automobiles." 49 U.S.C. § 32919(a). As discussed above, this preemption provision is without exception, and the legislative history shows that it was worded intentionally broad. *See* p. 8, *infra*.

"For purposes of the present case, the key phrase, obviously, is 'relat[ed] to.'" *Morales v. Trans Word Airlines, Inc.*, 504 U.S. 374, 383 (1992). The Supreme Court consistently has held that preemption provisions "related to" a particular field express a broad preemptive purpose. In *Morales*, for example, the Supreme Court held that certain state air travel industry guidelines governing the content and format of advertising for airline fares, frequent flier miles, and compensation for overbooking were preempted by the Airline Deregulation Act. That Act expressly preempted the states from "'enacting or enforcing any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier . . . .'" *Morales*, 504 U.S. at 383. In holding that the Act preempted the state guidelines, the Court relied on the expansive phrase "relating to." "The ordinary meaning of these words is a broad one – 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with' – and the words thus *express a broad pre-emptive purpose*." *Id.* (emphasis added) (quoting Black's Law Dictionary 1158 (5th ed. 1979)). The Court analogized the "relating to" language from the Airline Deregulation Act with the preemption clause in the Employee Retirement Income Security Act of 1974 ("ERISA"), which preempts all state laws "insofar as they . . . relate to any employee benefit plan":

> We have said, for example, that the "breadth of [that provision's] pre-emptive reach is apparent from [its] language," [*Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95-96 (1983) ]; that *it has a "broad scope*," *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739 (1985), and *an "expansive sweep*," *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47 (1987); and that it is *"broadly worded,"* *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990), *"deliberately expansive,"* *Pilot Life*, [481 U.S.] at 46, and *"conspicuous for its breadth,"* [*FMC Corp. v. Holliday*, 498 U.S. 52, 58 (1990)].

*Morales*, 504 U.S. at 383-84 (emphasis added); *see also Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246 (2004) (certain aspects of fleet rules adopted by the air quality district that

1    prohibited the purchase or lease by various public and private fleet operators of vehicles that did not

2    comply with stringent emission requirements were "related to" the control of emissions and were

3    therefore preempted under the Clean Air Act).

4    The Defendant likely will cite to the *Travelers* case and argue that the phrase "related to" is

5    not unbounded because, "[i]f 'relate to' were taken to extend to the furthest stretch of its

6    indeterminacy, then for all practical purposes pre-emption would never run its course, for 'really,

7    universally, relations stop nowhere.'" *New York State Conference of Blue Cross & Blue Shield Plans*

8    *v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995). *Travelers*, however, does not require a narrow

9    reading of the "related to" language. Rather, that case merely stands for a common-sense restriction

10   on the "related to" language – that "pre-emption does not occur . . . if the state law has only a

11   ***tenuous, remote, or peripheral connection with***" the preempted field. *Travelers*, 514 U.S. at 661

12   (emphasis added) (quoting *Dist. of Columbia v. Greater Wash. Bd. of Trade*, 506 U.S. 125, 130 n.1

13   (1992)); *see also Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev.*

14   *Comm'n*, 410 F.3d 492, 502 (9th Cir. 2005) ("The issue is whether the relation is 'indirect, remote,

15   and tenuous' or not.") (quoting *Californians For Safe & Competitive Dump Truck Transp. v.*

16   *Mendonca*, 152 F.3d 1184, 1189 (9th Cir. 1998)).[12] In fact, the subsequent Supreme Court case of

17   *Egelhoff v. Egelhoff*, 532 U.S. 141 (2001), reaffirmed *Morales* and described how that case should be

18   read with *Travelers*:

19           ERISA's pre-emption section, 29 U.S.C. § 1144(a), states that ERISA "shall
20           supersede any and all State laws insofar as they may now or hereafter relate to any
             employee benefit plan" covered by ERISA. ***We have observed repeatedly that this***
21           ***broadly worded provision is "clearly expansive."*** *New York State Conference of Blue*
             *Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995); ***see, e.g.,***
22           ***Morales v. Trans World Airlines, Inc.***, 504 U.S. 374, 384 (1992) (listing cases in
             which we have described ERISA pre-emption in broad terms). But at the same time,
23           we have recognized that the term "relate to" cannot be taken "to extend to the furthest
             stretch of its indeterminacy," or else "for all practical purposes pre-emption would
24           never run its course." *Travelers*, [514 U.S. at 655].

