1

2

3

4

5

6

7

8

9

10

11

12          IN THE UNITED STATES DISTRICT COURT FOR THE

13              EASTERN DISTRICT OF CALIFORNIA

14

15  CENTRAL VALLEY CHRYSLER-              )    CV F 04-6663 AWI LJO
    JEEP, INC. et al.,                   )
16                                        )
                      Plaintiffs,         )    ORDER ON MOTIONS AND
17                                        )    COUNTER-MOTIONS FOR
          v.                              )    SUMMARY JUDGMENT ON
18                                        )    PLAINTIFFS' CLAIMS FOR
    James GOLDSTONE, in his official      )    RELIEF ON EPCA
19  capacity as Executive Officer of the  )    PREEMPTION AND FOREIGN
    California Air Resources Board,       )    POLICY PREEMPTION
20                                        )
                      Defendant,          )
21                                        )
    THE ASSOCIATION OF                    )    Document #'s 398, 423, 427, 517,
22  INTERNATIONAL AUTOMOBILE              )    and 519
    MANUFACTURERS,                        )
23                                        )
                   Plaintiff-Intervenor,  )
24                                        )
    SIERRA CLUB, NATURAL                  )
25  RESOURCES DEFENSE COUNCIL,            )
    ENVIRONMENTAL DEFENSE,                )
26  BLUE WATER NETWORK, GLOBAL            )
    EXCHANGE, AND RAINFOREST              )
27  ACTION NETWORK,                       )
                                          )
28                 Defendant-Intervenors. )
    _____ )

**INTRODUCTION**

This is an action for injunctive and declaratory relief by plaintiffs Central Valley Chrysler-Jeep, Inc., et al. (collectively, "Plaintiffs") and Plaintiff-intervenors Association of International Automobile Manufacturers ("AIAM") against defendant James Goldstone,[1] in his official capacity as Executive Director of the California Air Resources Control Board ("CARB") and defendant-intervenors Sierra Club, et al. (collectively "Defendants").  In an order filed January 16, 2007 (the "January 16 Order"), the court granted Defendants' motion for a stay of proceedings pending the Supreme Court's decision in Massachusetts v. E.P.A. Pending in this court at the time the stay was imposed were a number of motions and cross-motions for summary judgment.  Both AIAM and Defendants have moved for summary judgment on Plaintiffs' claim that the Energy Policy and Conservation Act ("EPCA") preempts regulations promulgated by CARB that aim to regulate greenhouse gas emissions of greenhouse gasses, principally carbon dioxide, by motor vehicles.  Defendants have also moved for summary judgment on Plaintiffs' claim that CARB's proposed regulations are preempted by the foreign policy of the United States.

The Supreme Court's decision in Massachusetts v. E.P.A., 127 S.Ct. 1438 (2007), was announced on April 2, 2007.  The court requested briefing by the parties as to the impact of the decision in Massachusetts on the motions before this court.  Briefing by the parties commenced on July 20, 2007, and was completed by September 28, 2007.  During the period this case was stayed, the District Court for the District of Vermont filed an opinion and order in the consolidated case of Green Mountain Chrysler Plymoth, et al. v. Crombie, 508 F.Supp.2d 295 (D. Vt. 2007) (hereinafter "Green Mountain")[2], in which AIAM and a group of auto dealers and manufacturers challenged the State of Vermont's proposed adoption of

---

[1]     At the time this action was filed, Catherine E. Witherspoon was Executive Director of CARB and was the primary named defendant in this case.

[2]     The unpublished slip copy version of Green Mountain was submitted by Defendants at Document # 533.  Hereinafter, parallel citations are to page numbers in Document # 533.

2

the same regulations adopted by CARB on grounds identical to the grounds asserted by Plaintiffs in this case. Both parties have submitted briefing on the potential impact of <u>Green Mountain</u> on the motions now before this court. The court now lifts the previously imposed stay to consider the parties' motions for summary judgment in light of all the supplementary briefings filed.

## PROCEDURAL HISTORY

Plaintiffs filed this action on December 7, 2004. The first amended complaint ("FAC") alleged five claims for relief; preemption under EPCA, preemption under section 209(a) of the Clean Air Act, preemption under United States foreign policy, violation of the Dormant Commerce Clause, and violation of the Sherman Antitrust Act. Defendants filed a motion for judgment on the pleadings on June 1, 2006. On September 25, 2006, the court filed a memorandum opinion and order (the "September 25 Order") granting Defendants' motion for judgment on the pleadings as to Plaintiffs' claims under the Sherman Act and under the Dormant Commerce Clause. Doc. # 363. Judgment on the pleadings was denied with respect to Plaintiffs' claims for EPCA preemption, Clean Air Act preemption, and foreign policy preemption.

On October 27, 2006, Defendants moved for summary judgment on the remainder of Plaintiffs' claim on the ground of ripeness. During the pendency of that motion, Defendants moved for summary judgment as to Plaintiffs' claims under EPCA preemption and under foreign policy preemption. Defendants also moved to dismiss AIAM on the ground AIAM lacked associational standing to intervene.[3] On January 16, 2007, the court issued a memorandum opinion and order (the "January 16 Order") denying Defendants motions on the ground of ripeness and granting Defendants' motion to stay further proceedings until the Supreme Court issued its opinion in <u>Massachusetts</u>.

The January 16 Order also declared that "California's program to regulate greenhouse

---

[3]    Defendants motion to dismiss AIAM for lack of associational standing is not addressed in this order, but will be addressed in a separate order.

3

gas emissions pursuant to California Health and Safety Code, Section 43018.5(b)(1), is PREEMPTED by section 209(a) of the Federal Clean Air Act, 42 U.S.C. § 7543(a)." Doc. 606 at 22:26-28. The January 16 Order also enjoined the State of California from any enforcement of the proposed greenhouse gas emission regulations, such injunction to remain in effect until the earlier of either a grant of waiver of federal preemption by EPA, or enactment of federal legislation otherwise enabling the implementation of the regulations. Thus, the combination of the court's Orders of September 25 and January 16, resulted in the resolution of three of five of Plaintiffs' claims in the FAC, leaving undecided Plaintiffs' claims of EPCA preemption and foreign policy preemption.

On November 8, 2006, AIAM filed its motion for summary judgment on the EPCA preemption claim. Briefing on AIAM's motion for summary judgment on its EPCA claim was completed as of December 12, 2006. Also, on November 8, 2006, Defendants filed their motion for summary adjudication as to Plaintiffs' claim for EPCA preemption. Briefing on Defendants' motion appears to have been completed as of December 4, 2006. On November 22, 2006, Defendants filed a document titled "Defendants' Counter Motion for Summary Judgment or, in the Alternative Motion for Summary Adjudication," Doc. # 517 (the "517 cross-motion").[4] On November 22, 2007, Plaintiffs filed a memorandum in opposition to AIAM's motion for summary judgement on Plaintiffs' EPCA claim. Plaintiffs' opposition to AIAM's motion for summary judgment is based on Plaintiffs' contention that their case should be decided on facts that would be best adduced at trial, and that summary judgment should therefore be denied. On December 1, 2006, Plaintiffs filed a motion to strike the 517 cross-motion. On December 4, 2006, Plaintiffs filed an opposition on the merits of the 517 cross-motion. Briefing on the 517 cross-motion appears to have been completed by

---

[4]    The 517 cross-motion references Defendants' opposition to AIAM's Motion For Summary Judgment as its memorandum of points and authorities in support of the 517 cross-motion. The court interprets Defendants' 517 cross-motion as being Defendants' effort to cover all bases in their effort to obtain an adjudication on Plaintiffs' EPCA preemption claim. The court will address Plaintiffs' motion to strike the 517 cross-motion *infra*.

December 13, 2006.

The Supreme Court's decision in <u>Massachusetts</u>, was announced on April 2, 2007. The memorandum opinion and order by the District of Vermont in <u>Green Mountain</u>, is dated September 12, 2007.  The parties have completed supplemental briefing on the impact of <u>Massachusetts</u> as of September 28, 2007, including opening and responsive briefing in response to the opposing sides' briefs.  In total, the parties have submitted a total of twelve briefs and requests for judicial notice in response to this court's request for further briefing. Both Plaintiffs and Defendants addressed issues raised in <u>Green Mountain</u> in their reply briefs that were both filed on September 28, 2007.

**REGULATORY BACKGROUND AND PROPOSED UNDISPUTED**

**MATERIAL FACTS**

The statutory enactments that form the legal backdrop of this action have been extensively summarized in the court's September 25 Order.  The court summarizes here the portion of the background presented in the September 25 Order that is pertinent to this discussion.

**I.  California Regulatory Background**

In 2002, the California Legislature enacted Assembly Bill 1493 ("AB 1493"), codified at California Health and Safety Code, section 43018.5.  Section 43018.5(a) required CARB to "develop and adopt regulations that achieve the maximum feasible and cost-effective reduction of greenhouse gas emissions from motor vehicles" not later than January 1, 2005. The regulations directed by AB 1493 are to be applied to motor vehicles beginning with the 2009 model year.  AB 1493 required CARB to develop its regulations taking into account the technical feasability of implementing the regulations within the time frames provided and to take into account "environmental, economic, social, and technological factors."  The regulations to be set by CARB were also to be "[e]conomical to an owner or operator of a vehicle, taking into account the full life-cycle costs of the vehicle."  Cal. Health & Safety Code, § 43018.5(i)(2).

In 2004, CARB completed the development of regulations to reduce greenhouse gas

5

emissions and ultimately adopted those regulations in its resolution 04-28 (hereinafter the "AB 1493 Regulations"). The AB 1493 Regulations provide that carbon dioxide emissions for passenger cars and light duty trucks less than 3750 pounds be less than 323 grams per mile starting with the 2009 model year, and decrease to 205 grams per mile of carbon dioxide in the 2016 vehicle year and beyond. The corresponding values for emissions of carbon dioxide in grams per mile for light duty trucks over 3751 pounds and medium duty passenger vehicles is 439 grams per mile in 2009, and 332 grams per mile in 2016 and beyond. The AB 1493 Regulations address four greenhouse gases: carbon dioxide, methane, nitrous oxide and hydrofluorocarbons. Although the emissions standards are expressed in grams of carbon dioxide per mile, the AB 1493 Regulations provide formulae for the conversion of other greenhouse gas pollutants to their carbon dioxide equivalents. The AB 1493 Regulations detail the method for computation of fleet average carbon dioxide emissions for the vehicle fleets being regulated.

**II. Federal Regulatory Background**

The United States Environmental Protection Agency ("EPA") is empowered through the Clean Air Act to promulgate regulations necessary to prevent deterioration of air quality. 42 U.S.C., § 7601(a). Section 202(a)(1) of the Clean Air Act, codified at 42 U.S.C. § 7521(a)(1), empowers EPA to prescribe by regulation "'standards applicable to the emission of any air pollutant from any class or classes of new motor vehicles or new motor vehicle engines, which in [the EPA Administrator's] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare . . .'" Massachusetts, 127 S.Ct. at 1447.

Generally, the Clean Air Act expressly preempts state regulation of motor vehicle emissions. 42 U.S.C. § 7543(a). However, section 209 of the Clean Air Act, codified at 42 U.S.C. § 7543(b)(1) (hereinafter "section 209") provides that "any state which has adopted standards (other than crankcase emission standards) for the control of emissions from new motor vehicles or new motor vehicle engines prior to March 30, 1966," may be granted a waiver to impose standards more stringent than those imposed by the Clean Air Act, if

specified criteria are met.  California is the only state to have regulated new motor vehicle emissions prior to March 30, 1966, and so is the only state that may apply to EPA for a grant of waiver of preemption.  Although other states may not request waivers for standards they develop, other states may, pursuant to 42 U.S.C. § 7507, adopt standards that are promulgated by California and for which a waiver of preemption is granted by EPA pursuant to section 209.  Compliance with any California standards that are granted waiver of preemption under section 209 is deemed compliance with corresponding standards promulgated by EPA pursuant to 42 U.S.C., section 7543(b)(3), which provides:

> In the case of any new motor vehicle or new motor vehicle engine to which State standards apply pursuant to a waiver granted under paragraph (1), compliance with such State standards shall be treated as compliance with applicable Federal Standards for purposes of this subchapter.

The Energy Policy and Conservation Act ("EPCA") directs the Secretary of the Department of Transportation ("DOT") to improve the efficiency of motor vehicles by establishing federal fuel economy standards for new vehicles on a fleet-wide basis. 49 U.S.C. §§ 32902(a), 32902(c).  The Secretary of the Department of Transportation has delegated the authority under EPCA to determine the maximum feasible milage standard to the National Highway Traffic Safety Administration. ("NHTSA").  49 C.F.R. § 1.50(f).  In determining the maximum feasible average fuel economy, NHTSA must consider: "(1) technological feasibility; (2) economic practicability; (3) the effect of other Federal motor vehicle standards on fuel economy; and (4) the need of the nation to conserve energy." 49 U.S.C., § 32902(f); see Green Mountain, 508 F.Supp.2d at 305-307; Doc.# 533 at 12-14.

EPCA contains an express preemption provision as follows:

> When an average fuel economy standard prescribed under this chapter is in effect, a State or a political subdivision of a State may not adopt or enforce a law or regulation related to fuel economy standards or average fuel economy standards for automobiles covered by an average fuel economy standard under this chapter.

49 U.S.C. § 32919.  Unlike the Clean Air Act, EPCA provides no waiver mechanism for its preemptive effect that would allow California or any other state to adopt a regulation relating to fuel economy standards.

1

2       **III.  Proposed Undisputed Material Facts**

3              AIAM submitted a list of 42 proposed undisputed material facts that, in sum, are

4       proffered to support four core factual propositions.  The first twenty-five of these proposed

5       undisputed material facts support AIAM's core contention that carbon dioxide is the

6       inevitable byproduct of the complete combustion of liquid motor fuels and that the regulation

7       of the amount of carbon dioxide a vehicle may emit necessarily implies the regulation of the

8       amount of fuel the vehicle may consume per unit of travel.  As AIAM states the proposition,

9       "[c]arbon dioxide emissions from a gasoline-powered motor vehicle are directly and

10      inversely proportional to the vehicle's fuel economy and there is a mathematical formula

11      whereby one can convert carbon dioxide emissions into a miles-per-gallon fuel economy

12      figure and vice-versa."  AIAM's UMF # 9, Doc. # 421.