25   _____

26   [12] In the *Air Conditioning* case*,* the court held that the regulation at issue was not preempted
     because "[t]he relation between placing a manufacturer's name, the model name, and the date of
27   manufacture on an appliance and measures of energy consumption, as defined in EPCA [42
     U.S.C. § 6297(a)], is indirect, remote, and tenuous." *Air Conditioning & Refrigeration Inst. v.*
28   *Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 502 (9th Cir. 2005).

1    *Egelhoff*, 523 U.S. at 146 (emphasis added).

2         Applying this Supreme Court precedent to the AB 1493 Regulations leads to the inescapable

3    conclusion that the regulations violate EPCA's broad express preemption provision.    There can be

4    no question that the AB 1493 Regulations are "related to fuel economy standards."  And, there can be

5    no credible argument that the regulations have "only a tenuous, remote, or peripheral connection

6    with" fuel economy standards.  *Travelers*, 514 U.S. at 661.  As NHTSA states, fuel economy is

7    "virtually synonymous with CO2 emission rates."  *Light Truck Standards*, 71 Fed. Reg. at 17660; *see*

8    *also id.* at 17657 ("a State GHG standard is [a] fuel economy standard in almost all but name and

9    stated purpose.  It would have virtually the same effects as a fuel economy standard.")[13]  CARB's

10    own internal staff analyses mathematically translated the standard for the PC/LDT1 category for the

11    2016 model year to a fuel economy of roughly 43 mpg to make clear to management the impact of

12    the proposed standards.  A relationship cannot be any more direct than that.

13         Finally, the text and structure of EPCA and the regulations promulgated thereunder

14    demonstrate that CO2 emissions limits are related to fuel economy standards.  "Fuel economy" is

15    defined in the statute as "the average number of miles traveled by an automobile for each gallon of

16    gasoline (or equivalent amount of other fuel) used, ***as determined by the Administrator [of EPA]***

17    ***under section 32904(c) of this title*.**"  49 U.S.C. § 32901(a)(10) (emphasis added).  Section 32904(c),

18    in turn, provides in relevant part that "[t]he Administrator [of EPA] shall measure fuel economy for

19    each model and calculate average fuel economy for a manufacturer under testing and calculation

20    procedures prescribed by the Administrator."  49 U.S.C. § 32904(c).  Thus, the statutory definition of

21    "fuel economy" must be read in the context of the procedures established by EPA for measuring fuel

22    economy.  As discussed above, those procedures require fuel economy to be measured based

23    primarily on the rate of CO2 emissions from the motor vehicle.  40 C.F.R. § 86.144-90; 40 C.F.R. §

24    600.113-93(e). *See also Light Truck Standards,* 71 Fed. Reg. at 17661 ("compliance with federal fuel

---

13  Thus, the fact that these regulations are preempted under EPCA does not mean that other forms of
state regulation – such as speed limits and gasoline taxes – would also be preempted because such
regulation would unquestionably fall within a State's legitimate police powers and have only an
"indirect, remote, and tenuous" relationship with fuel economy.

economy standards is based primarily on CO2 emission rates of covered vehicles"); *see also id.* at 17660 ("fuel economy has become virtually synonymous with CO2 emission rates."). Thus, the EPCA statute and the regulations effectively define "fuel economy" based on CO2 emissions. Accordingly, the AB 1493 Regulations are expressly preempted under EPCA because they are "related to fuel economy standards" and their enforcement should be enjoined.[14]

## IV.    IMPLIED PREEMPTION UNDER EPCA

In addition to running afoul of EPCA's express preemption provision, the AB 1493 Regulations also are impliedly preempted by EPCA under the doctrines of "field preemption" and "conflict preemption." Each of these doctrines provides an independent basis for finding these regulations preempted by federal law.