13             Defendants dispute this central thesis arguing that, for purposes of computation of

14      carbon dioxide emissions in the context of the AB 1493 Regulations, contributions of the

15      vehicles air conditioning system (which is not factored into fuel economy calculations),

16      limitations on the production of products of incomplete combustion, and the carbon offsets

17      allowed for the production of vehicles that can use alternative biofuel mixtures means that

18      there is not an exact one-to-one correlation between the regulation of carbon dioxide

19      production and fuel efficiency.  See AIAMs' UMF #'s 7 and 9 and Defendants' response to

20      AIAM's UMF # 9.   Doc.# 520 at ¶9.

21             It is undisputed that "fuel economy is determined pursuant to EPA regulations by

22      measuring the exhaust emissions of carbon monoxide, carbon dioxide and unburned

23      hydrocarbons per mile traveled and, using a formula found at 40 C.F.R. § 600.113-93(e),

24      calculating the amount of fuel burned per mile driven."  AIAM's UMF # 7.  It is also not

25      disputed that carbon dioxide comprises approximately 99 percent of the carbon-containing

26      emissions from modern motor vehicle engines.  See AIAM's UMF # 8.   Thus, the court

27      accepts as proven for purposes of this discussion that the implementation of regulations that

28      require substantial reduction of carbon dioxide emissions will necessarily require substantial

                                                    8

increases in motor vehicle fuel efficiency as measured in miles-per-gallon.

It is also not disputed that California's AB 1493 Regulations grant offsets in the computation of carbon dioxide emissions for air conditioner improvements and for the ability of the vehicle to run on alternative fuel formulations that provide lower net carbon emissions when upstream carbon balances are factored in. See Doc. # 563 at ¶¶ 5-11. Based on Defendants' list of additional material facts and in consideration of AIAM's objections thereto, the court concludes it is undisputed that compliance with California's AB 1493 Regulations can be at least partially achieved through changes that are not directly reflected in fuel economy improvements measured in miles-per-gallon.

The second core factual proposition supported by AIAM's proposed undisputed facts relates to the time period over which the AB 1493 Regulations are implemented. AIAM alleges the AB 1493 Regulations prescribe a 4-year phase-in period during which time manufacturers will "introduce the new technologies into their entire vehicle fleet." AIAM's UMF # 26. Defendants dispute the proffered fact noting that there are different phase in periods for near-term standards, which are phased in over a four-year period beginning with the 2009 model year, and mid-term standards, which are phased in between model years 2013 and 2016.

Third, AIAM's proposed undisputed material facts seek to support the claim that implementation of the AB 1493 Regulations could cause a loss in new vehicle sales of up to 10,788 vehicles in the 2010 model year and that the actual extent of economic impact depends on the technical feasibility of the fuel efficiency improvements required and the time available to accomplish the necessary changes. AIAM alleges that CARB failed to fully account for vehicle sales losses that would occur if the AB 1493 Regulations were to be adopted by other states. AIAM allege that CARB's own program officials opined that implementation of the AB 1493 Regulations would lead to a decrease in new vehicle sales of approximately 4.7%. See Plaintiffs' proposed UMF's, ¶¶ 30-34. Defendants dispute Plaintiffs' proffered facts and allege that the 4.7% sales decrease represents the cumulative effect to the year 2020. Defendants allege the actual loss in sales is calculated to be on the

1    order of 0.4% per year.  Defendants allege that CARB determined there would be no effect

2    on new vehicle sales or employment due to the proposed regulations.

3           Fourth, AIAM's proffer proposed undisputed material facts numbered 36 to 42 to

4    support their contention that implementation of the AB 1493 Regulations will force

5    consumers to buy smaller vehicles, thereby constraining customer choice and exposing the

6    public to increase risk of injury while driving smaller, lighter vehicles.  Defendants dispute

7    the factuality of the vehicle weight - safety connection and contend the proffered facts are

8    irrelevant.

9                                    **LEGAL STANDARD**

10          Summary judgment is appropriate when it is demonstrated that there exists no

11   genuine issue as to any material fact, and that the moving party is entitled to judgment as a

12   matter of law.  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970);

13   Poller v. Columbia Broadcast System, 368 U.S. 464, 467 (1962); Jung v. FMC Corp., 755

14   F.2d 708, 710 (9th Cir. 1985); Loehr v. Ventura County Community College Dist., 743 F.2d

15   1310, 1313 (9th Cir. 1984).

16          Under summary judgment practice, the moving party always bears the initial
            responsibility of informing the district court of the basis for its motion, and
17          identifying those portions of "the pleadings, depositions, answers to
            interrogatories, and admissions on file, together with the affidavits, if any,"
18          which it believes demonstrate the absence of a genuine issue of material fact.

19   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When the moving party has the burden

20   of proof at trial, that party must carry its initial burden at summary judgment by presenting

21   evidence affirmatively showing, for all essential elements of its case, that no reasonable jury

22   could find for the non-moving party.  United States v. Four Parcels of Real Property, 941

23   F.2d 1428, 1438 (11th Cir.1991) (en banc); Calderone v. United States, 799 F.2d 254, 259

24   (6th Cir. 1986); see also E.E.O.C. v. Union Independiente De La Autoridad De Acueductos Y

25   Alcantarillados De Puerto Rico, 279 F.3d 49, 55 (1st Cir. 2002) (stating that if "party moving

26   for summary judgment bears the burden of proof on an issue, he cannot prevail unless the

27   evidence that he provides on that issue is conclusive.")

28          If the moving party meets its initial responsibility, the burden then shifts to the

                                              10

opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747, 749 (9th Cir. 1973).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Anderson, 477 U.S. 248-49; Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  First Nat'l Bank, 391 U.S. at 290; T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); International Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c); Poller, 368 U.S. at 468; SEC v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982).  The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court

must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)(per curiam); Abramson v. University of Hawaii, 594 F.2d 202, 208 (9th Cir. 1979). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

## MOTIONS FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION ON PLAINTIFFS' CLAIM OF EPCA PREEMPTION

### I. Prior Rulings of the Court

The court's September 25 Order addressed Defendants' motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. In its September 25 Order, the court noted that:

> On a motion for judgement on the pleadings, the court accepts as true Plaintiffs' factual allegations about the effects of the California regulations. [Citation.] Defendants do not contend that Plaintiffs' have failed to adequately allege facts supporting their claims that California regulations will risk higher prices, decreased choices and safety for the consumer, and decreased profitability, and lost goodwill for manufacturers and dealers. Defendants instead contend that Congress intended to permit the California Regulations regardless of such impacts.

Doc. # 363 at 13:6-12. The September 25 Order considered and rejected arguments advanced by Defendants to support their general contention that Congress intended to permit California to regulate carbon dioxide emissions regardless of the impact of those regulations on fuel efficiency standards under EPCA. First, the court rejected Defendants' contention that the grant of a waiver of preemption under section 209 of the Clean Air Act immunizes to any extent a state regulation from a preemption challenge under EPCA. The court opined:

> Defendants contend that the EPCA and regulations that receive an EPA waiver under section 209(b) [of the Clean Air Act] comprise "an overlapping federal scheme." [Citation to Defendants' reply brief.] They point out the EPA under the Clean Air Act, Like NHTSA pursuant to the EPCA, considers the technological feasibility and economic practicability of emission standards. Defendants note that the EPA, when scheduling implementation of

12

regulations that have received a waiver, allows such a regulation to take effect only "after such period as the Administrator finds necessary to permit the development and application of the requisite technology, giving appropriate consideration to the cost of compliance within such period." 42 U.S.C. § 7521(a)(2).

Nothing in the statutory language or the legislative history of the Clean Air Act, the EPCA, or any other statute before the court indicates Congress' intent that an EPA waiver would allow a California Regulation to disrupt the CAFE program. Section 209(b) provides only that the waiver exempts the regulations from express preemption under section 209(a). See 42 U.S.C. § 7543(b)(1) ("The administrator shall, after notice and opportunity for public hearing, waive application of *this section* . . . ." (Emphasis added)). On its face, the language does not endorse regulations that present obstacles to the objectives of the EPCA, nor do the criteria considered by EPA in granting a waiver ensure that such interference will not occur.

Doc. # 363 at 16:8-23. The court continued on to make explicit its holding that the grant of a waiver by EPA does not "federalize" the state regulation:

Section 209(b) does not provide that regulations, once EPA grants a waiver, become federal law and are thereby rendered immune from preemption by other federal statutes. Defendants point out that compliance with state standards that have been granted a waiver is treated as compliance with federal standards, giving them federal status. 42 U.S.C. § 7507(b)(3). However, the sentence to which Defendants refer indicates that "compliance with such State standards shall be treated as compliance with applicable Federal standards *for purposes of this subchapter*." Id. (emphasis added). Section 177 also demonstrates that Congress also gave narrow effect to other states' adoption of regulations that receive a waiver. See 42 U.S.C. § 7507 (providing that "[**n]otwithstanding section 7543(a) of this title,** the Clean Air Act's express preemption provision, other states may adopt standards identical to California's emphasis added)). Hence, the statutory language explicitly disclaims any special status for the California regulations under other federal statutes. The legislative history generally emphasizing the breadth of California's discretion upon receiving an EPA waiver does not provide any reason to believe that the resulting regulations could stand as an obstacle to other federal schemes. See, e.g., H.R. Rep. No. 95-294 at 301-02 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1077, 1380-81.

Doc. # 363 at 17:1-15 (emphasis in original).

The court's September 25 Order also considered and rejected Defendants' contention that EPCA's obligation to consider "the effect of other Federal motor vehicle standards on fuel economy" pursuant to 49 U.S.C. § 32902(f) does not indicate a congressional intent to allow state regulations to infringe on EPCA's existing structure or goals. The court concluded that the statutory duty to consider a factor does not require that EPCA harmonize its goals or regulations with those of a state regulation that has been granted a waiver of

13

preemption under the Clean Air Act.  The court held that "[t]he language of section 32902(f) merely requires NHTSA to investigate and analyze what effect the "other" regulations will have on fuel economy.  Doc.# 363 at 18:15-16.

The court concluded that "[b]ecause nothing before the court evinces Congress' intent to permit California regulations that stand as an obstacle to the EPCA's objectives, Plaintiffs have stated a claim for EPCA preemption and the court will not grant judgment on the pleadings on this cause of action."  Doc.# 363 at 19:5-7.

**II. Defendants' Motion for Reconsideration**

Defendants, in their cross-motion for summary judgment, reiterate their contention that California's AB 1493 Regulations will, upon grant of a waiver of preemption under the Clean Air Act, become an "other motor vehicle standard[ ] of the government" which DOT will be required to factor into the formulation of further fuel economy standards pursuant to 42 U.S.C. § 32902(f), and, as such, will not be subject to preemption by implication. Defendants also reiterate their contention that Congress did not intend that EPCA's preemption provision should bar enforcement of California's AB 1493 Regulations if and when those regulations are granted waiver of preemption under section 209 of the Clean Air Act.  Defendants request as part of their cross motion for summary judgment on AIAM's claim for EPCA preemption that this court reconsider its holdings to the contrary contained in the September 25 Order.

Local Rule 78-230(k) requires that a party seeking reconsideration of a district court's order identify the decision being challenged and identify "what new or different facts or circumstances are claimed to exist which did not exist or were not shown upon such prior motion, . . ."  Generally, before reconsideration may be granted there must be a change in the controlling law or facts, the need to correct a clear error, or the need to prevent manifest injustice.  See United States v. Alexander, 106 F.3d 874, 876 (9th Cir. 1997).

*A.  Intervening Authority*

*1. Massachusetts v. E.P.A.*

The court's January 16 Order stayed proceedings pursuant to Defendants' motion to

14

await the anticipated decision of the Supreme Court in <u>Massachusetts</u>.  The action in <u>Massachusetts</u> arose as a result of the denial by EPA of a rule-making petition on behalf of several states and a number of environmental organizations that asked EPA "to regulate 'greenhouse gas emissions from new motor vehicles under § 202 of the Clean Air Act.'" <u>Massachusetts</u>, 127 S.Ct. At 1449.  On September 8, 2003, EPA denied the rule-making petition, opining that: (1) "the Clean Air Act does not authorize the EPA to issue mandatory regulations to address global climate change, [. . .]; and (2) that even if the agency had the authority to set greenhouse gas emission standards, it would be unwise to do so at this time. . . ." <u>Id</u>. at 1450 (internal citations omitted).

Petitioners for the rule-making petition sought review of  EPA's order in the District of Columbia Circuit Court of Appeals.  The appellate court determined that the EPA Administrator had properly exercised his discretion in denying the petition and therefore denied the petition for review.  In its review of the appellate court's 2-to-1decision, the Supreme Court noted that the three judges of the appellate panel wrote separately and expressed different reasons for their conclusions.  Judge Sentelle's determination that the EPA administrator's denial should not be overturned was based primarily on the ground that the plaintiff parties in the case had failed to demonstrate particularized injuries that would satisfy the constitutional requirement for standing.  Judge Randolph avoided a ruling as to standing, but opined that the EPA Administrator's decision was within his discretion to the extent the decision took into account policy judgments as well as scientific evidence.  Judge Tatel dissented finding both standing and that the EPA Administrator's decision was an abuse of discretion given the scientific evidence before the court.

The Supreme Court addressed both the standing and the substantive issue of EPA's authority to regulate carbon dioxide and other greenhouse gas emissions under the Clean Air Act.  Standing is not at issue here[5] and it is sufficient to note that the Supreme Court found

---

[5]    AIAM's associational standing, which is placed at issue in this action by Defendants' motion to dismiss was not before the Supreme Court in <u>Massachusetts</u>.

the petitioners in <u>Massachusetts</u>, had standing to challenge EPA's denial of the rule making

petition. <u>Id</u>. at 1458.