### A.    The AB 1493 Regulations Are Preempted Because EPCA Occupies The Field Of Fuel Economy Regulation

Under the doctrine of "field preemption," "preemption may be inferred when federal regulation in a particular field is 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Bank of Am. v. City & County of San Francisco*, 309 F.3d 551, 558 (9th Cir. 2002) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *Sayles Hydro Ass'n v. Maughan*, 985 F.2d 451, 455 (9th Cir. 1993). "When the federal government completely occupies a given field or an identifiable portion of it . . . , the test of preemption is

---

[14] This holds whether or not the Court narrowly construes EPCA's preemption provision, as the Defendant will likely claim it must. It bears noting, however, that there is no presumption against preemption where Congress is regulating "in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000); *also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347-48 (2001) (no presumption against preemption because "[p]olicing fraud against federal agencies is hardly 'a field which the States have traditionally occupied'"); *Bank of Am. v. City & County of San Francisco*, 309 F.3d 551, 558 (9th Cir. 2002) (presumption against federal preemption of state law is inapplicable to federal banking regulation because of the history of federal presence in the field). Here, "because the states have not traditionally occupied the field on fuel economy regulation and fuel economy regulation has had a history of significant federal presence, the presumption [against preemption] is not triggered in this action." *Cent. Valley Chrysler-Plymouth v. Cal. Air Res. Bd.*, No. CV-F-02-5017, 2002 U.S. Dist. LEXIS 20403, at *8-*9 (E.D. Cal. June 11, 2002). Moreover, it is immaterial that California has couched its regulations as "emissions standards" and thereby attempted to argue that they fall within the State's traditional police power. *Locke*, 529 U.S. at 108-09 (no presumption against preemption even though state law was arguably designed to protect the health and safety of its citizens).

1  whether 'the matter on which the state asserts the right to act is in any way regulated by the federal

2  government.'" *Public Utility Dist. No. 1 of Grays Harbor County Wash. v. IDACORP Inc.*, 379 F.3d

3  641, 647 (9th Cir. 2004) (quoting *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev.*

4  *Comm'n*, 461 U.S. 190, 212-13 (1983)).

5      Congress's intent that EPCA occupy the entire field of automobile fuel economy is clear from

6  two factors.  The first is the breadth of EPCA's express preemption provision.  Congress forbade

7  states from adopting or enforcing any regulation that had any relation to fuel economy standards.

8  Preemption is not restricted to regulations that actually prescribe fuel economy standards.  *See*

9  *Morales*, 504 U.S. at 385 ("[h]ad the statute been designed to pre-empt state law [only with respect to

10  actually prescribing rates, routes and services] it would have forbidden the States to '*regulate* rates,

11  routes, and services.'").  Nor is preemption here restricted to regulations that are actually inconsistent

12  with EPCA.  *Compare Metrophones Telecomm., Inc. v. Global Crossing Telecomm., Inc.*, 423 F.3d

13  1056, 1072 (9th Cir. 2005) ("by expressly limiting federal preemption to state requirements that are

14  inconsistent with the federal regulations, Congress signaled its intent not to occupy the entire field of

15  payphone regulation.")  Indeed, as discussed above, Congress rejected these more narrow forms of

16  preemption in enacting the EPCA statute.

17      In this way, the preemption provision found in 49 U.S.C. § 32919 is much broader in scope

18  and more absolute than the preemption provision found elsewhere in EPCA concerning appliance

19  testing and labeling (42 U.S.C. § 6297(a)) that the Ninth Circuit considered in *Air Conditioning &*

20  *Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492 (9th Cir. 2005).  That

21  section only preempts state labeling regulations that required the disclosure of information "other

22  than information required under 6294 of this title [establishing federal labeling requirements]."  42

23  U.S.C. § 6297(a)(1)(B).  Therefore, the court found that a state regulation that "only requires

24  compliance with federal marking requirements" was not preempted by that statute.  *Air Conditioning*

25  *& Refrigeration Inst.*, 410 F.3d at 502.  In contrast, EPCA's preemption of any state law or regulation

26  "related to fuel economy standards or average fuel economy standards" is without exception or

27  qualification, and would preempt a state regulation that merely required a manufacturer to comply

28  with federal CAFE standards.

Second, other provisions of EPCA carve out of this broad express preemption provision specifically enumerated areas in which states may regulate. For example, EPCA provides that states "may adopt or enforce a law or regulation on disclosure of fuel economy or fuel operating costs," but only if those requirements are "identical" to the federal requirements. 49 U.S.C. § 39219(b). EPCA also allows a state to "prescribe requirements for fuel economy for automobiles obtained for its own use." 49 U.S.C. § 39219(c). The fact that Congress saw the need to preserve expressly these narrowly limited areas of state autonomy shows that it intended EPCA to otherwise occupy the entire field of fuel economy regulation.