On the merits, the Supreme Court held that greenhouse gasses, including carbon

dioxide, are "air pollutants" that are subject to regulation through the Clean Air Act. <u>See id</u>.

at 1462 ("EPA has the statutory authority to regulate the emission of such [greenhouse]

gasses from new motor vehicles"). In so holding, the Supreme Court examined and rejected

the reasons originally cited by EPA for the decision of that agency to decline the rule-making

petition. Significantly, for purposes of this discussion, the Supreme Court specifically

considered EPA's argument that EPA could not regulate carbon dioxide emissions because

"doing so would require [EPA] to tighten mileage standards, a job (according to EPA) that

Congress has assigned to DOT. In this regard, the Supreme Court observed "EPA has been

charged with protecting the public's health and welfare," 42 U.S.C. § 7521(a)(1), a statutory

obligation wholly independent of DOT's mandate to promote energy efficiency. [Citation.]

The two obligations may overlap, but there is no reason to think the two agencies cannot both

administer their obligations and yet avoid inconsistency." <u>Massachusetts</u>, 127 S.Ct. at 1462.

### 2. *Green Mountain Chrysler v. Crombie*

In the fall of 2005, the State of Vermont adopted standards restricting greenhouse gas

emissions for new vehicles identical to the standards set forth in California's AB 1493.

There ensued an action by a number of motor vehicle dealers, manufacturers and associations

requesting declaratory and injunctive relief to prevent implementation of the proposed

regulations. The action in <u>Green Mountain</u> is essentially identical to the instant action. In

<u>Green Mountain</u>, as in the instant action, the state and intervenor defendants challenged the

plaintiffs' action by a motion for judgment on the pleadings and challenged the action on the

ground of ripeness. As in the instant case, the <u>Green Mountain</u> court concluded the action

was prudentially ripe.

Plaintiffs in <u>Green Mountain</u> moved for partial summary judgment on the ground the

proposed regulations are prempted by EPCA. The <u>Green Mountain</u> court denied motions by

defendants in that case to stay proceedings pending the Supreme Court's decision in

Massachusetts and pending the outcome of the outstanding motions for summary judgment in this case.  The Green Mountain court, responding to the plaintiffs' motion for summary adjudication on the issue of EPCA preemption, determined that there were outstanding factual issues that remained in dispute.  The court conducted a 16-day bench trial.  The 240-page memorandum opinion and order represents the Green Mountain court's decision as to certain contested evidentiary issues and as to the parties motions for summary judgment on grounds of EPCA and foreign policy preemption.

In its analysis of the plaintiffs' claims of preemption under EPCA and foreign policy, the Green Mountain court addressed the threshold question of whether a regulatory scheme that is reviewed and approved by EPA pursuant to section 209(b) of the Clean Air Act becomes an "other motor vehicle standards of the [federal] Government" for purposes of 49 U.S.C., § 32902(f).  The Green Mountain court reasoned the question is one of threshold importance because, as discussed infra, if the effect of adoption of a proposed state regulation of vehicle greenhouse gas emissions by EPA pursuant to section 209 of the Clean Air Act "federalizes" the regulation, then the doctrine of preemption does not apply.

The Green Mountain court's inquiry looked extensively at the history and intent of congressional enactments regarding the Clean Air Act and Congress' recognition of California's role as an innovator of alternative regulatory schemes to address air pollution problems.  The Green Mountain court observed that Congress stated unequivocally in 1975 that "federal standards included EPA-approved California standards."  Green Mountain, 508 F.Supp.2d at 346; Doc.# 533 at 110. After an examination of the 1994 legislation recodifying the Clean Air Act, the Green Mountain court concluded the changes enacted in 1994 did not result in any substantive changes in the law and that has continued to be Congress' intent that California laws adopted under section 209 of the Clean Air Act would continue to be "other motor vehicle standards of the government."  Id.; Doc.# 533 at 110-111.

Pursuant to this analysis, the Green Mountain court concluded that "preemption doctrines do not apply to the interplay between Section 209(b) of the [Clean Air Act] and EPCA . . . ."  Id. at 350; Doc.# 533 at 119.  The court concluded that the interplay between

17

1 the "federalized" California standards and EPCA is potentially that of conflict between two

2 federal regulatory schemes, but not one of preemption of a state scheme and a federal

3 scheme.  Id.  Notwithstanding the fact the Green Mountain court found the plaintiffs'

4 preemption arguments inapplicable, the court went on to conduct a federal preemption

5 analysis in the alternative because of EPCA's express preemption provision and because of

6 the plaintiffs' claim that implementation of California's AB 1493 provisions would "actually

7 conflict with EPCA's fuel economy standards."  Id.

8      The Green Mountain court applied standard analyses for express, field and conflict

9 preemption and found that none apply to prevent the enactment of California's AB 1493

10 Regulations.  The Green Mountain court's analysis of both express and conflict preemption

11 relies significantly on information found at the court trial.  The court's analysis of field

12 preemption does not rely on facts derived from trial.

13      **B. Reconsideration**

14      The court stayed further activity in this case pending the Supreme Court's decision in

15 Massachusetts in part because the court was concerned that the issue of the preclusive effect

16 of EPCA's CAFE program on EPA's authority to regulate greenhouse gas emissions,

17 principally carbon dioxide, had been raised in that case and would probably be addressed by

18 the Supreme Court if their decision reached the merits of the case.  The court understands

19 that the issue of preemption was not precisely before the Supreme Court because the issues in

20 that case pertained to the authority of one agency of the federal government, the EPA, to

21 regulate carbon dioxide emissions under the Clean Air Act to the possible detriment of

22 DOT's aims and goals in its administration of EPCA's CAFE standards program.  While the

23 preemption doctrine does not apply to the interplay between two federal schemes, the inquiry

24 into the conflict between those schemes is similar to preemption analysis because "both

25 preemption of state law and preclusion of federal statutory remedies are questions of

26 congressional intent."  Felt, 60 F.3d at 1419.

27      The court finds that the Supreme Court's decision in Massachusetts constitutes a

28 change in controlling law such that reconsideration of this court's holding with respect to

EPCA preemption of California's AB1493 Regulations as set forth in the September 25

Order is appropriate.

**III.  Preemption, Preclusion, and EPCA**

"The Supremacy Clause of Article VI of the United States Constitution grants

Congress the power to preempt state or local law." Olympic Pipeline Co. v. City of Seattle,

437 F.3d 872, 877 (9th Cir. 2006).  Where the interrelationship of two federal laws is at

issue, preemption doctrine *per se* does not apply.  Felt v. Atchison, Topeka & Santa Fe

Railway, 60 F.3d 1416, 1418-19 (9th Cir. 1995).  Rather, the issue becomes whether one

federal law has preclusive effect on the applicability of the other.  Id. at 1419.

A major contention underpinning AIAM's motion for summary judgment is the legal

proposition that California's AB 1493 Regulations, when and if they are granted a waiver of

preemption under section 209 of the Clean Air Act, are and remain state regulations and

therefore subject to preemption.  Defendants take the opposite position and ask the court to

reconsider its order holding that a state law that is granted waiver of preemption under the

Clean Air Act does not become "federalized" and therefore immune from preemption.  The

court acknowledges that the court in Green Mountain reached a conclusion on the issue of

"federalization" of state regulations under the Clean Air Act that was essentially opposite this

court's conclusion.

After review of the decision in Green Mountain, the Supreme Court's decision in

Massachusetts, and the Parties' arguments, the court is of the opinion that a slightly different

analytical approach may be more appropriate.  Without disagreeing with the Green Mountain

court's conclusion that "preemption doctrines do not apply to the interplay between section

209(b) of the [Clean Air Act] and EPCA," Green Mountain,  508 F.Supp.2d at 350; Doc.#

533 at 119, this court notes that the Green Mountain court's ruling is essentially the product

of a conclusion of non-conflict.  The Green Mountain court never actually offers a legal

foundation for the conclusion that a state regulation granted waiver under section 209 is

essentially a federal regulation such that any conflict between the state regulation and EPCA

is a conflict between federal regulations.  See Green Mountain,  508 F.Supp.2d at 350; Doc.#

533 at 119.  Likewise, AIAM offers no definitive authority for the proposition that a state

regulation granted waiver under section 209 remains a state regulation subject to preemption

other than the absence of an explicit statutory provision to the contrary.

This court concludes that a more productive approach is to first analyze the interplay

between the regulatory function of the Clean Air Act and EPCA's milage-setting authority.

Specifically, the court's analysis begins by asking if EPA may promulgate emission control

regulations that have an effect on fuel economy.  If so, the next question is whether any new

EPA-promulgated regulations that would have the incidental effect of requiring greater fuel

efficiency than is required under existing regulations set by NHTSA under the CAFE

program are precluded by EPCA.  Finally, the court will ask if there is any basis for treating a

state regulation that has been granted waiver under section 209 any differently than a

regulation that has been promulgated by EPA.

### A.  EPA's Authority to Promulgate Emission Control Regulations Having an Effect on Fuel Economy

Pertinent to the issues raised by Plaintiffs' claim of preemption under EPCA, the

Supreme Court, in its discussion of potential conflict between EPCA and EPA's authority to

regulate carbon dioxide, held:

> EPA finally argues that it cannot regulate carbon dioxide emissions from motor vehicles because doing so would require it to tighten milage standards, a job (according to EPA) that Congress has assigned to DOT.  See 68 Fed.Reg. 52929.  But that DOT sets mileage standards in no way licenses EPA to shirk its environmental responsibilities.  EPA has been charged with protecting the public's "health" and "welfare," 42 U.S.C. § 7521(a)(1), a statutory obligation wholly independent of DOT's mandate to promote energy efficiency.  See Energy Policy and Conservation Act § 2(5), 89 Stat. 874, 42 U.S.C. § 6201(5).  The two obligations may overlap, but there is no reason to think the two agencies cannot both administer their obligations and yet avoid inconsistency.

> While the Congresses that drafted § 202(a)(1) might not have appreciated the possibility that burning fossil fuels could lead to global warming, they did understand that without regulatory flexibility, changing circumstances and scientific developments would soon render the Clean Air Act obsolete." (internal quotation marks omitted)).  Because greenhouse gases fit well within the Clean Air Act's capacious definition of "air pollutant," we hold that EPA has the statutory authority to regulate the emission of such gasses from new motor vehicles.

1    Massachusetts, 127 S.Ct. 1438, 1461-1462.

2        This court's discussion of the issue of EPCA preemption in its September 25 Order

3    centered on the conflict between the goal of the AB 1493 Regulations to limit greenhouse gas

4    production and the goals of EPCA to set milage standards by balancing technical feasibility,

5    vehicle safety, economic impacts, and customer choice.  However, the above-quoted portion

6    of Massachusetts indicates that the threshold inquiry should not be aimed at the likelihood the

7    California standards would interfere with EPCA's regulatory scheme; rather, the threshold

8    inquiry is to examine the scope of EPCA's ability to preclude regulations that are aimed at

9    the prevention of damage to public health or welfare from greenhouse gas emissions where

10   those regulations may impact milage standards.

11       Two elements of the previously quoted portion of the Massachusetts decision indicate

12   clearly that Congress empowered EPA to enact controls on greenhouse gasses

13   notwithstanding that such regulation might require increased fuel efficiency.  First, the

14   Supreme Court noted that EPA is specifically tasked with protection of the public health and

15   welfare under the Clean Air Act, and that DOT, under EPCA, is not.  In its discussion on

16   plaintiffs' standing in Massachusetts, the Supreme Court acknowledged that carbon dioxide

17   emissions from human activities constitute a causal connection with global warming and that

18   the widely recognized consequences of global climate change constitute an increasingly

19   severe threat to human health and welfare.  See Massachusetts, 127 S.Ct. at 1455-56.

20       This appreciation of the scope and extent of the threat posed by global climate change

21   on human health and welfare forms the relevant backdrop to the Supreme Court's holding in

22   the first paragraph quoted above that EPA's duty to regulate greenhouse gas emissions that it

23   finds threaten health and welfare are independent of the effect such regulation may have on

24   fuel efficiency.  It also forms the relevant backdrop for the Supreme Court's opinion in the

25   second paragraph that the regulatory authority of EPA was created broadly by Congress to

26   enable EPA to respond to threats that were not adequately known or envisioned at the time

27   section 202(a)(1) of the Clean Air Act was drafted.  The Supreme Court's strong statement of

28   EPA's authority to regulate carbon dioxide emissions informs this court's conclusion that

21

1   Congress intended EPA to be able to promulgate emissions control regulations for the

2   protection of public health and welfare notwithstanding the potential effect of those

3   regulations on average fleet fuel economy standards determined under EPCA.

4                    **B. *Non-Preclusion of EPA's Regulations by EPCA***

5            As previously noted, in questions of both preemption of state law and preclusion of

6   federal statutory remedies by other federal statutes, the touchstone is congressional intent.

7   Felt, 60 F.3d at 1414.  "To determine the congressional intent [. . . ], [the court] look[s] to the

8   language, structure, subject matter, context and history-factors that typically help courts

9   determine a statute's objectives and thereby illuminate its text."  Akhtar v. Burzynski, 384

10  F.3d 1193, 1199 (9th Cir. 2004) (internal quotation marks omitted).

11           As the Supreme Court's decision in Massachusetts makes clear, the EPA's

12  congressionally established purpose is to protect the public's health and welfare, 42 U.S.C. §

13  7521(a)(1), a task EPA can and must undertake independent of NHTSA's duty to set milage

14  standards.  Massachusetts, 127 S.Ct. At 1462.  While the Massachusetts Court recognized

15  that the "obligations of the two agencies may overlap," it opined that "there is no reason to

16  think the two agencies cannot both administer their obligations and yet avoid inconsistency."

17  Id.  What remains unaddressed is the mechanism by which the two agencies should resolve

18  inconsistencies between the two regulatory regimes.  Put more directly, the question to be

19  answered is what happens when EPA, independently fulfilling its duty to regulate emissions

20  that threaten the public's health and welfare, imposes a regulatory structure that would result

21  in  fuel efficiency standards that are more stringent than the currently-operative CAFE

22  standards?