NHTSA has exclusively occupied the field of fuel economy since EPCA's enactment in 1975. Moreover, other than California's earlier failed attempt with the ZEV amendments, no state has ever attempted to regulate fuel economy. Yet as discussed above, the AB 1493 Regulations intrude into this field because they have the force and effect of regulating motor vehicle fuel economy. They are therefore impliedly preempted by EPCA.

**B.    The AB 1493 Regulations Are Preempted Because They Conflict With The Federal CAFE Program**

The Supreme Court has described conflict preemption as "pre-empting state law that 'under the circumstances of the particular case . . . stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' -- whether that 'obstacle' goes by the name of 'conflicting; contrary to; . . . repugnance; difference; irreconcilability; inconsistency; violation; curtailment; . . . interference,' or the like." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Thus, where Congress or a federal agency has sought to create a balanced relationship between competing interests through comprehensive statutory or regulatory treatment, state law disturbing that balance is preempted. *See*, *e.g.*, *Geier*, 529 U.S. at 873 (state tort claim was preempted by federal safety standard where tort rules would upset the Department of Transportation's gradual phase-in of air bags).[15]

---

[15]  *See also Transcon. Gas Pipe Line Corp. v. State Oil & Gas Bd.*, 474 U.S. 409 (1986) (congressional determination to reduce federal regulation to allow market forces to set price preempts state regulation that would upset intricate cost relationships of the market); *Michigan Canners & Freezers Ass'n., Inc. v. Agri. Mktg. & Bargaining Bd.*, 467 U.S. 461 (1984)

[Footnote continued on next page]

Gibson, Dunn & Crutcher LLP

Here, the EPCA statute authorizes NHTSA to set CAFE standards at "the maximum feasible average fuel economy level" for a given model year.  49 U.S.C. § 32902(a), (c).  Relying on "the language of the EPCA and NHTSA's statements," this Court previously found that "among the objectives of the CAFE program are maximizing fuel economy, avoiding economic harm to the automobile industry, maintaining consumer choice, and ensuring vehicle safety."  *September 25 Order* at 10.  In the recently enacted Light Truck Standards, for example, NHTSA stated that it "balanced the express statutory factors and other relevant considerations, such as safety concerns, effects on employment and the need for flexibility to transition to a Reformed CAFE program that can achieve greater fuel savings in a more economically efficient way" and "determined that the standards under both Unreformed CAFE and Reformed CAFE represent the maximum feasible fuel economy level for each system."  *See Light Truck Standards*, 71 Fed. Reg. at 17569.  The AB 1493 Regulations upset the CAFE program's balance in a number of respects.

> **1.    The AB 1493 Regulations Conflict With EPCA On Their Face Because They Require More Stringent Fuel Economy And Are Structured Inconsistently**

The first conflict between the two regulatory regimes is how they classify vehicles.  The CAFE program provides for separate standards for passenger automobiles and light-duty trucks.  The California regulations, however, split the light-duty truck category into two groups.  The smaller light-duty trucks ("LDT1s") are combined with passenger cars for calculating fleet-wide emissions and the heavier light-duty trucks ("LDT2s") are placed in a separate category and classified together with certain heavier vehicles, called Medium Duty Passenger Vehicles ("MDPVs").  This difference in classification is significant because of the way fleet-wide standards function.  Because the smaller light duty trucks tend to have higher fuel economy than the larger light duty trucks but lower fuel

[Footnote continued from previous page]

(Agricultural Fair Practices Act preempts state marketing statute that undermines balanced relationship Congress sought to establish between agricultural producers and "handlers"); *Edgar v. MITE Corp.*, 457 U.S. 624, 102 S. Ct. 2629, 73 L. Ed.2d 269 (1982) (plurality opinion) (noting that the Williams Act struck a careful balance between the interests of offerors and target companies and finding that the state statute in question "upset" this balance and therefore was preempted); *Palmer v. Liggett Group, Inc.*, 825 F.2d 620, 629 (1st Cir. 1987) (state tort liability preempted when enforcement would be "seriously disruptive to the congressionally calibrated balance of national interests").

Gibson, Dunn & Crutcher LLP

1   economy than passenger cars, removing them from the truck fleet and placing them with the

2   passenger cars for compliance purposes has the effect of increasing the stringency of both of the

3   fleet-wide standards under AB 1493.