23           Plaintiff-intervener AIAM contends that the Supreme Court's opinion in

24  Massachusetts that the two agencies, DOT and EPA, can "administer their obligations and yet

25  avoid inconsistency" indicates the Supreme Court's understanding that EPA will

26  "coordinate" with DOT through NHTSA to craft regulations that are not inconsistent with

27  EPCA's purposes.  See Doc. # 627 at 8:12-14.  Although AIAM does not specifically make

28  an argument that EPA is precluded from making regulations that conflict with EPCA's

1    purposes, AIAM's argument carries the implication that EPA-developed regulations must be

2    consistent with NHTSA's balancing of fuel efficiency standards set under EPCA according to

3    NHTSA's assessment of cost, benefit, public safety and economic growth.  See Doc. # 627 at

4    8:15-18 (citing Exec. Order No. 13432, 72 Fed.Reg. 27717 (May 14, 2007).

5        At oral argument, AIAM clarified its EPCA preemption argument contending the

6    effect of the Supreme Court's decision in Massachusetts is to require "harmonization" of the

7    tension between EPA's regulation of greenhouse gasses and NHTSA's duty to set fuel

8    economy standards under EPCA.  AIAM contends that the Supreme Court's decision gave

9    EPA authority to work out the overlap with DOT or NHTSA so that conflict would be

10   avoided.  AIAM's oral arguments continue to strongly imply without directly stating that it is

11   EPA who must act to assure harmonization of any new regulations that limit motor vehicle

12   greenhouse gas emissions if the new regulations impinge on existing CAFE standards.  This

13   court has examined the statutory language of the Clean Air Act and has reviewed the

14   Supreme Court's decision in Massachusetts carefully and can find no support there for

15   AIAM's position.

16       To the extent AIAM's argument is intended to indicate that EPA bears the burden of

17   harmonization in the event of a conflict, the court must conclude AIAM misreads or

18   misinterprets Congress' intent.  An examination of the structure and text of both EPCA and

19   the relevant portions of the Clean Air Act indicate to this court that Congress intended to

20   allocate to EPA the broader scope of authority to regulate vehicle exhaust emissions for the

21   more important purpose of safeguarding the public's health and welfare.  AIAM does not

22   cite, nor is the court aware of any statutory or case law basis for the proposition that the

23   burden of harmonization falls on EPA, or that EPA cannot promulgate and enforce new

24   regulations limiting greenhouse gas emissions if it finds such regulation necessary to protect

25   public health and welfare.  The Massachusetts Court held that it is EPA's duty to evaluate the

26   risk to public health and welfare posed by greenhouse gas emissions from motor vehicles

27   and, if endangerment is found, to regulate.  Massachusetts, 127 S.Ct. At 1461-1462.

28   Nothing in the language of Massachusetts requires EPA to harmonize its regulation with

1    DOT's administration of EPCA.

2        EPCA's language requires NHTSA to give consideration to "other motor vehicle

3    standards of the Government," including, explicitly, regulations promulgated by EPA.  42

4    U.S.C. § 32902(f).  There is no corresponding statutory duty by EPA to give consideration to

5    EPCA's regulatory scheme.  This asymmetrical allocation by Congress of the duty to

6    consider other governmental regulations indicates that Congress intended that DOT, through

7    NHTSA, is to have the burden to conform its CAFE program under EPCA to EPA's

8    determination of what level of regulation is necessary to secure public health and welfare.

9        The court is mindful that in its September 25 Order, it gave little weight to the "other

10   motor vehicle standards" language of section 32902(f), finding that this provision required no

11   accommodation by NHTSA, only that the other government standard be investigated and

12   analyzed.  See Doc.# 363 at 18:3-6.  The court also notes that AIAM has argued, both in its

13   briefs and at oral argument, that EPCA's requirement that NHTSA must consider "other

14   motor vehicle standards of the Government" extends only so far as to require minimal

15   coordination with EPA.  In light of the Supreme Court's decision in Massachusetts, the court

16   finds it has cause to revisit its prior discussion of the "shall consider" requirement in section

17   32902(f).

18       In holding the EPA has statutory authority to regulate broadly, the Supreme Court

19   noted that the "broad language of § 202(a)(1)" that empowers the EPA to regulate *any*

20   pollutant "reflects an intentional effort to confer the flexibility necessary" to meet unforseen

21   regulatory needs.  Massachusetts, 127 S.Ct. at 1462.  The Supreme Court also cited

22   Pennsylvania Dept. of Corrections v. Yeskey, 524 U.S. 206, 212 (1998) for the proposition

23   that wording enabling a statute to be applied in situations not expressly anticipated by

24   Congress demonstrates the intent of Congress that the statute should be so applied.  Based on

25   this language in Massachusetts, the court concludes that the "shall consider" requirement in

26   section 32902(f) evinces Congress's intent to empower NHTSA to adapt its regulations

27   developed through EPCA to accommodate emissions restrictions imposed by EPA as

28   necessary for the public's health and welfare.

1      This conclusion is supported by noting how the factors EPA must consider to

2  discharge its duty to formulate regulations necessary to protect public health and welfare

3  overlap with the factors NHTSA is required to consider in formulating the highest possible

4  fuel efficiency standards.  In formulating emissions regulations, EPA is obliged to give

5  consideration to factors including the level of emissions reductions achievable through

6  available technology, cost, and energy and safety factors associated with the application of

7  the emission-reduction technology.  42 U.S.C. § 7521(a)(3)(A).  NHTSA, as previously

8  mentioned,  must consider technological feasibility, economic practicability, and the need of

9  the nation to conserve energy, in addition to the effect of other government regulations.

10  Thus, EPA is required to give consideration to the same factors NHTSA must consider in

11  formulating its fuel efficiency standards while NHTSA is not directly empowered to consider

12  EPA's goal to protect public health and welfare.

13      In practical terms, the overlap between the factors NHTSA must consider in setting

14  milage standards under EPCA and the factors EPA must consider in regulating emissions of

15  greenhouse gasses overlap to a greater degree than the statutory language might suggest.  In

16  the very recent case of Center for Biological Diversity v. NHTSA, No. 06-71891, 2007 WL

17  3378240 (9th Cir. Nov. 15, 2007), the Ninth Circuit Court of Appeals invalidated a Final

18  Rule set by NHTSA through EPCA process in part because the Final Rule failed to examine

19  the environmental effects, and specifically the global climate change effects that would result

20  from promulgation of the Final Rule.  Id. at *30.  The appellate court held that the setting of a

21  CAFE standard pursuant to EPCA "does not limit NHTSA's duty under [the National

22  Environmental Policy Act ("NEPA")] to assess the environmental impacts, including the

23  impact on climate change, of its rule."  Id.  Thus, among the "other laws of the Government"

24  that NHTSA must consider in setting fuel efficiency standards, NEPA requires NHTSA to

25  consider precisely the same issue – global climate change – that California's AB 1493

26  Regulations aim to address.

27      When the overlap in the factors NHTSA and EPA must consider in formulating their

28  respective regulations is viewed in light of the Supreme Court's observation in

25

Massachusetts, reflecting Congress' concern that changing circumstances and scientific developments related to global warming not be allowed to prevent EPA from acting, the congressional purpose behind EPCA's "shall consider" language becomes apparent. While Congress did not empower NHTSA to consider the impact of milage standards on public health and welfare, Congress did empower NHTSA to consider the impact of "other motor vehicle standards of the Government" on milage standards. Thus, Congress enabled NHTSA to conform the milage standards it sets through the EPCA process to the pollution reduction requirements that are determined by EPA to be necessary for the protection of public health and welfare.

Current events illustrate the point. Ongoing scientific research into the area of climate science has produced a continuous stream of analytical documents that, over recent time, point with increasing alarm to the rapidity of evolution of measurable changes in climate instability and evince a growing consensus that human-caused greenhouse gas emissions must be curtailed more rather than less and sooner rather than later. It is not important to this discussion that there may be disagreements as to the accuracy of any particular assessment. Rather, what is important is the very present possibility that EPA, in discharging its duty to protect public health and welfare, may determine that it is compelled by the weight of scientific evidence to implement regulations substantially limiting greenhouse gas emissions in order to secure the protection of public health and welfare. It is further possible that the regulations EPA deems necessary conflict with existing standards set by NHTSA under EPCA. The Supreme Court's decision in Massachusetts makes it clear that, while Congress could not have foreseen the evolution of climate change science that would bring EPA's mandate to protect health and welfare into conflict with NHTSA's goals in setting milage standards, Congress intended that under such circumstances, EPA would not be prevented from necessary action. See Massachusetts, 127 S.Ct. at 1462 (holding that Congress did not intend to allow changes in scientific developments to render the Clean Air Act obsolete).

As the Supreme Court's decision in Massachusetts explicitly stated, there is no

necessary conflict between the Clean Air Act's purpose to protect health and welfare and EPCA's purpose to establish maximum feasible fuel efficiency standards.  While some level of conflict may arise in a situation where EPA is compelled to act on the basis of current climate science to achieve deep reductions in greenhouse gas emissions, EPCA empowers NHTSA to import EPA's determination of the necessity of the regulation through EPCA's "shall consider" provision and conform its milage standards to what EPA determines is necessary for the protection of health and welfare.  Given the level of impairment of human health and welfare that current climate science indicates may occur if human-generated greenhouse gas emissions continue unabated, it would be the very definition of folly if EPA were precluded from action simply because the level of decrease in greenhouse gas output is incompatible with existing milage standards under EPCA.

Simply put, the court concludes that where EPA, consistent with its obligation to protect public health and welfare, determines that regulation of pollutants under the Clean Air Act is necessary and where such regulation conflicts with average milage standards established pursuant to EPCA, EPA is not precluded from promulgating such regulation.  The court further concludes  the agency designated by EPCA to formulate average milage standards is obliged to consider such regulations pursuant to 49 U.S.C. § 32902(f) and is further obliged to harmonize average fuel efficiency standards under EPCA with the standards promulgated by EPA.  To the extent the court's September 25 Order may have stated or suggested a contrary conclusion, that portion of the order is hereby vacated.

### C.  The Status of State Regulations Granted Waiver by EPA

The court's September 25 Order explicitly rejected Defendants' contention that state regulations that are granted a waiver by EPA pursuant to section 209(b) of the Clean Air Act have any special status that would immunize the regulations from preemption by other federal law.  See Doc.# 363 at 17:1-15.  Because the court did not have the benefit of the Supreme Court's opinion in Massachusetts, the court's analysis failed to begin by addressing EPA's authority to promulgate regulations that may conflict with EPCA's goals.  Consequently, the court's analysis in the September 25 Order glosses over what now appears

to be the important question of whether and how a state regulation granted a waiver by EPA under section 209(b) is different from the same regulation if it had been originated and promulgated by EPA.

The Supreme Court's opinion in <u>Massachusetts</u> is critical to the analysis because, as has been discussed, it informs this court's opinion of EPA's congressionally-mandated authority and duty to independently regulate air pollution for the purpose of preservation of public health and welfare. The <u>Massachusetts</u> opinion also informs this court's revised opinion of the scope of NHTSA's duty to consider other motor vehicle regulations of the Government and to harmonize milage standards under the CAFE program with emissions reductions mandated by EPA for the purpose of protection of the public's health and welfare.

The court's conclusion that it is ultimately NHTSA's obligation to conform and harmonize milage standards with EPA's determination of what is necessary for the protection of health and welfare fundamentally reframes the court's analysis of the issue of whether California's AB 1493 Regulations, if granted a waiver of preemption under section 209, may interfere with EPCA's purposes. In its September 25 Order, the court approached the question by looking for indications within EPCA that such interference would be allowed. Having now determined that EPA may promulgate regulations that are in conflict with fuel efficiency standards, the court re-posits the question to ask whether a state regulation that is granted waiver of preemption under the Clean Air Act should stand in any different stead with respect to inconsistencies or conflicts it may have with EPCA-established fuel efficiency standards.

Section 209 of the Clean Air Act imposes three conditions on state regulations that are submitted to EPA for waiver of preemption (other than the requirement that they be proposed by California). First, the proposed regulations must "be, in the aggregate, at least as protective of the public health an welfare as applicable Federal standards." 42 U.S.C. § 7543(b)(1). Second, EPA must determine the state regulations are necessary to "to meet compelling and extraordinary conditions," and that the regulations were not promulgated in an arbitrary and capricious fashion. <u>Id.</u>; <u>Motor Equip. & Mfrs. Ass'n v. EPA</u>, 142F.3d 499,

28

462-463 (D.C. Cir. 1998) ("MEMA").  Finally, the proposed regulations must be consistent with section 7521(a), which requires that air pollution standards be formulated in consideration of technological feasability, the time necessary to apply the requisite technology, the cost of compliance, and energy and safety factors associated the application of the technology.  42 U.S.C. §§ 7543(b)(1)(c) and 7521(a)(2) and (3).

If EPA concludes that California's regulations meet these three requirements, EPA is obliged to grant the waiver application.  MEMA, 142 F.3d at 463.  Although regulations proposed by California pursuant to section 209 must broadly advance EPA's primary purpose to protect public health and welfare, and must be at least as stringent as the corresponding EPA regulations in the aggregate, the proposed California regulations need not establish perfect compliance with all provisions of the Clean Air Act.  Id.  In creating the waiver provisions of section 209, Congress determined that California should have the "'broadest possible discretion in selecting the best means to protect the health of its citizens.' [Citation.]" Id.  "'In short, Congress consciously chose to permit California to blaze its own trail with a minimum of federal oversight.' [Citation.]" Id. (quoting Ford Motor Co. v. EPA, 606 F.2d 1293, 1297 (D.C. Cir. 1979)).