4        Second, the AB 1493 Regulations conflict with the CAFE program in terms of the different

5   levels of fuel economy required under each.  The current CAFE standard for passenger cars is

6   prescribed by statute at 27.5 mpg.  49 U.S.C. § 32902(b); 49 C.F.R. § 531.5.  The AB 1493

7   Regulations in contrast would require manufacturers to produce a fleet of passenger cars and small

8   light duty trucks with a combined average fuel economy of over 36 mpg for the 2012 model year,

9   gradually increasing to over 40 mpg by the 2016 model year (assuming full air conditioning credits).

10  Thus, by definition the State of California has come to a radically different conclusion than Congress

11  about the appropriate level of fuel economy for passenger cars.

12       The AB 1493 Regulations likewise conflict with the light-duty truck CAFE standards, in

13  terms of both their different numeric levels and their inconsistent structures.  The recently enacted

14  Light Truck Standards provide for a transitional "Unreformed CAFE" standard which sets fleet-wide

15  CAFE standards at 22.5, 23.1 and 23.5 mpg for the 2008, 2009 and 2010 model years, respectively.

16  *Light Truck Standards*, 71 Fed. Reg. at 17566.  The regulations then transition to a "Reformed

17  CAFE" system starting in 2011 whereby a fuel economy "target" will be calculated for each model of

18  light truck based on the model's "footprint."[16]  *Id.*  Pursuant to the formula, models with a smaller

19  "footprint" will have a higher, more stringent, fuel economy target, and models with a larger

20  "footprint" will have a lower target.  *Id.*  Each manufacturer's required fleet-wide CAFE performance

21  for a given model year is the production-weighted mean fuel economy target of all the light truck

22  models in its fleet.  *Id.* at 17607.[17]

23       The transition to an attribute-based approach for CAFE represents a dramatic shift in how

24  NHTSA sets fuel economy standards for light-duty trucks.  It was specifically recommended by the

25  _____

26  [16]  The "footprint" is the product of the average track width (the distance between the centerline of
     the tires) and wheelbase (the distance between the centers of the axles).

27  [17]  During a transition period between model years and 2010, manufacturers may elect to comply
     with the Reformed CAFE standard or the Unreformed standard.

28

National Academy of Sciences, which found that "[t]he CAFE program might be improved significantly by converting it to a system in which fuel economy targets depend on vehicle attributes" such as vehicle weight or size. *NAS CAFE Study, supra,* at 5. NHTSA adopted this approach for light-duty trucks only after it carefully considered and weighed EPCA's competing goals. For example:

- Increased Energy Savings: "The Reformed CAFE system increases the energy savings of the CAFE program over the longer term because fuel saving technologies will be required to be applied to light trucks throughout the entire industry, not just by a limited number of manufacturers." *Id.* at 17618.

- Economic Practicability: "[Reformed CAFE] prevents adverse economic consequences by incorporating greater consideration of economic practicability issues into the projections of the timing and rate at which manufacturers can introduce fuel economy improving technologies into their fleets, and by setting the Reformed CAFE standards, beginning in MY 2011, at the level at which marginal benefits equal marginal costs." *Id.* at 17568.

- Consumer Choice: "Reformed CAFE . . . more fully respects economic conditions and consumer choice" because it "does not force vehicle manufacturers to adjust fleet mix toward smaller vehicles unless that is what consumers are demanding." *Id.* at 17570.

- Safety: "In addition to the improved energy savings, this CAFE program enhances safety by eliminating the previous regulatory incentive to downsize vehicles and by raising the light truck standards so that there is no regulatory incentive from the CAFE program to design small vehicles as light trucks instead of passenger cars." *Id.* at 17568.

The AB 1493 Regulations are not based on an attribute approach. Rather, they set a single uniform average for each fleet – the very approach NHTSA and the NAS CAFE Study found to be inferior because it could cause adverse safety consequences and economic hardship. All of the benefits NHTSA sought to secure by enacting the Reformed CAFE program necessarily will be swept away if automakers are forced to comply with the more stringent numerical fuel economy levels required under AB 1493.