Once a proposed California regulation has been granted a waiver of preemption pursuant to section 209 of the Clean Air Act, section 177 of the Clean Air Act, codified at 42 U.S.C. § 7507 (hereinafter "section 177") provides, in pertinent part:

> Notwithstanding section 7543(a) of this title [expressly preempting state regulation of vehicle emissions], any State which has plan provisions approved under this part may adopt and enforce for any model year standards relating to control of emissions from new motor vehicles or motor vehicle engines and take such other actions as are referred to in section 7543(a) of this title respecting such vehicles if –
>
> (1) such standards are identical to the California standards for which a waiver has been granted for such model year, and
> (2) California and such State adopt such standards at least two years before commencement of such model year (as determined by regulations of the Administrator).

Section 177 further provides that any state adopting a California regulation for which waiver has been granted may not "have the effect of creating [ ] a motor vehicle engine different than

29

a motor vehicle or engine certified in California under California standards (a "third vehicle") or otherwise create such a "third vehicle". Id.

As a consequence of the limited adoption provisions of section 177, "there can be only two types of cars 'created' under emissions regulations in this country: 'California' cars and 'federal' (that is, EPA-regulated ) cars." American Automobile Mfg. Ass'n v. Massachusetts Dep't Envtl. Prot., 31 F.3d 18, 21 (1st Cir. 1994). Once a proposed California vehicle emission regulation is granted waiver of preemption, any other state may, through its own legislative process, adopt vehicle emission regulations in lieu of EPA-promulgated regulations provided: (1) the adopted regulations are "'identical' to California's (the identicality requirement)," and (2) the adopting state must assure "there is a two-year time lapse between the time the standards are adopted and the first model year affected by those standards (the leadtime requirement)." Id.

Defendants contend, and Plaintiffs and AIAM do not directly dispute that a California regulation that has been granted waiver of preemption under section 209 of the Clean Air Act is an "other law of the Government" that must be considered by NHTSA in the formulation of average fleet milage standards under EPCA. At oral argument AIAM admitted that a California regulation that is granted waiver of preemption under section 209 is an "other law of the Government" that NHTSA must consider, however AIAM contends that the extent of consideration of the California regulation is confined to a determination that the regulation has a de minimis effect on fuel efficiency. AIAM contends that if NHTSA's consideration of the California regulation indicates an effect of fuel efficiency that is anything more than de minimis, then the California regulation is preempted. AIAM does not offer any textual or case law basis for this contention. As a historical matter, the court notes that it is true that prior California regulations that were approved under section 209 that reduced motor vehicle emissions of oxides of sulphur and nitrogen through catalytic converters had the effect of slightly decreasing fuel efficiency. However, this is merely a fortuitous historical fact that does not establish the otherwise unsupported proposition that EPCA requires NHTSA to consider and harmonize its standards only with California regulations that have no significant

1    effect on fuel efficiency.

2        The most thorough and persuasive analysis of the issue so far as the court has found

3 was offered as part of the decision in <u>Green Mountain</u> wherein that court rejected plaintiffs'

4 claim of EPCA preemption. The <u>Green Mountain</u> court observed:

> Section 502(d) of EPCA as originally enacted provided that any manufacturer could apply to the Secretary of Transportation for modification of an average fuel economy standard for model years 1978 through 1980 if it could show the likely existence of a "Federal standards fuel economy reduction," defined to include EPA-approved California emissions standards that reduce fuel economy. § 502(d)(1-3); *see also* S. Rep. No. 94-516 at 156 (1975), 1975 U.S.C.C.A.N. 1956, 1997. Thus, in 1975 when EPCA was passed, Congress unequivocally stated that federal standards included EPA-approved California emissions standards. § 502(d)(3)(D)(i). In 1994, when EPCA was recodified, all reference to the modification process applicable for model years 1978 through 1980, including the categories of federal standards, was omitted as executed. However the 1994 recodification was intended to "revise[ ], codif[y], and enact[ ]" the law "without substantive change." Pub. L. No. 103-272, 108 Stat. 745 745 (1994); *see also* H. R. Rep. No. 103-180, at 1 (1994), reprinted in 1994 U.S.C.C.A.N. 818, 818; S. Rep. No. 103-265, at 1 (1994). If the recodification worked no substantive change in the law, then the term "other motor vehicle standards of the Government" continues to include both emission standards issued by EPA and emission standards for which EPA has issued a waiver under section 209(b) of the [Clean Air Act], as it did when enacted in 1975. ¶ NHTSA has consistently treated EPA-approved California emissions standards as "other motor vehicle standards of the government," which it must take into consideration when setting maximum feasible average fuel economy under § 32902.

17 <u>Green Mountain</u>, 508 F.Supp.2d at 345; Doc.# 533 at 114-115. Based on this analysis from

18 the <u>Geen Mountain</u> court and on the foregoing discussion, the court concludes there is

19 nothing in statute or in case law to support the proposition that a regulation promulgated by

20 California and granted waiver of preemption under section 209 is anything other than a "law

21 of the Government" whose effect on fuel economy must be considered by NHTSA in setting

22 fuel economy standards.

23        In sum, when a California regulation is granted waiver of preemption pursuant to

24 section 209 of the Clean Air Act, the California regulation assumes three attributes. First, the

25 California regulation becomes available for adoption by any other state, subject only to the

26 identicality and leadtime requirements. Second, compliance with the California regulation or

27 standard is deemed "compliance with applicable Federal standards for purposes of

28 [Subchapter II – Emissions Standards for Moving Sources]." 42 U.S.C. § 7543(b)(3). Third,

1   as discussed in <u>Green Mountain</u>, the California regulation or standard becomes an "other

2   motor vehicle standard[ ] of the government" that affects fuel economy and that the Secretary

3   of Transportation must consider in formulating maximum feasible average fuel economy

4   standards under EPCA.  49 U.S.C. § 32902(f).  <u>Green Mountain</u>,  508 F.Supp.2d at 347; Doc.

5   # 533 at 115.

6   The court can discern no legal basis for the proposition that an EPA-promulgated

7   regulation or standard functions any differently than a California-promulgated and EPA-

8   approved standard or regulation.  Either EPA-promulgated regulations or California-

9   promulgated regulations that are approved by EPA may be implemented to achieve

10  compliance by any state, and both must be considered by NHTSA in formulating average fuel

11  economy standards. In either case, where there is conflict between new EPA-promulgated or

12  California-promulgated regulations that are EPA approved and existing EPCA fuel economy

13  standards, DOT is empowered through EPCA to take the new regulations into consideration

14  when revising its CAFE standards.

15  The court concludes that, just as the <u>Massachusetts</u> Court held EPA's duty to regulate

16  greenhouse gas emissions under the Clean Air Act overlaps but does not conflict with DOT's

17  duty to set fuel efficiency standards under EPCA, so too California's effort to regulate

18  greenhouse gas emissions through the waiver of preemption provisions of the Clean Air Act

19  overlaps, but does not conflict with DOT's activities under EPCA.

20  **IV. Express Preemption and Conflict Preemption**

21  There remains the question of whether, notwithstanding the non-preclusion of EPA-

22  approved state regulation by EPCA-established fuel economy standards, EPCA either

23  expressly or impliedly preempts states from enforcing EPA-approved California regulations

24  because those regulations impinge on DOT's duty through EPCA to set maximum feasible

25  milage standards.  Preemption of state law may be either express or implied.  Express

26  preemption may be found where Congress has explicitly stated "the extent to which its

27  enactments preempt state law." <u>English v. Gen. Elec. Co.</u>, 496 U.S. 72, 79 (1990).  State law

28  is impliedly preempted where obligations imposed by federal statute "reveal a purpose to

32

1    preclude state authority." Rice v. Santa Fe Elevator Corp., 331 U.S.218, 230 (1947).

2         *A. Express Preemption*

3         When a court examines a federal statute to discern the scope of express preemption,

4    that examination is "informed by two presumptions about the nature of the preemption." Air

5    Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n, 410 F.3d

6    492, 496 (9th Cir. 2005).  First, the court assumes that the "'historic police powers of the

7    states were not to be superceded by the Federal Act unless that was the clear and manifest

8    purpose of congress.' [Citation.] This presumption against preemption leads [the court] to the

9    principle that express preemption statutory provisions should be given a narrow

10   interpretation. [Citation.]" Id.  Second the court proceeds on the understanding that "'the

11   purpose of Congress is the ultimate touchstone in every pre-emption case.' [Citation.]" Id.

12   As previously noted, congressional intent is discerned by an examination of the "language,

13   structure, subject matter, context and history-factors that typically help courts determine a

14   statute's objectives and thereby illuminate its text." Akhtar, 384 F.3d at 1199.

15        EPCA provides that ". . . a State or a political subdivision of a State may not adopt or

16   enforce a law or regulation related to fuel economy standards or average fuel economy

17   standards . . . ." 49 U.S.C. § 32919.  EPCA's preemptive scope obviously turns on the

18   breadth of regulatory activities embodied in the term "related to."  In light of the foregoing

19   discussion, the question to be resolved is not whether California's AB1493 Regulations will

20   have an effect on fuel economy standards established by EPCA, but whether the definition of

21   "related to" encompasses effects on fuel efficiency that are incidental to the stated purpose of

22   limiting greenhouse gas emissions.

23        The waiver provision of the Clean Air Act recognizes that California has exercised

24   its police power to regulate pollution emissions from motor vehicles since before March 30,

25   1966; a date that predates both the Clean Air Act and EPCA.  Thus, the court must presume

26   that Congress did not intend that EPCA would supercede California's exercise of its

27   historically established police powers.  Second, EPCA's requirement that NHTSA consider

28   "other motor vehicle standards of the government" that affects fuel economy pursuant to 49

33

U.S.C. § 32902(f) makes it clear that Congress did not intend that EPCA should preempt state laws that serve purposes different from EPCA, but which may have some effect on fuel economy as a byproduct of their enforcement.  It makes no logical sense that EPCA would direct NHTSA to give consideration to a law that cannot be enforced because EPCA preempts it.  Third, the Supreme Court's decision in Massachusetts makes it clear that EPA regulations under the Clean Air Act that control carbon dioxide emissions serve a purpose that is distinct from, and not in conflict with, the purpose of EPCA.

Each of the foregoing considerations support the proposition that EPCA's express preemption of state regulations *related to* milage standards be construed as narrowly as the plain language of the law permits.  The narrowest interpretation consistent with the plain language of EPCA's preemptive provision is that it encompasses only those state regulations that are explicitly aimed at the establishment of fuel economy standards, or that are the *de facto* equivalent of milage regulation, or that do not meet the requirements established by the Clean Air Act for waiver of preemption under section 209.

Both parties agree that the proposed California AB 1493 Regulations, if granted preemption of waiver by EPA, will require substantial improvements in average fuel efficiency performance in passenger cars and light trucks.  By the same token, the parties do not dispute that such factors as air conditioning offsets, hybrid and plug-in hybrid credits, and up-stream carbon offsets for ethanol-gasoline blends and other fuel-source considerations mean that the relationship between carbon dioxide reduction requirements under AB 1493 and increases in average fleet fuel efficiency that would be required to achieve those reductions is not one-to-one.

Plaintiffs' and AIAM's argument with respect to EPCA preemption can be summarized as contending that the fact implementation of the California AB 1493 Regulations would require substantial improvement in average fleet fuel efficiency standards under the CAFE program is sufficient to bring the proposed standards within the ambit of EPCA's preemption provision.  Defendants' argument, on the other hand, can be summarized as asserting that the fact that the California AB 1493 Regulations do not have a one-to-one

34

1    correspondence to average fleet fuel efficiency standards under the CAFE program and that

2    the California AB 1493 Regulations are "other Government standards" that NHTSA must

3    consider in formulating average fleet milage standards takes the California AB 1493

4    Regulations out of the scope of EPCA's preemption provision.  Given the narrow scope the

5    court must accord EPCA's "related to" language, it is this court's opinion that Defendants

6    have the better of the argument.

7          At oral argument, Plaintiffs argued that the court should construe EPCA's express

8    preemption provision broadly because EPCA was adopted after the Clean Air Act and

9    Plaintiffs contend that the preemption provision was put in place in light of, and to provide

10   for preemption of, state regulations that are granted waiver of preemption under section 209

11   of the Clean Air Act.  Plaintiffs' and AIAM's argument is undercut by the fact EPCA, in

12   addition to including an express preemption provision, also includes a provision that

13   specifically requires the agency developing milage standards under EPCA to specifically

14   consider standards promulgated by California and granted waiver of preemption under

15   section 209 of the Clean Air Act.  See discussion *supra* at pp 29-30.  As previously

16   discussed, this feature of EPCA evinces a congressional intent to empower NHTSA to

17   accommodate California regulations that are granted waiver of preemption by EPA under the

18   Clean Air Act.  The court finds the fact that EPCA's preemption provision was enacted after

19   the waiver of preemption provision of the Clean Air Act is not determinative of the scope of

20   express preemption under EPCA.

21         The court finds that the preemptive force of 49 U.S.C. § 32919 extends very narrowly.

22   State laws that are granted waiver of preemption under the Clean Air Act that have the effect

23   of requiring even substantial increases in average fuel economy performance are not

24   preempted where the required increase in fuel economy is incidental to the state law's

25   purpose of assuring protection of public health and welfare under the Clean Air Act.  The

26   court also finds that a law that requires substantial improvement in average fleet milage

27   standards incidentally to its purpose of protecting public health and welfare does not

28   constitute a *de facto* regulation of fuel economy standards unless there is a narrow one-to-one

correlation between the pollution reduction regulation and the fuel efficiency standard. Where, as here, various considerations including fuel type and source and other sources of emission may have the effect of mitigating fuel efficiency improvement requirements, the pollution control standard does not constitute a *de facto* regulation of fuel efficiency.

The court notes that the finding that California's AB 1493 Regulations are not expressly preempted by 49 U.S.C. § 32919 does not contradict or modify the September 25 Order. The court's discussion in the September 25 Order was confined to consideration of Plaintiffs' and AIAM's claim that the proposed California regulation was impliedly preempted under the doctrine of conflict preemption. It is to that matter that the court now turns.