Another direct conflict between the California regulation and new Light Truck Standard is the pace at which manufacturers are required to integrate fuel savings technologies across their fleets.[18] The Light Truck Standards are based on a six-year phase in period to "reduce the economic impact of

---

[18] Recall that the technologies CARB relied on for setting the AB 1493 standards are the same fuel savings technologies NHTSA relied on in setting the Light Truck Standards.

applying technology by providing greater flexibility as to when fuel economy improvements are expected." *Light Truck Standards,* 71 Fed. Reg. at 17590.  Indeed, the aggressiveness of the phase in period was the subject of numerous comments and received very careful consideration by NHTSA, as demonstrated by the following discussion in the Federal Register notice:

> The agency recognizes that vehicle manufacturers must have sufficient lead time to incorporate changes and new features into their vehicles. In making its lead time determinations, the agency considered the fact that vehicle manufacturers follow design cycles when introducing or significantly modifying a product. For the final rule, the agency based our lead time assumptions more closely on the findings of the NAS report, typically relying on the mid-point of the NAS range for full market penetration, i.e., 6 years or approximately a 17 percent phase-in rate.[19] As illustrated in Appendix B of this document, and as discussed further below, the agency made numerous adjustments to timing when applying technologies in order to address lead time concerns.

*Light Truck Standards*, 71 Fed. Reg. at 17626.  The AB 1493 Regulations, however, would require auto makers to incorporate the very same fuel reduction technologies, but within a four-year phase in period.  Sep. State. Fact No. 26.  This substantially shorter lead time compared to NHTSA is a facial conflict between the regulations.  This conflict is particularly significant in light of the admission by CARB's designated witness on lead time, who testified that it will actually take manufacturers up to seven years in order to bring their fleets into compliance with the 2012 model year standards.  *Deposition of Steve Albu* at 272:15-273:19.

### 2.    The AB 1493 Regulations Conflict With EPCA With Regard To The State's Consideration of EPCA's Statutory Criteria

It is not surprising that California and NHTSA reach such different regulatory outcomes given that the State was not required to (and did not) consider the same factors weighed by NHTSA in setting CAFE standards.  *See* Cal. Health & Safety Code § 43018.5 (setting forth the statutory criteria for the regulations).  Consider, for example, the impact of the AB 1493 Regulations on employment outside of California.  Nothing in the statute requires CARB to determine the regulations' impacts on

---

[19]  The NAS CAFE study states "[t]echnology changes require very long lead times to be introduced into the manufacturers' product lines. Any policy that is implemented too aggressively (that is, in too short a period of time) has the potential to adversely affect manufacturers, their suppliers, their employees, and consumers.  Little can be done to improve the fuel economy of the new vehicle fleet for several years because production plans already are in place.  The widespread penetration of even existing technologies will probably require 4 to 8 years."  NAS CAFE Study, *supra,* at 5.

employment outside of California. *Id.; see also Shulock Depo.* at 235:2-11 ("Q. So the law does not -- the state law does not require you to assess the job loss that may result in the auto industry as a result of the AB 1493 regulation?    A. Outside of California?    Q. (Nodding head)    A. No.   Q. Okay.  And so you made no analysis of that; correct?  A.  Correct.").

It is, however, the official position of CARB that the regulations will not impact sales volumes (and thus employment) because (CARB claims) the required fuel savings technologies are economically feasible and because there is adequate lead time for manufacturers to adopt them. *Shulock Depo.* at 211:12-212:14.  This official position, however, was reached despite a modeling analysis conducted on behalf of CARB in the rulemaking concluding that the implementation of the AB 1493 Regulations will result in a 4.7% decrease in new motor vehicle sales in the State of California. Sep. State. Fact No. 33.  That modeling analysis is contained in one of CARB's "Technical Support Documents" called "Other Considerations." *Id.*  Mr. Shulock estimated that this lost sales would amount to roughly 97,000 units in 2020 alone. *Id.*[20]  Despite this conclusion, however, it is undisputed that CARB conducted no formal analysis of the number of jobs that would be lost in the industry should sales in California fall by 4.7%:

> Q.   Okay.  And just to be clear, I'm asking you on behalf of the Air Resources Board now.
>
> Did the Air Resources Board do any kind of study, investigation, data collection, analysis, anything like that, to assess how many jobs, if at all, would be lost as a result of an approximately 5 percent decrease in sales of new motor vehicles in California as a result of the AB 1493 regulations?
>
> A.   No.

*Shulock Depo.* at 233:13-20; *see also id.* at 241:6-14  ("Q.   My question to you is, did the Air Resources Board think it was important – 'yes' or 'no,' it was important or was not important, at the time of the rulemaking to investigate how many jobs might be lost in the United States if it were true that there would be a hundred thousand fewer new motor vehicle sales as a result of the regulation? A.  Well, I -- cannot say whether we considered it important or not.  We did not do it."); *Hughes*

---

[20]  Mr. Shulock's personal opinion is that the regulations will result in some loss of sales volume.  *See Shulock Depo.* at 220:12-221:1 ("My personal opinion is that there will be some loss in sales. I do not -- feel able to quantify it.")