### B. Conflict Preemption

In its September 25 Order, the court noted:

> [A] state law is invalid to the extent it 'actually conflicts with a . . . federal statute.'" Int'l Paper v. Ouellette, 479 U.S. 481, 491-92 (1987). Such a conflict can result in preemption where it is impossible for a private party to comply with both the state and federal requirements. English v. Gen. Elec. Co., 496 U.S. 72, 79 (1990). Conflict preemption can also be found where "the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Int'l Paper, 479 U.S. at 491-92 (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).

Doc. # 363 at 8:13-19.

The court has previously noted that under the CAFE program, NHTSA must consider "technological feasibility, economic practicability, the effect of other motor vehicle standards of the government on fuel economy, and the need of the United States to conserve energy." The court also noted NHTSA must consider the effect of fuel economy requirements on safety. See Doc. # 363 at 9:21-26. Based on these statutory provisions and on Plaintiffs' allegations set forth in the First Amended Complaint, the court concluded that "among the objectives of the CAFE program are maximizing fuel economy, avoiding economic harm to the automobile industry, maintaining consumer choice, and ensuring vehicle safety." Doc. # 363 at 10:14-16.

Because a motion for judgment on the pleadings accepts as factual the allegations set

36

1  forth in the complaint, the court's September 25 Order accepted that Plaintiffs adequately

2  alleged California's AB 1493 Regulations would "risk higher prices, decreased choices and

3  safety for the consumer, and decreased profitability and lost goodwill for manufacturers and

4  dealers." The court then went on to look for textual evidence of congressional intent to

5  permit state regulations to interfere with objective established by EPCA, and, finding no

6  evidence that such interference is permitted, the court denied Defendants' motion for

7  judgment on the pleadings.

8      The Massachusetts Court observed that "EPA has been charged with protecting the

9  public's 'health' and 'welfare,' 42 U.S.C. § 7521(a)(1), a statutory obligation wholly

10  independent of DOT's mandate to promote energy efficiency." Massachusetts, 127 S.Ct. at

11  1461. When this court's discussion of conflict preemption under EPCA in its September 25

12  Order is reviewed in light of this statement by the Massachusetts Court, it becomes apparent

13  that this court erroneously conflated EPCA's objective and the factors against which that

14  objective should be balanced.

15      Based on the discussion in Massachusetts, and on the text of EPCA, it is apparent that

16  the objective of EPCA's efforts in establishing fuel economy standards is to conserve fuel by

17  establishing the "maximum feasible average fuel economy" level. Id.; 49 U.S.C. § 32902(f);

18  see also, Center for Biological Diversity, 2007 WL 3378240 at * 34(overarching goal of

19  EPCA is energy conservation). Considerations such as pricing, consumer choice, safety for

20  the consumer, and dealer profitability are not goals or objectives in and of themselves, they

21  are factors against which the possibility of increased fuel efficiency is weighed in order to

22  determine feasibility. Massachusetts, 127 S.Ct. at 1461. Similarly, EPA's central mandate

23  under the Clean Air Act is protection of public health and welfare. Factors such as

24  technological feasibility, cost, and the like are factors against which the effort to promote

25  public health and welfare is balanced.

26      In the context of concerns over carbon dioxide emissions, EPA's mandate to protect

27  public health and welfare and DOT's mandate to establish the highest feasible level of fuel

28  efficiency are aligned. DOT's goal of increasing fuel efficiency to the maximum feasible

1    level promotes EPA's goal of limiting greenhouse gas air pollution and vice versa.  Center

2    for Biological Diversity, 2007 WL 3378240 at * 34.  Both EPA-promulgated standards or

3    EPA-approved state standards must balance reductions in pollution emissions against factors

4    that are specified by Clean Air Act, just as DOT, through NHTSA, must balance its

5    determination of maximum feasible fuel economy against certain factors specified by EPCA.

6    Neither the Clean Air Act nor EPCA, however, require any particular balance as a matter of

7    law.  See, e.g., Center for Biological Diversity, 2007 WL 3378240 at * 13 (noting in the

8    context of EPCA that NHTSA has "discretion to balance the factors – as long as NHTSA's

9    balancing does not undermine the fundamental purpose of the EPCA: energy conservation").

10        When EPA and DOT consider statutorily mandated factors in response to an

11   identified threat to pubic health and welfare, both may give greater or lesser weight to

12   particular factors in order to adequately address the threat while producing the least negative

13   impact consistent with adequate measures to protect public health and welfare.  In this regard,

14   EPA is empowered to lead because it is specifically tasked with the protection of public

15   health and welfare; and DOT is empowered to follow because it is able to give consideration

16   to "other regulations of the Government" that may affect fuel economy.

17        Case and statutory law support the broad authority of EPA to force substantial change

18   on the status quo on an industry-wide basis.  The "technology-forcing goals" of Subchapter

19   II, the portion of the Clean Air Act that establishes emissions standards for moving vehicles,

20   are well recognized.  See, e.g., Whitman v. American Trucking Ass'n, 531 U.S. 457, 491-492

21   (2001) (Breyer, J. dissenting).  The technology-forcing authority of the Clean Air Act is

22   embodied in the language of the Act that directs EPA to promulgate standards "that reflect

23   the greatest degree of emission reduction achievable through the application of technology

24   which the Administrator determines will be available for the model year to which the

25   standards apply, . . . ."  42 U.S.C. § 7521(a)(3)(A)(i).  EPA is thus empowered to set

26   standards for future model years based on reasonable projections of technology that may not

27   be available currently.  NRDC v. Thomas, 805 F.2d 410, 429 (D.C. Cir. 1986).  Further, the

28   same technology-forcing effect that an EPA-promulgated regulation may have on the

automotive industry may be manifested in a California regulation that is granted waiver under section 209.  See MVMA, 17 F.3d at 536 (noting that the Clean Air Act is "technology forcing" in the context of California's LEV program).

At the core of Plaintiffs' action is a concern that the California AB 1493 Regulations, if granted waiver of preemption under section 209, will substantially burden auto manufacturers, who will be required to invest in fuel economy improvement technology; consumers, who will be required to bear higher new car costs and decreased choice; and automobile dealers, who will suffer loss of potential sales from the combination of increased pricing and decreased selection.  In this context, Plaintiffs and AIAM see the milage standards as set through EPCA as providing a level of protection from economic uncertainty by preventing states from promulgating regulations that upset the balance struck through the EPCA process.  EPCA's preemptive provision is seen as protecting manufacturers, dealers and customers from state regulations that would impose costly technological modifications or limit consumer choice by prohibiting sales of non-conforming vehicles.

At oral argument Plaintiffs noted that under EPCA, NHSTA was required to factor "economic practicability" into its determination of maximum feasible fuel efficiency. Plaintiffs contend the term "economic practicability" incorporates considerations such as job loss, consumer impacts, and revenue losses from lost sales.  The implication of Plaintiffs' argument is that there is actual conflict between California's AB 1493 Regulations and EPCA's purposes because California was not required to consider "economic practicability" and its AB1493 Regulations conflict with what NHTSA determined is economically practicable.  Plaintiffs' argument is not persuasive.  While California may not be required to engage in precisely the same weighing as NHTSA or to consider precisely the same factors, California is required to give consideration to the factors set forth in 42 U.S.C. §7521; namely technological availability, cost, and safety factors associated with the application of emission-reduction technology – the same factors EPA would have to consider in promulgating regulations under its own authority. While EPCA and the Clean Air Act use somewhat different words to describe the factors that must be considered in setting standards

1   or promulgating regulations, the court finds the weighing process covers substantially the

2   same ground in both cases insofar as an assessment of economic impacts is concerned.

3       Based on available legal authority, the court must conclude Plaintiffs and AIAM

4   assert more by way of economic protection than EPCA provides.  The ability of EPA-

5   promulgated regulations, or of California regulations that are granted waiver of preemption,

6   to force technology changes necessarily implies the expectation that the forcing of technology

7   change will force substantial investment by regulated companies to implement the required

8   technology within the lead time provided.  Such guarantee against economic burden as the

9   statutory structure provides is embodied in EPA's charge to consider issues such as cost,

10  technological availability, energy requirements, and time required to implement the

11  technological improvement.  In terms of California regulations that are granted waiver of

12  preemption, such guarantee against economic burden is embodied in the requirements that the

13  state standards are consistent with the requirements of section 7521(a) and that adequate lead-

14  time be provided.

15      Because California's AB 1493 Regulations, if granted waiver under section 209 will

16  fulfil both EPA's objective of "greatest degree of emission reduction achievable through the

17  application of technology . . .," 42 U.S.C. §7521(a)(3)(A), and EPCA's objective of

18  implementing the "maximum feasible average fuel economy" standards, 49 U.S.C. §

19  32902(f), the enforcement of the California AB 1493 Regulations will not conflict with

20  EPCA for purposes of conflict preemption.  To the extent the enforcement of the AB 1493

21  Regulations may be incompatible with existing CAFE standards, NHTSA is empowered to

22  revise its standards taking into account the AB1493 Regulations.  To the extent the

23  implementation of technology to meet the AB 1493 Regulations will be forced by

24  enforcement of the standards, that technology forcing does not constitute an interference with

25  EPCA's purpose of setting average fleet milage standards to the maximum feasible level.

26  / / /

27  / / /

28

40

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFFS' CLAIM**

**OF FOREIGN POLICY PREEMPTION**

Intrusions of state law on the Federal Government's exercise of its authority to conduct foreign affairs are subject to preclusion. Zschernig v. Miller, 389 U.S. 429, 440-441 (1968). The preemptive power of the federal executive in areas of foreign policy has been expressed as conflict preemption, see American Ins. Ass'n v. Garamendi, 539 U.S. 396, 421 (2003) ("[t]he exercise of the federal executive authority means that state law must give way where [. . .] there is clear conflict between the policies adopted by the two"), or as field preemption. See Zschernig, 389 U.S. at 441 ("even in the absence of a treaty, a State's policy may disturb foreign relations); see generally Garamendi, 539 U.S. at 418-20 (describing the "contrasting theories of field and conflict preemption" of state legislation in the area of foreign affairs). "[C]ategories of preemption are not 'rigidly distinct,' and 'field pre-emption may be understood as a species of conflict pre-emption.' [Citation.]" Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 n.6 (2000) (quoting English v. General Elec. Co., 496 U.S. 72, 79-80 n.5). Thus, foreign policy preemption, whether expressed in terms of conflict or field preemption should be understood as a species of conflict preemption.

Because foreign policy is a species of conflict preemption, the court's analysis of Plaintiffs' claim of foreign policy preemption will track to some extent the analysis the court undertook with respect to Plaintiffs' claim with regard to EPCA preemption. That is, the court will first examine whether considerations of foreign policy limit EPA's authority to regulate the emission of greenhouse gasses. If executive branch policy does not prevent EPA from promulgating regulations to limit greenhouse gas emissions, then the court will address whether Congress intended that California regulations that are granted waiver of preemption under section 209 should be regarded any differently than EPA-promulgated regulations. Finally, the court will determine whether there is actual conflict between California's AB 1493 Regulations and United States foreign policy in light of all the information submitted by the parties and now before the court.

41

**I. Authority of EPA to Regulate**

A major component of Plaintiffs' opposition to Defendants' motion for summary judgment on Plaintiffs' foreign policy claim is their contention that the court correctly ruled in its September 25 Order that Defendants' motion for judgment on the pleadings must be dismissed because Plaintiffs had alleged facts sufficient to state a claim for relief. The court reached this conclusion based in substantial part on Plaintiffs allegation, which was accepted as factual by the court, that EPA had issued a report that determined that, even if EPA had authority to regulate greenhouse gas emissions from vehicles, such regulation would be inappropriate at this time because:

> Unilateral EPA regulation of motor vehicle GHG emissions could also weaken U.S. efforts to persuade key developing countries to reduce the GHG intensity of their economies. Considering the large populations and growing economies of some developing countries, increases in their GHG emissions could quickly overwhelm the effects of GHG reduction measures in developed countries. Any potential benefit of EPA regulation could be lost to the extent other nations decided to let their emissions significantly increase in view of U.S. emissions reductions. Unavoidably, climate change raises important foreign policy issues, and it is the President's prerogative to address them.

Doc. # 363 at 22:17-22. The court thus accepted as legally authoritative EPA's pronouncement that it would be interfering in United States foreign polity if EPA were to attempt to regulate carbon dioxide emissions independently of the Administration's determination that such regulation is timely in view of the Administration's negotiations with foreign states.

The Supreme Court's decision in <u>Massachusetts</u> rejected EPA's position on foreign policy after determining that the plain language of the Clean Air Act empowered EPA to regulate carbon dioxide emissions:

> EPA has refused to comply with [Congress's] clear statutory command [to determine if carbon dioxide emissions constitute a threat to public health or welfare]. Instead it has offered a laundry list of reasons not to regulate. For example, EPA said that [. . . ] regulating greenhouse gasses might impair the President's ability to negotiate with "key developing nations" to reduce emissions, [citation], and that curtailing motor-vehicle emissions would reflect "an inefficient and piecemeal approach to address the climate change issue," [citation].
>
> Although we have neither the expertise nor the authority to evaluate these policy judgments, it is evident they have nothing to do with whether

42

greenhouse gas emissions contribute to climate change.  Still less do they amount to a reasoned justification for declining to form a scientific judgment. In particular, while the President has broad authority in foreign affairs, that authority does not extend to the refusal to execute domestic laws.  In the Global Climate Protection Act of 1987, Congress authorized the State Department - not EPA - to formulate United States foreign policy with reference to environmental matters relating to climate. [Citation.] EPA has made no showing that it issued the ruling in question here after consultation with the State Department.  Congress did direct EPA to consult with other agencies in the formulation of its policies and rules, but the State Department is absent from that list. [Citation.].

Massachusetts, 127 S.Ct. at 1463.

The Supreme Court's decision in Massachusetts reflects the well-established rule that the Executive Branch's power to implement policies is at its lowest when those policies would operate in contradiction to an act of Congress.  See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637 (1952) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb . . .").  Thus, the Supreme Court's holding in Massachusetts that Congress intended that EPA should have authority to regulate greenhouse gas emissions, including specifically carbon dioxide, recognizes that whatever the foreign policy of the executive branch might be, it does not conflict with or prevent EPA from carrying out its congressionally mandated regulatory duties.