*Depo.* at 287:4-8 ("Q.   Okay.  Has there been any analysis, modeling or testing of the impact on jobs outside of California in connection with AB-1493's implementation?   A.   I don't believe so."); *Sep. State.* Fact Nos. 34-35.  There was likewise no analysis conducted of the impact on jobs if the AB 1493 Regulations are implemented in the other states that have adopted them under Section 177 of the Clean Air Act.[21]

> Q.   And have you made any effort to determine the total amount of lost sales of new motor vehicles that might occur nationwide if California's regulation is upheld and the other states that have adopted it also are upheld?
>
> A.   No.
>
> Q.   And have you made any effort at all to consider how many job losses might result from all of those lost new motor vehicle sales if California's regulation is upheld and the other states that you predict and hope will adopt or have adopted the regulation's efforts are also upheld?
>
> A.   On the national level, you're saying?
>
> Q.   Yeah.
>
> A.   No.

*Shulock Depo.* at 242:7-21; *Sep. State.* Fact Nos. 34-35.

Thus, CARB's assessment of the employment impacts of its regulation poses a direct conflict with NHTSA's implementation of the CAFE program in either one of two ways.  If CARB has indeed concluded that the AB 1493 Regulations will have no impact on sales or employment, then it conflicts with NHTSA's determination that the Light Truck Standards – which are far less stringent than the AB 1493 standards – would result in a decrease in sales volume of just under 11,000 units per year, and a resulting negative impact on employment that it determined would be insignificant. *See Final Regulatory Impact Analysis, Corporate Average Fuel Economy and CAFE Reform For MY 2008-2011 Light Trucks* (attached as Exhibit 3 to the Request for Judicial Notice) at VII-16 (Table VII-7b); *Light Truck Standard*, 71 Fed. Reg. at 17591.  Alternatively, if the conclusion in CARB's Other Considerations document is correct and the regulations will cause a decrease in sales of up to 4.7% in those states adopting them, then CARB proceeded with its rulemaking without even

---

[21]  Section 177 allows states other than California to adopt the California emissions standard instead of being governed by the federal scheme.  42 U.S.C. § 7507.

1    assessing what sort of employment impact this loss would have on the automobile industry. Either

2    approach is entirely inconsistent with how NHTSA implements the employment-related goals of the

3    CAFE program.

4         Safety is another consideration where CARB's rulemaking conflicts with NHTSA's balancing

5    approach. It is NHTSA's view that there is a link between fuel economy and vehicle safety in that

6    "[t]he historical fact is . . . that carmakers respond to CAFE standards by reducing the size of their

7    fleets." *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.,* 956 F.2d 321, 325 (D.C.

8    Cir. 1992). Indeed, the NAS CAFE Study states that:

9        the evidence is clear that past downweighting and downsizing of the light-duty vehicle
    fleet, while resulting in significant fuel savings, has also resulted in a safety penalty.

10       In 1993, it would appear that the safety penalty included between 1,300 and 2,600
    motor vehicle crash deaths that would not have occurred had vehicles been as large

11       and heavy as in 1976.

12   *NAS CAFE Study, supra,* at 28. NHTSA, therefore, is on record as saying that any change in CAFE

13   standards will only be made after careful consideration of its safety impacts. *Reforming the*

14   *Automobile Fuel Economy Standards Program*, 68 Fed. Reg. 74908-01 at 74913 (Dec. 29, 2003); *see*

15   *also Passenger Automobile Average Fuel Economy Standards for Model Years 1987-88*, 51 Fed.

16   Reg. 35594, 35613 (Oct. 6, 1986). *Passenger Automobile Average Fuel Economy Standards for*

17   *Model Year 1989*, 53 Fed. Reg. 39275, 39294 (Oct. 6, 1988).

18        CARB's rulemaking conflicts with NHTSA by not considering any connection between more

19   stringent fuel economy regulations, vehicle downsizing and any resultant impact on safety. This

20   omission was an artifact of the AB 1493 statute, which provides that the regulations adopted by

21   CARB shall not "require" a reduction in vehicle weight. Cal. Health & Safety Code § 43018.5(d)(3).

22   CARB staff construed this to mean that they could not even consider whether weight reduction would

23   be a cost-effective compliance option (even if not explicitly required):

24       Q.  Has there been any analysis, modeling or testing of the cost-effectiveness of
    down-weighting as opposed to including various technologies for purposes of

25       increasing fuel economy or decreasing greenhouse gas emissions in order to comply
    with AB-1493?