**II.  Congressional Intent Regarding California Regulations**

The Supreme Court's holding in Massachusetts points to two errors in this court's analytical approach in the September 25 Order to Defendants' motion for judgment on the pleadings on Plaintiffs' foreign policy preemption claim.  First, the Supreme Court's decision in Massachusetts teaches that the proper starting point is not with administrative policy, but with congressional intent.  Second, the decision in Massachusetts teaches that when the court seeks to determine what United States foreign policy is, it must look to sources other than EPA because EPA's pronouncements of what is United States foreign policy, and what constitutes interference with that policy, are not authoritative.  Because the court's September 25 Order was deficient both in failing to consider congressional intent and in accepting EPA's pronouncements regarding United States foreign policy as authoritative, the court

43

cannot be guided by its prior conclusion in deciding whether Defendants, in light of all the evidence now before the court, are entitled to summary judgment on Plaintiffs' foreign policy preemption claim.

In view of the foregoing, the court begins its analysis of Defendants' motion for summary judgment on Plaintiffs' foreign policy claim by noting that the Supreme Court's decision in Massachusetts unequivocally establishes that Congress intended that EPA should make an independent determination of whether vehicle emissions of greenhouse gasses, including carbon dioxide, constitute a risk human health and welfare.  Congress further unequivocally determined that if EPA does find a risk to human health and welfare, it should regulate. The next question is whether a California  state regulation that is granted waiver of preemption under section 209 of the Clean Air Act is an integral part of an EPA mandate to regulate.

As was previously discussed in the context of EPCA and conflict preemption, the touchstone of preemption is congressional intent.  Felt, 60 F.3d at 1414.  Also as previously discussed, the court determines Congress' intent with respect to California's ability to promulgate regulations pertaining to greenhouse gas emissions from motor vehicles by looking to the traditional elements of language, structure, subject matter, context and history-factors.  Akhtar v. Burzynski, 384 F.3d 1193, 1199 (9th Cir. 2004)

It is clear from examination of the text of the Clean Air Act that section 209(b)'s provisions that specify the conditions under which California may apply for and EPA must grant a waiver of preemption are an integral part of Congress' regulatory scheme.  Congress clearly intended that California, having established itself as having both particular needs with regard to air quality regulation and particular expertise in developing regulations to address its needs, should be empowered to develop alternative and more protective regulations for the control of air pollutants subject only to EPA's determination that the statutory criteria set forth in section 209(b) are met.  Congress also plainly intended that any other state so desiring could adopt the California standards once they are granted waiver of preemption under the Clean Air Act.

44

1    Because it is Congress's express intent that California be empowered to develop

2    alternative regulations subject to congressionally-specified conditions, executive branch

3    policy may not interfere with that intent.  The court again declines to cast the issue as being

4    one of "federalization" of the proposed California standards.  Rather, the court refers to its

5    discussion on EPCA preemption in which it determined that there is no indication of

6    congressional intent that a proposed California state regulation that is granted waiver of

7    preemption under section 209 of the Clean Air Act is different for any purpose from a

8    regulation that is promulgated directly by EPA.  The court concludes that an executive branch

9    policy cannot interfere with Congress's manifest intent to empower EPA to address the issue

10   of regulation of carbon dioxide emissions from motor vehicles.  It follows that the same

11   executive branch policy cannot interfere with the congressionally-established pathway in the

12   Clean Air Act that enables California to seek and receive a waiver of preemption so that

13   California, and any other state that chooses to follow the California's lead, may require

14   compliance with the more protective California regulations.

**III.  Conflict Between California's AB 1493 Regulations and Foreign Policy**

16   To the extent foreign policy preemption can be held to be a free-standing doctrine it's

17   modern root appears to be in the Supreme Court case of <u>Zschernig v. Miller</u>, 389 U.S. 429

18   (1968).  In <u>Zschernig</u>, the next of kin and sole heirs of an Oregon resident who died intestate

19   brought an action against members of the Oregon State Land Board who had petitioned the

20   probate court for escheat of the proceeds of the decedent's estate.  <u>Id.</u> at 429.  The next of kin

21   were residents of the then-communist country of East Germany.  The Oregon probate court

22   granted the petition for escheat pursuant to an Oregon law that essentially prohibited

23   disbursement of estate proceeds to citizens of countries whose governments would not grant

24   reciprocal rights of inheritance or that would confiscate the proceeds of the estate.  In

25   practical terms, the Oregon statute prevented disbursement of proceeds of the estate of an

26   Oregon resident to any citizen of a communist country.  <u>Id.</u> at 435.

27   Although the Supreme Court acknowledged the interference by the Oregon law with a

28   1923 treaty with Germany that was still in effect, the Supreme Court invalidated the Oregon

45

statute on broader grounds holding that where state laws "conflict with a treaty, they must bow to the superior federal policy. [Citation.] yet, even in the absence of a treaty, a State's policy may disturb foreign relations." Id. at 441.  The Court further held that if there are to be restraints against dealings between individuals in the United States and foreign countries, even if minor, they must be provided by the Federal Government, if at all.  See id. ("The present Oregon law is not as gross an intrusion in the federal domain as those others might be.  Yet, as we have said, it has a direct impact upon foreign relations and may well adversely affect the power of the central government to deal with those problems").

In Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363 (2000), the Supreme Court addressed the validity of a Massachusetts law that restrictively regulated contracts with the military dictatorship of the country of Myanmar (formerly Burma) or persons doing business with Myanmar.  Three months after the Massachusetts law was passed, Congress passed a statute imposing conditional and mandatory sanctions on Myanmar.  Id. at 368.  Although no treaty was involved, and the congressional enactment contained no provision of express preemption, the Court found that the Massachusetts law interfered with the President's power, as authorized by congressional enactment, to apply limited sanctions to Myanmar.  Id. at 385.  The Crosby Court applied broad concepts of conflict to find that notwithstanding the fact that the overall goals of the Massachusetts law and the federal law were the same, conflict would still be found where the two laws are at odds with respect to the right degree of sanction to employ.  Id. at 379.  The Crosby Court cited Wisconsin Dept. Of Indus. v. Gould, Inc., 475 U.S. 282, 286 (1986) in noting that "[C]onflict is imminent when two separate remedies are brought to bear on the same activity."  Id. (internal quotations omitted).

In American Ins. Ass'n v. Garamendi, 539 U.S. 396 (2003) ("Garamendi"), the Supreme Court addressed California's Holocaust Victim Insurance Relief Act of 1999 ("HVIRA"), which was enacted at about the same time as President Clinton was engaged in intensive negotiations with the German government to institute a program of reparations to holocaust survivors.  Id. at 396-397.  The product of the President's efforts was an agreement, the German Foundation Agreement, that set up a German foundation that was to be funded

46

with 10 billion deutsch marks and would be charged with administering reparations claims.

The agreement further provided:

> the German government would (1) submit a statement that it would be in this country's foreign policy interests for the foundation to be the exclusive forum and remedy for [holocaust survivor] claims, and (2) [the United States would] try to get state and local governments to respect the foundation as the exclusive mechanism.

Id. at 405-406.

Unlike Zschernig and Crosby,  Garamendi did not involve either a treaty or a congressional enactment.  The Garamendi Court noted that the Zschernig majority:

> . . . relied on statements in a number of previous cases open to the reading that state action with more than incidental effect on foreign affairs is preempted, even absent any affirmative federal activity in the subject area of the state law, and hence without any showing of conflict.

Id. at 418.  The Garamendi Court examined carefully its prior decision in Zschernig, and in particular noted Justice Harlan's separate opinion concurring in the judgment but criticizing the Court's willingness to ground its decision on a constitutional power analysis rather than on the non-constitutional conflict between the Oregon law and the 1923 treaty with Germany. See Garamendi, 539 U.S. at 418-420 (examining Justice Harlan's opinion in Zschernig, 389 U.S. at 443- 462).

The Garimendi Court declined to directly decide wither Justice Harlan's view represents a competing theory of the extent of Executive Branch preemption in the area of foreign policy.

> It is a fair question whether respect for the executive foreign relations power requires a categorical choice between the contrasting theories of field and conflict preemption evident in the Zschernig opinions.  But the question requires no answer here.  For even on Justice Harlan's view, the likelihood that state legislation will produce something more than incidental effect in conflict with express foreign policy of the National Government would require preemption of the state law.  And since on this view it is legislation within "areas of . . . traditional competence" that gives a State any claim to prevail, [citation], it would be reasonable to consider the strength of the state interest, judged by standards of traditional practice, when deciding how serious a conflict must be shown before declaring the state law preempted. [Citation.]

Garamendi, 539 U.S. at 419-420 (internal footnote and citations omitted).  The Garamendi Court cast the issue of whether presidential authority to conduct foreign relations preempted

47

California's effort to compensate holocaust survivors as a matter of traditional conflict preemption.  The <u>Garamendi</u> Court held "[t]he exercise of the federal executive authority means that state law must give way where, as here, there is evidence of clear conflict between the policies adopted by the two."  <u>Id.</u> at 421.

In <u>Garamendi</u> the Supreme Court found "clear conflict" between the President's exercise of constitutionally delegated powers to conduct foreign policy in order to secure relief for holocaust victims and California's efforts to do the same thing through legislation. So far as this court can discern, <u>Garamendi's</u> holding that the California law is preempted represents the high-water mark in the reach of the doctrine of foreign policy preemption. Other courts addressing the application of field preemption under <u>Zschernig</u> to situations where the conflict between state law and federal foreign policy is less clear than in <u>Garamendi</u> have shown reluctance to extend the <u>Zschernig's</u> reach further.  <u>See, e.g.</u>, <u>Cruz v. United States</u>, 387 F.Supp.2d 1057, 1075 (N.D. Cal. 2005).

The court concludes that <u>Zschernig</u>, together with cases that follow it, including <u>Garamendi</u>, hold that a party asserting preemption on the ground of foreign policy preemption must show "clear conflict" between a state law or program and the functioning of some agreement, treaty, or program that is the product of negotiations between the administrative branch and a foreign government.  In the context of the present case, this means that Plaintiffs, in order to adequately state a claim for foreign policy preemption must show what the policy of the United States is and precisely how California's AB 1493 Regulations, if granted waiver of preemption by EPA and implemented, would interfere with the United States' foreign policy.

The court's September 25 Order, as well as Plaintiffs' arguments with respect to foreign policy preemption, approach the question of foreign policy preemption accepting as proven that it is the policy of the Executive Branch "'to negotiate with other nations to reach agreements regarding greenhouse gas emissions reductions and that unilateral state actions might well conflict with this policy."  Plaintiffs' Response to Defendants' Supplemental Brief, Doc.# 625 at 21:10-12.

1    Plaintiffs' current and former arguments with regard to the foreign policy of the

2    United States point to two sources of authority to establish what United State foreign policy

3    is, and to support their contention that implementation of state regulations would interfere

4    with the policy.  First, Plaintiffs point to EPA's reasoning with respect to foreign policy

5    interference that was expressed by EPA in EPA's decision to deny rule making.  Plaintiffs

6    allege EPA opined that "'[u]nilateral EPA regulation of motor vehicle GHG emissions could

7    also weaken U.S. efforts to persuade key developing countries to reduce the GHG intensity of

8    their economies.'  EPA, Control of Emissions from New Highway Vehicles and Engines, 68

9    Fed.Reg. 52,922, 52,931 (Sept. 8, 2003)."  Doc. # 625 at 19:16-18.  Second, Plaintiffs point

10   to the Brief for the Federal Respondent, prepared by the Solicitor General of the United

11   States that was submitted on behalf of EPA in Massachusetts, which Plaintiffs have provided

12   to this court at Exhibit 2 to Document # 515.

13   As quoted above, the Supreme Court observed that Congress, through the Global

14   Climate Protection Act of 1987, authorized the State Department, not EPA, to "formulate

15   United States foreign policy with reference to environmental matters relating to climate."

16   Massachusetts, 127 S.Ct. at 1463.  The Supreme Court also noted that EPA was not obliged

17   by statute to consult with the State Department in formulating its ruling denying rule making

18   nor did EPA offer any evidence that such consultation took place.  Id.  In short, the Supreme

19   Court pointed out that EPA is not authorized to pronounce United States foreign policy; and

20   by inference pointed out that EPA's pronouncements of what foreign policy is cannot be

21   taken as authoritative absent some showing of State Department approval.

22   The arguments of the Solicitor General in the brief in Massachusetts are no more

23   supportive of Plaintiffs' contentions regarding U.S. foreign policy.  The Solicitor General's

24   brief in Massachusetts does not refer to any independent determination of foreign policy on

25   the part of the Solicitor General.  Rather, the Solicitor General simply asserts, without offer

26   of proof as to what U.S. foreign policy actually is, that EPA was correct to be concerned that

27   its efforts to regulate greenhouse gas emissions might interfere with the executive branch's

28   efforts to reduce greenhouse gas emissions in foreign countries.  There is no reference to

49

State Department pronouncement or to any other authoritative source of foreign policy. Thus, the Solicitor General's brief does not constitute an independent authoritative pronouncement of foreign policy of the United States.

At oral argument, Plaintiffs represented to the court that further discovery has made available additional evidence of the substance of United States foreign policy with respect to global climate change. The court granted leave for both parties to submit additional information and argument with respect to Plaintiffs' foreign policy preemption claim. On November 11, 2007, Plaintiffs submitted supplemental briefing and a total of 27 additional evidentiary exhibits to support their contentions with respect to United States foreign policy with regard to climate change.

In sum, the exhibits submitted by Plaintiffs establish that United States foreign policy with respect to global climate change is: (1) integrated with the broader policy of promotion of international economic growth; (2) aimed at programs in foreign countries that result in poverty reduction, enhancement of energy security reduction of pollution and mitigation of greenhouse gas emissions; and (3) expressed through individually negotiated voluntary agreements, partnerships or economic initiatives with foreign countries (rather than through binding international treaties, such as Kyoto, that omit developing nations). See, e.g., Harlan Watson, Seminar of Government Experts, U.S. Climate Change Policy (2005), Doc. # 649-1; Fact Sheet: A New International Climate Change Framework, May 31, 2007, Doc. # 648-2.