26       [Objection interposed]

27       THE WITNESS:  No. We were specifically instructed by AB-1493 not to consider

28       weight reduction so we didn't examine that arena.

Gibson, Dunn &
Crutcher LLP

*Hughes Depo.* at 287:9-18; *Sep. State.* Fact Nos. 38-39.  Thus, CARB conducted no analysis of

whether the regulations would have any impact on vehicle safety:

> Q.  Now, sir, has there been any analysis, modeling or testing of the safety impact of AB-1493?
>
> A.  I am not aware of any.
>
> Q.  Okay.  And again, you are speaking now as the designated representative of the Air Resources Board; correct?
>
> A.  Yes.

*Id.* at 286:19-287:3; *Sep. State.* Fact Nos. 38-39.

The Defendant likely will respond by saying that manufacturers can comply with the regulations in a cost effective manner without downsizing their vehicles, and there should therefore be no impact on safety.  The point, however, is not whether CARB is right or wrong on this question.  Rather, the point is that CARB's conclusion and its overall lack of consideration of safety impacts conflicts with the approach required to be taken by NHTSA.  In contrast to NHTSA's (and the NAS CAFE Study's) conclusions regarding the relationship between more stringent fuel economy standards, vehicle downsizing, and safety, CARB has set a standard that requires improvements in fuel economy by over 45% over the current CAFE standard, and blithely shrugs off any safety consequences as a non-issue.

Moreover, even if the more stringent fuel economy required by the AB 1493 Regulations were by themselves to have no safety impacts, their structure conflicts with NHTSA's safety-related considerations in adopting an attribute-based approach for light trucks.  That agency concluded that this new approach optimizes vehicle safety because it eliminates a "regulatory incentive to downsize vehicles," which in NHTSA's view reduces safety.  *Light Truck Standards*, 71 Fed. Reg. at 17568.  By setting a single numeric standard for each fleet instead of enacting an attribute-based standard, the AB 1493 Regulations necessarily conflict with NHTSA's approach for ensuring vehicle safety.

It is therefore beyond dispute that the mere act of CARB's adopting a regulation that effectively mandates fuel economy greatly in excess of the requirements of the federal CAFE program creates an inexorable conflict.  "In selecting the maximum feasible level, NHTSA strives to set the standards ***as high as it can*** without causing significant adverse consequences for the

manufacturers or consumers." *Light Truck Standards,* 71 Fed. Reg. at 17668 (emphasis added).  "The process of achieving those goals involves great expertise and care."  *Id.*  Thus, as NHTSA has determined, any state regulation of $CO_2$ emissions outside of the CAFE program "would 'abrogate EPCA's regime,' rendering NHTSA's careful balancing of consideration[s] a nullity" because the fuel economy of the cars sold in all states which have adopted the AB 1493 Regulations would not be determined by the federal CAFE standard, but rather by the more stringent AB 1493 standard.  *Id.* (citation omitted).  Because the AB 1493 Regulations conflict with the federal CAFE program, they are impliedly preempted by EPCA.

## V.     CONCLUSION

The essential facts of this case are beyond dispute and establish that the AB 1493 Regulations are preempted by federal law.  EPCA preempts any state regulation "related to fuel economy standards." California has promulgated a regulation limiting vehicular emissions of $CO_2$, which by all accounts is the functional equivalent of a fuel economy standard.  Moreover, the regulations effectively require vehicle manufacturers to improve the fuel economy of their fleets because doing so is the only practical means of reducing tailpipe $CO_2$ emissions.  Finally, Because these regulations require fuel economy levels greatly in excess of those established by the Federal Government, theycreate a direct and inexorable conflict with the CAFE program administered by the National Highway Traffic Safety Administration.

DATED: November 8, 2006

KIMBLE, MACMICHAEL & UPTON

By:_____/s/_____
              Jon Wallace Upton

Attorneys for Intervenor,
Association of International Automobile Manufacturers

Attorneys for The Association of International
Automobile Manufacturers

FINAL California Motion for Summary Judgment.doc

Gibson, Dunn &
Crutcher LLP