The materials submitted adequately support Plaintiff's contention that it is United States foreign policy to: (1) approach climate change through voluntary agreements or partnerships negotiated with single or multiple foreign states; (2) that aim to reduce the carbon dioxide intensity (units of carbon dioxide produced per unit of economic activity) of their economies; (3) while maintaining a robust economy. It is important to note, however, that this statement of policy is different than what Plaintiffs allege constitutes current United States foreign policy.

In attempting to show conflict between California's efforts to regulate and United States foreign policy, Plaintiffs emphasize only the first part of the foregoing policy

50

statement.  That is, Plaintiffs look to the President's avowed intent to seek voluntary bilateral or multilateral agreements with foreign countries, including developing countries, and characterize this intent to negotiate as being the "policy."  From there, Plaintiffs contend that the "policy" that California's attempt to regulate greenhouse gas emissions is in conflict with is the government's "policy" of leveraging foreign agreements by "speaking with one voice."

"Speaking with one voice" does not constitute a actual *policy* within the meaning of any of the cases heretofore cited.  The "policy" in evidence in Garamendi was evinced by the *results* of the President's negotiations and was embodied in an *agreement*; in Crosby, the "policy" was embodied in an act of Congress setting forth specific limited sanctions against a country; in Zschernig, the "policy" was evinced by a negotiated treaty that covered the same subject as the state law. What Plaintiffs label as a policy in this case is actually nothing more than a commitment to negotiate under certain conditions and according to certain principles.

The term "policy" as used in Zschernig and its progeny refers to a concrete set of goals, objectives and/or means to be undertaken to achieve a predetermined result.   A commitment to negotiate falls short of this definition.  The President's commitment to engage in negotiations that include developing nations does not set any particular goals or means, does not guide the actions of any actors with respect to greenhouse gas reduction, and imparts no information to guide future actions that may increase or decrease greenhouse gas production.  It is merely a statement of an intent to negotiate on the terms specified.

Rather, what Plaintiffs contend is United States "policy" is more accurately described as a strategy; that is, a means to achieve an acceptable policy but not the policy itself.  It is the agreements, or partnerships themselves that are the results of the Administration's negotiation that are or can be evidence of the President's exercise of foreign policy.  When the court looks for conflict or interference, the question necessarily arises as to the object of the interference.  In order to conflict or interfere with foreign policy withing the meaning of Zschernig, Garamendi or related cases, the interference must be with a policy, not simply with the means of negotiating a policy.  Thus, in order to prove conflict in the instant case, Plaintiffs must make a showing that California's efforts to implement regulations limiting the

51

1    emission of greenhouse gasses from automobiles will interfere with the efforts of this

2    government or a foreign government to reduce the intensity of their greenhouse gas emissions

3    pursuant to a negotiated agreement, treaty, partnership or the like.

4         When the court looks to the undisputed facts of this case to find "clear conflict"

5    between California's proposed AB 1493 Regulations and the foreign policy of the United

6    State Government, it finds none.

7         The Supreme Court's decision in Massachusetts impliedly recognized that EPA's

8    contention that it should not regulate greenhouse gas emission even if it is empowered to do

9    so is little more than a post-hoc rationalization for inaction.  Massachusetts, 127 S.Ct. at

10   1462-1463.  Plaintiffs' contention that unilateral efforts to regulate greenhouse gas emissions

11   might interfere with United States foreign policy is an apparent attempt to bootstrap EPA's

12   rationalization into a pronouncement of foreign policy.  When the court looks to the

13   additional exhibits that Plaintiffs have submitted to the court to demonstrate United States

14   foreign policy, there are two facts that are important to Plaintiffs' argument that are

15   conspicuous by their absence.  First, there is absolutely nothing in any of the exhibits

16   submitted to support the contention that it is United States foreign policy to limit its own

17   current efforts or the efforts of individual states in controlling greenhouse gas emissions in

18   order to leverage agreements with foreign countries.  Second, there is nothing in any of the

19   evidence submitted to indicate that with respect to the Administration's conduct of foreign

20   policy, the effort to reduce carbon dioxide from motor vehicle emissions is to be considered

21   separate for any purpose from other efforts to reduce these emissions.

22        While the court will accept as factual Plaintiffs' allegation that it is United States

23   foreign policy to secure commitments of other developing nations before committing itself to

24   international treaty obligations to reduce greenhouse gas emissions, the court finds that

25   Plaintiffs' contention that it is also United States foreign policy to hold in abeyance internal

26   efforts to reduce greenhouse gas emissions in order to leverage foreign cooperation is

27   completely without factual support.

28        Neither can the court make any presumptions in Plaintiffs' favor as a matter of logic.

1   There is absolutely no reason in logic for any presumption that the efforts of California or any

2   other state to reduce greenhouse gas emissions would interfere with efforts by the Executive

3   Branch to negotiate agreements with other nations to do the same.  Plaintiffs offer no

4   evidentiary basis for the proposition that the United State would get farther in its efforts to

5   negotiate agreements with other nations by withholding efforts to limit greenhouse gas

6   emissions than by leading the way by example.  In essence, Plaintiffs' "bargaining chip"

7   theory of interference only makes logical sense if it would be a rational negotiating strategy to

8   refuse to stop pouring poison into the well from which all must drink unless your bargaining

9   partner agrees to do likewise.  The court declines to make any presumptions to that effect.

10      The "bargaining chip" theory of interference also embraces an impermissibly broad

11  range of activities that fall within the traditional powers of states to regulate under their own

12  police powers for the health and welfare of their own citizens.  If states can be barred from

13  taking action to curb their greenhouse emissions, then the efforts of the various states to

14  encourage the use of compact florescent light bulbs, subsidize the installation of solar electric

15  generating panels, grant tax rebates for hybrid automobiles, fund renewable energy start-ups,

16  specify enhanced energy efficiency in building codes, or any other activity that results in

17  lower fuel or energy use would likewise constitute an interference with the President's

18  alleged "bargaining chip policy."

19      Based on all the evidence submitted by Plaintiffs and AIAM, the court finds no

20  indication of any "policy" by the President or Secretary of State to differentiate efforts to

21  decrease greenhouse gas emissions from automobiles from efforts to decrease greenhouse gas

22  emissions from any other source.  The court further finds absolutely no evidence of any

23  "policy" on the part of the Administration to restrain state-based activities to curb greenhouse

24  gas emission in order to leverage international cooperation.  The court concludes Plaintiffs'

25  foreign policy preemption claim must fail because the evidence submitted does not identify

26  any "policy" with which California's AB 1493 Regulations might conflict.

27      What Plaintiffs have shown is that it is United States policy to approach greenhouse

28  gas reduction on a global scale by negotiating and reaching agreements with all nations,

including developing nations. California's AB 1493 Regulations do not "conflict" with that policy within the meaning of Zschernig, Garamendi, or related cases. As previously noted, to find conflict between California's AB 1493 Regulations and United States foreign policy, there must be "evidence of clear conflict between the policies adopted by the two." Garamendi, 539 U.S. at 21. The conflict must be more than incidental. Id. at 19.

In Zschernig, Garamendi, and Crosby, conflict was found because the preempted state law was aimed directly at a foreign country, and because the state law was aimed directly at some aspect of that foreign country's conduct that was the subject of United States foreign policy activity. Here, that is not the case. The California's AB 1493 Regulations are aimed internally at the state's traditional role in the regulation of what may be sold in the state and at corporations, not nations, that manufacture items for the state's market. Further, the *effect* of the AB 1493 Regulations, to the extent any effect has been alleged, is not on foreign countries or their activities or directly on United States' policy with regard to any particular country.

To the extent United States has articulated a concrete policy with respect to its international approach to control of greenhouse gas emissions from the motor vehicle sector of the economy, that policy is articulated in the G8 Summit Report of 2007 which provides that the member states will ask their governments to:

> . . . foster a large number of possible measures and various instruments that can clearly reduce energy demand and $CO_2$ emissions in the transport sector, including, inter alia innovative engine concepts, alternative fuels, city planning measures, pubic transport, best possible inter-linkage transport methods, increase the share of alternative fuels and energy carriers (biofuels, hydrogen, LPG/CNG, hybrid, etc.) in total fuel consumption; fuel diversification, for example synthetic and cellulosic biofuels and $CO_2$-free hydrogen, particularly in combination with the fuel cell . . . .

Doc. # 648-4 at 23. There is no conflict apparent to this court between the United States policy to promote alternative fuels and innovative engine concepts, including hybrids, and California's AB 1493 Regulations. The AB 1493 Regulations are, in fact, supportive of the United States' policy because they provide market-based incentives for exactly the sorts of innovation envisioned by the G8 Summit Report. That is, they provide a state economy that

1  favors by statute such innovations as alternative fuels, hybrid motors, and other technological

2  approaches to greenhouse gas reduction recommended by the G8 report.

3        As previously stated, the court cannot accept as proven that it is United States policy

4  that efforts by states to reduce their greenhouse gas emissions should be prevented by

5  preemption because the United States seeks to withhold any action as a means of "speaking

6  with one voice" so as to leverage the cooperation of other nations.  Because this loss of the

7  ability to "speak with one voice" is the actual conflict that is claimed by Plaintiffs and

8  because it is not proven, Plaintiffs' claim of foreign policy preemption must fail for lack of

9  proof of a prima facie case.  Further, even if the court were to take Plaintiffs' allegation of

10  foreign policy interference as proven, Plaintiffs' claim of foreign policy preemption must fail

11  nonetheless because the kind of interference claimed is not "clear conflict" within the

12  meaning of Zschernig, Garamendi or any of their progeny.

13                                 **CONCLUSION**

14        Pursuant to the foregoing discussion, the court concludes that both EPA and

15  California, through the waiver process of section 209, are equally empowered through the

16  Clean Air Act to promulgate regulations that limit the emission of greenhouse gasses,

17  principally carbon dioxide, from motor vehicles.  The court further concludes that the

18  promulgation of such regulations does not interfere or conflict with NHTSA's duty to set

19  maximum feasible average milage standards under EPCA.  The court finds EPCA's

20  preemption of state laws that regulate vehicle fuel efficiency does not expressly preempt

21  California's effort to reduce greenhouse gas emissions through AB 1493.  Because Congress

22  intended there should be no conflict between EPA's duty to protect public health and welfare

23  and NHTSA's duty to set fuel efficiency standards through EPCA, the doctrine of conflict

24  preemption does not apply.  To the extent the enforcement of California's AB 1493

25  Regulations may be inconsistent with existing CAFE standards, EPCA provides that NHTSA

26  has authority to reformulate CAFE standards to harmonize with the AB 1493 Regulations if,

27  and when, such standards are granted waiver of preemption by EPA.

28        The court also concludes that Plaintiffs have failed to make a prima facie showing

1    that it is the foreign policy of the United States to hold state-based efforts to reduce

2    greenhouse gas emissions in abeyance in order to leverage agreements with foreign countries.

3    Plaintiffs have also failed to demonstrate that implementation of California's AB 1493

4    Regulations will conflict in any way with United States foreign policy.

5         The court expresses no disagreement with the <u>Green Mountain</u> court's conclusion that

6    California regulations that are granted waiver of preemption under section 209 of the Clean

7    Air Act become laws of the federal government not subject to preemption.  The court has

8    offered here an alternative analysis that avoids the issue of "federalization" in the hope of

9    adding a measure of clarity to the discussion.

10        As a final matter, the court notes that the parties have endeavored to keep the court

11   apprised of recent developments throughout the course of these proceedings.  The most

12   recent example of this is the submission on November 16, 2007, of the text of the Ninth

13   Circuit's opinion and order in <u>Center for Biological Diversity</u>, which was filed by the Ninth

14   Circuit on November 15, 2007, together with brief arguments and counter-arguments as to

15   the case's applicability to the court's present deliberations.  This court has incorporated the

16   decision in <u>Center for Biological Diversity</u> into the instant discussion to the extent it deems

17   appropriate.  To the extent that an argument could be raised that there is no conflict between

18   California's AB 1493 Regulations and EPCA because the Ninth Circuit's decision

19   invalidated NHTSA's most recent attempt to reformulate CAFE standards under EPCA, the

20   court declines to entertain that argument.

21                           **ORDERS**

22        Pursuant to the foregoing discussion, the court hereby ORDERS that:

23   1.    The stay previously imposed by this court pending the outcome of the decision of the

24         Supreme Court in <u>Massachusetts v. E.P.A.</u>, 127 S.Ct. 1438 (2007) is hereby LIFTED.

25   2.    The motion for summary judgment by Plaintiff-Intervenor AIAM (Doc. # 398) is

26         DENIED.

27   3.    The Defendant and Defendant-Intervenors' motion for summary adjudication of

28         Plaintiffs' EPCA preemption claim and United States foreign policy preemption claim

(Doc. # 427) is GRANTED.  Summary adjudication is hereby GRANTED in favor of Defendants as to Plaintiffs' claims for preemption under EPCA and for preemption under United States foreign policy.

4.   Defendants' cross-motion for summary judgment is denied as moot as to Plaintiffs' EPCA preemption claim.  Doc. # 517.

5.   The court declares that, should California's AB 1493 Regulations be granted waiver of preemption by EPA pursuant to section 209 of the Clean Air Act, enforcement of those regulations by California or by any other state adopting the AB 1493 Regulations pursuant to section 177 of the Clean Air Act shall not be prevented by the doctrine of conflict preemption or by express preemption under the terms of 48 U.S.C. § 32919.

6.   The court declares that, should California's AB 1493 Regulations be granted waiver of preemption by EPA pursuant to section 209 of the Clean Air Act, enforcement of those regulations by California or by any other state adopting the AB 1493 Regulations pursuant to section 177 of the Clean Air Act shall not be prevented by the doctrine of preemption by the foreign policy of the United States.

IT IS SO ORDERED.

**Dated:    December 11, 2007            /s/ Anthony W. Ishii**
UNITED STATES DISTRICT JUDGE